

CLOSED

**U.S. District Court**
**Eastern District of Virginia (Norfolk)**
**CIVIL DOCKET FOR CASE #: 2:07-cv-00612-RGD-TEM**
**Internal Use Only**

Kobayashi Ventures, LLC v. Papertech Inc.
Assigned to: District Judge Robert G. Doumar
Referred to: Magistrate Judge Tommy E. Miller
Cause: 28:1338 Patent Infringement

Date Filed: 12/27/2007
Date Terminated: 05/07/2008
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Kobayashi Ventures, LLC**

represented by **Alexia Kent Bourgerie**
Stein Sperling Bennett De Jong Driscoll &
Greenfeig PC
25 West Middle Ln
Rockville, MD 20850
**\*\*NA\*\***
(301) 340-2020
Fax: (301) 354-8132
Email: abourgerie@steinsperling.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*



**Jeffrey Martin Schwaber**
Stein Sperling Bennett De Jong Driscoll &
Greenfeig PC
25 West Middle Ln
Rockville, MD 20850
(301) 340-2020
Fax: (301) 354-8110
Email: jschwaber@steinsperling.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ivonne Corsino Lindley**
Stein Sperling Bennett De Jong Driscoll &
Greenfeig PC
25 West Middle Ln
Rockville, MD 20850
(301) 340-2020
*ATTORNEY TO BE NOTICED*

**Defendant**

**Papertech Inc.**

represented by **Dabney Jefferson Carr, IV**
Troutman Sanders LLP
1001 Haxall Point

PO Box 1122
Richmond, VA 23218
804-697-1238
Fax: 804-698-5119
Email: dabney.carr@troutmansanders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Lynn Hickson**
Snell & Wilmer LLP
600 Anton Blvd
Suite 1400
Costa Mesa, CA 92626
**NA**
(714) 427-7000
Fax: (714) 427-7799
Email: jhickson@swlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Roger Rick Tache**
Snell & Wilmer LLP
600 Anton Blvd
Suite 1400
Costa Mesa, CA 92626
**NA**
(714) 427-7000
Fax: (714) 427-7799
Email: rtache@swlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/27/2007 | 1 | COMPLAINT against Papertech Inc. ( Filing fee $350 receipt number 100-5670.), filed by Kobayashi Ventures, LLC. (Filed Subject to Defect -- No Financial Disclosure) (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Civil Cover Sheet # 10 Cover Letter# 11 Receipt)(vwar, ) (Entered: 12/31/2007) |
| 12/27/2007 | | Notice of Correction re 1 Complaint - The Complaint is defective as there was not a financial disclosure filed at the time the complaint was filed. Counsel has been notified that leave of court is needed to file the financial disclosure. (vwar, ) (Entered: 12/31/2007) |
| 12/27/2007 | 2 | MOTION for Alexia Kent Bourgerie to Appear Pro hac vice by Kobayashi Ventures, LLC, Receipt #100-5671, Fee: $50.00. (Attachments: # 1 Cover Letter# 2 Receipt)(vwar, ) (Entered: 12/31/2007) |
| 12/27/2007 | | (Court only) Abatement deadline for 4/25/2008. (vwar, ) (Entered: 12/31/2007) |
| 01/03/2008 | 3 | ORDER granting 2 Motion for Pro hac vice Appointed Alexia Kent Bourgerie for Kobayashi Ventures, LLC. Signed by Judge Robert G. Doumar and filed on 1/3/08. (vwar, ) |

|  |  | (Entered: 01/04/2008) |
|---|---|---|
| 01/08/2008 | 4 | MOTION for Leave to File *Financial Interest Disclosure Statement* by Kobayashi Ventures, LLC. (Attachments: # 1 Financial Interest Disclosure Statement# 2 Proposed Order)(Schwaber, Jeffrey) (Entered: 01/08/2008) |
| 01/08/2008 | 5 | Brief in Support to 4 MOTION for Leave to File *Financial Interest Disclosure Statement* filed by Kobayashi Ventures, LLC. (Schwaber, Jeffrey) (Entered: 01/08/2008) |
| 01/08/2008 | 9 | Financial Interest Disclosure Statement (Local Rule 7.1) by Kobayashi Ventures, LLC. (lwoo) (Entered: 01/29/2008) |
| 01/11/2008 | 6 | MOTION to Transfer Case by Kobayashi Ventures, LLC. (Attachments: # 1 Proposed Order)(Schwaber, Jeffrey) (Entered: 01/11/2008) |
| 01/11/2008 | 7 | Brief in Support to 6 MOTION to Transfer Case filed by Kobayashi Ventures, LLC. (Schwaber, Jeffrey) (Entered: 01/11/2008) |
| 01/14/2008 |  | (Court only) Suspense, response to motion to file financial disclosure form and motion to transfer case due by 1/25/2008. (jcow, ) (Entered: 01/14/2008) |
| 01/28/2008 |  | (Court only) ***Deadlines terminated. (jcow, ) (Entered: 01/28/2008) |
| 01/28/2008 |  | MOTIONS REFERRED: 6 MOTION to Transfer Case, 4 MOTION for Leave to File Financial Interest Disclosure Statement REFERRED to Judge Robert G. Doumar. (jcow, ) (Entered: 01/28/2008) |
| 01/29/2008 | 8 | ORDER granting 4 Motion for Leave to File financial interest disclosure statement, previously lodged financial statement is accepted for filing as of the date of the filing of the motion. Signed by Judge Robert G. Doumar and filed on 1/29/08. Copies mailed 1/29/08. (lwoo) (Entered: 01/29/2008) |
| 01/29/2008 | 10 | Summons with one copy issued as to Papertech Inc. and mailed to counsel. (Attachments: # 1 Magistrate's notice and Judge's instructions)(lwoo) (Entered: 01/29/2008) |
| 01/29/2008 |  | (Court only) Suspense to 2/28/2008 for service. (lwoo) (Entered: 01/29/2008) |
| 01/29/2008 | 11 | ORDER denying 6 Motion to Transfer Case. Signed by Judge Robert G. Doumar and filed on 1/29/08. Copies mailed 1/29/08. (lwoo) (Entered: 01/29/2008) |
| 02/26/2008 | 12 | NOTICE of Appearance by Dabney Jefferson Carr, IV on behalf of Papertech Inc. (Carr, Dabney) (Entered: 02/26/2008) |
| 02/26/2008 | 13 | Financial Interest Disclosure Statement (Local Rule 7.1) by Papertech Inc.. (Carr, Dabney) (Entered: 02/26/2008) |
| 02/28/2008 | 14 | MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer Venue* by Papertech Inc.. (Carr, Dabney) (Entered: 02/28/2008) |
| 02/28/2008 | 15 | Memorandum in Support re 14 MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer Venue* filed by Papertech Inc.. (Attachments: # 1 Exhibit Declaration of J. Rick Tache', # 2 Exhibit A to Tache' Declaration, # 3 Exhibit B to Tache' Declaration, # 4 Exhibit C to Tache' Declaration, # 5 Exhibit D to Tache' Declaration, # 6 Exhibit Declaration of Michael Heaven)(Carr, Dabney) (Entered: 02/28/2008) |
| 02/28/2008 | 16 | MOTION for Janet Lynn Hickson to appear Pro hac vice on behalf of Papertech Inc. (Attachments: # 1 Receipt)(lwoo) (Entered: 02/28/2008) |
| 02/28/2008 | 17 | MOTION for Joseph Roger Rick Tache to appear Pro hac vice on behalf of Papertech Inc. |

| | | (Attachments: # 1 Receipt)(lwoo) (Entered: 02/28/2008) |
|---|---|---|
| 02/28/2008 | | (Court only) ***Deadlines terminated as to service. (lwoo) (Entered: 02/28/2008) |
| 02/28/2008 | 18 | ORDER granting 16 Motion for Pro hac vice Appointed Janet Lynn Hickson for Papertech Inc. Signed by Judge Robert G. Doumar and filed on 2/28/08. Copies mailed 2/29/08. (lwoo) Modified on 2/29/2008 to correct filing date to 2/28/08 (lwoo). (Entered: 02/29/2008) |
| 02/28/2008 | 19 | ORDER granting 17 Motion for Pro hac vice Appointed Joseph Roger Rick Tache for Papertech Inc. Signed by Judge Robert G. Doumar and filed on 2/28/08. Copies mailed 2/29/08. (lwoo) (Entered: 02/29/2008) |
| 03/03/2008 | | (Court only) Suspense to 3/13/2008 response to motion to dismiss. (lwoo) (Entered: 03/03/2008) |
| 03/05/2008 | 20 | SUMMONS Returned Executed Papertech Inc. served on 2/5/2008. (lwoo) (Entered: 03/06/2008) |
| 03/10/2008 | 21 | CONSENT ORDER extending plaintiff's deadline to respond to Defendant's motion to dismiss to 3/13/08. Signed by Judge Robert G. Doumar and filed on 3/10/08. (lwoo) (Entered: 03/10/2008) |
| 03/13/2008 | 22 | Memorandum in Opposition re 14 MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer Venue* filed by Kobayashi Ventures, LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(Schwaber, Jeffrey) (Entered: 03/13/2008) |
| 03/14/2008 | | (Court only) Suspense to 3/21/2008 for reply to memorandum in opposition to #14. (lwoo) (Entered: 03/14/2008) |
| 03/21/2008 | 23 | REPLY to Response to Motion re 14 MOTION to Dismiss for Lack of Jurisdiction *or in the Alternative to Transfer Venue* filed by Papertech Inc.. (Attachments: # 1 Exhibit Declaration of Michael Heaven)(Carr, Dabney) (Entered: 03/21/2008) |
| 03/21/2008 | | (Court only) ***Deadlines terminated. (lwoo) (Entered: 03/21/2008) |
| 03/21/2008 | | MOTION REFERRED to Judge Robert G. Doumar. 14 MOTION to Dismiss for Lack of Jurisdiction or in the Alternative to Transfer Venue. (lwoo) (Entered: 03/21/2008) |
| 03/24/2008 | 24 | MOTION to Strike 23 Reply to Response to Motion *to Dismiss* by Kobayashi Ventures, LLC. (Schwaber, Jeffrey) (Entered: 03/24/2008) |
| 03/25/2008 | 25 | Memorandum in Opposition re 24 MOTION to Strike 23 Reply to Response to Motion *to Dismiss* filed by Papertech Inc.. (Carr, Dabney) (Entered: 03/25/2008) |
| 03/26/2008 | | Notice of Correction re 24 MOTION to Strike 23 Reply to Response to Motion to Dismiss. Memorandum in Support not filed with motion. (lwoo) (Entered: 03/26/2008) |
| 03/26/2008 | | (Court only) ***Deadlines terminated. (lwoo) (Entered: 03/26/2008) |
| 03/26/2008 | | (Court only) Suspense to 3/31/2008 reply to response to motion to strike. (lwoo) (Entered: 03/26/2008) |
| 03/26/2008 | 26 | MOTION to Amend/Correct 24 MOTION to Strike 23 Reply to Response to Motion *to Dismiss* by Kobayashi Ventures, LLC. (Schwaber, Jeffrey) (Entered: 03/26/2008) |
| 03/26/2008 | 27 | Brief in Support to 26 MOTION to Amend/Correct 24 MOTION to Strike 23 Reply to Response to Motion *to Dismiss* filed by Kobayashi Ventures, LLC. (Schwaber, Jeffrey) |

| | | |
|---|---|---|
| | | (Entered: 03/26/2008) |
| 03/27/2008 | | (Court only) Suspense #1 to 4/10/2008 for response to amended motion to strike #26. (lwoo) Modified on 3/27/2008 to show #1 (lwoo). (Entered: 03/27/2008) |
| 04/03/2008 | | (Court only) ***Deadlines terminated. (lwoo) (Entered: 04/03/2008) |
| 04/03/2008 | | MOTIONS REFERRED to Judge Robert G. Doumar. 24 MOTION to Strike (lwoo) (Entered: 04/03/2008) |
| 04/18/2008 | | MOTION REFERRED to Judge Robert G. Doumar. 26 MOTION to Amend/Correct 24 MOTION to Strike 23 Reply to Response to Motion to Dismiss (lwoo) (Entered: 04/18/2008) |
| 05/01/2008 | 28 | ORDER granting 26 Motion to Amend insofar as the Amended motion to strike removes the claim that Papertech's reply was untimely filed; denying 24 Motion to Strike (See order for specifics.) Signed by District Judge Robert G. Doumar and filed on 4/28/08. (lwoo) (Entered: 05/01/2008) |
| 05/07/2008 | 29 | ORDER granting 14 Motion to Transfer Venue to the USDC for the Southern District of New York, directing the Clerk to effectuate the transfer of this action. Signed by District Judge Robert G. Doumar on 5/7/08. Copies mailed 5/8/08. (lwoo) (Entered: 05/08/2008) |
| 05/07/2008 | | (Court only) ***Civil Case Terminated. (lwoo) (Entered: 05/09/2008) |

**A TRUE COPY, TESTE:**
**CLERK, U.S. DISTRICT COURT**

BY _____
**DEPUTY CLERK**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

KOBAYASHI VENTURES, LLC   :
12587 Fair Lakes Circle, Suite 308   :
Fairfax, VA  22033,   :
  :
     Plaintiff   :
  :
   v.   :   CA No. 2:07CV612
  :
  :
PAPERTECH INC.   :   JURY TRIAL DEMANDED
108 – 245 Fell Avenue   :
North Vancouver, B.C., Canada,   :   **COMPLAINT**
  :
   Serve: Kari K.  Hilden   :
  :
     Defendant.   :

## INTRODUCTION

    This is an action brought by Kobayashi Ventures, LLC ("Kobayashi Ventures") for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  Kobayashi Ventures exclusively owns, among other things, three U.S. patents and a variety of foreign patents that relate to the invention(s) of synchronizing cameras to the speed of a moving web.  Defendant Papertech Inc. ("Papertech") willfully and materially has infringed upon such patents belonging to Kobayashi Ventures ("Kobayashi's Patented Technology," detailed in ¶ 6 below).

    Kobayashi's Patented Technology has been pivotal in the web monitoring industry and its direct customers, the paper, plastics and printing industries—facilitating digital monitoring and capturing of events during the manufacturing process to increase production efficiencies. Kobayashi's Patented Technology has accomplished that which previously had not been

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

possible, enabling the production of higher quality product at great savings to manufacturers and ultimately to consumers. With conscious disregard for the patent laws of the United States of America and of Kobayashi's Patented Technology, Papertech has been violating U.S. patent laws and the legal rights of Kobayashi Ventures, among others. In this Complaint, Kobayashi Ventures seeks necessary injunctive relief and legal damages in its favor and against Papertech.

## PARTIES

1.    Kobayashi Ventures is a limited liability company organized and existing under the laws of the State of Delaware with an office located in the Commonwealth of Virginia. The business of Kobayashi Ventures is to manage, market, consult, develop, manufacture, create, own, distribute, purchase, sell and/or license patents and other intellectual property.

2.    Papertech is a corporation organized and existing under the laws of the Canada with its principal place of business in North Vancouver, B.C., Canada, and sales and service offices and operations in the United States of America. Papertech provides systems and equipment used in the production of paper and other products and touts itself as a market leader committed to the development of the paper industry's leading event capturing camera systems. These systems in fact incorporate and rely on Kobayashi's Patented Technology.

## JURISDICTION AND VENUE

3.    Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. § 281.

4.    This Court has personal jurisdiction over Papertech because Papertech conducts business in the Commonwealth of Virginia, has availed itself of the rights and benefits of Commonwealth law, and has engaged in substantial and continuing contacts with and within the Commonwealth.

5.    Venue is proper under 28 U.S.C. §1391 and 28 U.S.C. 1400(b).

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## FACTUAL ALLEGATIONS

6.     On or about December 10, 2007, by written assignment executed and delivered by Jacklin Associates, Inc. to Kobayashi Ventures, Kobayashi Ventures became, and now is, the owner, *inter alia*, of all right, title, and interest in and to such letters patent (previously and hereinafter referenced as "Kobayashi's Patented Technology"), having the exclusive right to make, use, sell, offer for sale, and import into the U.S. the following inventions:

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finnish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

Attached hereto as Exhibit 1 and incorporated herein by reference is the Patent Assignment.  Such Patent Assignment was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0844.

7.     On or about October 19, 2007, by written assignment executed and delivered by International Paper Company ("International Paper") to Jacklin Associates, Inc., Jacklin Associates became the owner, *inter alia*, of all right, title, and interest in and to such letters patent (identified in ¶ 6 above), then having the exclusive right to make, use, and sell Kobayashi's Patented Technology.  Attached hereto as Exhibit 2 and incorporated herein by reference is the Patent Purchase Agreement, Exhibit D of which is the Assignment of Patent

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

3

Rights. Such Assignment of Patent Rights was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0823.

8.    International Paper became the owner of all right, title, and interest in and to such letters patent (identified in ¶ 6 above) by virtue of assignment from each of the inventors to its predecessor company Champion International Corporation ("Champion"), which became International Paper through a merger. The inventors' assignment was executed March 2, 1995 and recorded in the Patent and Trademark Office on March 6, 1995 at Reel/Frame 007382/0557, and the merger document was executed December 31, 2000 and recorded in the Patent and Trademark Office on November 26, 2007 at Reel/Frame 020143/0440.

9.    On or about November 12, 1998, Papertech entered into a License Agreement with Champion, acquiring patent rights to what is now known as Kobayashi's Patented Technology. Attached hereto as <u>Exhibit 3</u> and incorporated herein by reference is the License Agreement.

10.    On July 31, 2000, Papertech made a five percent (5%) royalty payment under the above referenced License Agreement of $21,084.54, on $468,545.48 of sales, of which $274,362 were to the acquiring owner International Paper. Attached hereto as <u>Exhibit 4</u> and incorporated herein by reference is documentation of such payment.

11.    On August 23, 2000, Richard Stewart, Chief Counsel—Intellectual Property Department of International Paper (formerly of Champion) sent a letter to Papertech by its General Manager, Kari Hilden offering a "fully paid up license under the lump sum payment terms of the Honeywell-Measurex license" for the sum of $1.13 million. Attached hereto as <u>Exhibit 5</u> and incorporated herein by reference is this letter.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

12.     In a letter dated September 27, 2000, Papertech by its General Manager, Kari Hilden, allegedly sent a letter to Richard Piela of Champion, "Subject: Termination of the License Agreement between Champion International Corp. ("Champion") and PT Papertech Inc. ("Papertech")" which claimed termination effective thirty (30) days after receipt by International Paper "as per the agreement Article 16." Attached hereto as <u>Exhibit 6</u> and incorporated herein by reference is this letter.

13.     On August 23, 2004, Papertech by its General Manager E. Michael Heaven sent a letter to Richard Stewart, Chief Counsel—Intellectual Property Department International Paper. Papertech's letter was in response to a July 16, 2004 letter from International Paper demanding royalty payments under the License Agreement. In this letter, Papertech claimed, "That agreement was terminated several years ago . . ." Attached hereto as <u>Exhibit 7</u> and incorporated herein by reference is this letter.

14.     Section 16.5 of the License Agreement states in pertinent part, "in the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of CV2 System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which as not been held invalid in a final unappealable judgment of a court of competent jurisdiction." This section of the License Agreement makes it abundantly clear that Papertech proactively was given an effective actual notice of infringement by way of termination of the License Agreement, if it chose to continue to make, cause to be made, used, sold, and offered for sale products embodying the Kobayashi Patented Technology.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

15.    After termination of the License Agreement, Papertech continued and continues to this day to make, causes to be made, uses, sells, and offers for sale products embodying Kobayashi's Patented Technology.

16.    A number of times, including the above mentioned August of 2004 letter and thereafter on or about November 1, 2007, International Paper and Kobayashi Ventures, respectively, notified Papertech in writing of its failure to make royalty payments and thereby its infringement of Kobayashi's Patented Technology.

17.    Papertech has responded, including on November 6, 2007, stating in pertinent part that it had "no knowledge of a license agreement or any other agreement with Champion International Corporation including in particular, any agreement dated November 12, 1998."

18.    Most recently, on or about November 27, 2007, Kobayashi Ventures provided to Papertech additional written notice of its patent infringement. Attached hereto as <u>Exhibit 8</u> and incorporated herein by reference is the written notice of infringement.

19.    In summary, Papertech's actions include the following:

   o   1998: Entered into the License Agreement;

   o   1998 to License Agreement termination: Failed to pay all royalties due under the License Agreement;

   o   2000: Attempted to unilaterally terminate the License Agreement but failed to give proper notice;

   o   2000 to present: Willfully infringed upon Kobayashi's Patented Technology;

   o   2004: Ignored requests for payment to International Paper due under the License Agreement prior to termination;

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

o  2007:  Denied ever having been a party to the License Agreement;

o  2001 to present:  Evaded payment of an estimated $750,000 in royalties;

o  2001 to present:  Benefited to the detriment of the licensees who have paid nearly $2,250,000 in royalties from an unfair advantage in the marketplace by its willful infringement of Kobayashi's Patented Technology; and

o  2001 to present:  Through its willful infringement has gained market share to the detriment of its competitors, growing from less than ten percent (10%) to an estimated thirty percent (30%) of market sales.

20.    Through its actions such as those identified hereinabove, Papertech willfully has infringed upon Kobayashi's Patented Technology.

21.    Further, at all times relevant hereto, Papertech has been obligated, among other things, to mark on its products and integrated systems which use Kobayashi's Patented Technology the words, "U.S. Patent(s) [and the number(s) of the patent rights applicable thereto]" or such other patent marking as Papertech reasonably may have been directed from the then holder of Kobayashi's Patented Technology.  Upon information and belief Papertech consistently has failed to do so.

22.    Since about September 27, 2000, Papertech has, with full knowledge of the ownership by others identified above, of Kobayashi's Patented Technology, infringed upon

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Kobayashi's Patented Technology within the judicial district of this Court and elsewhere by engaging in conduct such as the following:

    (a)    making, causing to be made, using, selling, and offering for sale, without marking, license, permission and/or payment, products such as the following:

WebVision and WebVison Plus
WebInspector
PerfectVison

These products among others, marketed and sold by Papertech, embody Kobayashi's Patented Technology; and

    (b)    actively inducing and causing others (i) to induce manufacturers and owner operators of such products to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, without marking, license, permission, and/or payment, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

23.    Papertech will continue its acts of infringement unless enjoined by this Court. At the least, Papertech should be immediately barred from the continued use of technology it admittedly agreed to license under the License Agreement subsequently terminated.

24.    Since Papertech's "termination" in September of 2000, Papertech by its own admission has installed over 250 WebVision systems in twenty four (24) countries worldwide. It has utilized a network of over twenty-five (25) distributors, third-party representatives and licensees to further its misappropriation of Kobayashi's Patented Technology. Unknowingly, these middlemen and the end customers who have purchased the systems have become unwitting accomplices to Papertech's willful infringement as Papertech has induced these parties into

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

believing that Kobayashi's Patented Technology incorporated into the Webvision system has been appropriately licensed, paid for and marked.

25.     Absent entry of an injunction, the rights of the web monitoring industry and its direct customers, the paper, plastics and printing industries, likely will be irreparably harmed. Specifically, failure to provide to Kobayashi Ventures the equitable relief requested herein would allow Papertech to force its unfair advantage upon the marketplace as Papertech's competitors are under a royalty fee obligation.  If Papertech's infringement effectively were to be condoned by not granting to Kobayashi Ventures the equitable relief sought herein, then Papertech will continue to gain market share at the expense of its royalty paying competitors and use its infringement to further its unfair competitive advantage.  Such unfair competitive advantage would be harmful to the web monitoring industry as a whole, to the paper, plastics and printing industries, and to Kobayashi Ventures and the licensees of Kobayashi's Patented Technology.

26.     Remedies available at law are inadequate to compensate for an injury such as that described in herein.

27.     The balance of hardships between Kobayashi Ventures and Papertech, warrants granting to Kobayashi Ventures an equitable remedy.  Denying the legitimate royalty paying operators in the web monitoring industry and Kobayashi Ventures the equitable relief sought herein will cause Kobayashi Ventures to suffer additional immediate and real irreparable harm. This is due to the fact that for example there are multiple pending web monitoring projects up for competitive bid at this time.  A failure to grant the equitable relief sought herein would amount to a tacit consent allowing Papertech to win business at the expense of the other legitimate royalty paying bidders.  Papertech should not be purporting to legitimately bid on these contracts since it lacks a valid license to Kobayashi's Patented Technology.  Granting to Papertech not

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301 540-2020

only the ongoing ability to bid but also the ongoing ability to benefit from a significant pricing advantage as a direct result of its ill-gotten price disparity would be doubly damaging to the market. The resulting damage to the web monitoring industry and its customers would be impossible to reverse after the fact, given that the legitimate winning bid amount and bidder would be indeterminate and the well poisoned. In contrast, granting the limited equitable relief sought simply would place Papertech in the rightful position it chose to be in after September 27, 2000, had it legitimately terminated the License Agreement, paid all past due royalties and immediately ceased the use of Kobayashi's Patented Technology. But as we now know, Papertech instead chose to willfully and flagrantly take that which does not belong to it, and absent the relief sought, Papertech would continue to profit from its theft at the expense of the legitimate licensees and customers in the web monitoring industry.

28.    For reasons described hereinabove, the public interest would be well served by granting to Kobayashi Ventures the equitable relief sought herein. The very purpose of the United States Patent and Trademark Office as well as the statutory scheme governing intellectual property rights throughout the United States of America will be threatened if companies are permitted to misappropriate protected, patented and/or otherwise proprietary technology for themselves without cost or ramification. A denial of the equitable relief sought herein materially would also disserve the public interest in the manner described in ¶¶ 25 and 27 above.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

<div align="center">

COUNT I
Patent Infringement

</div>

29.     Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 1 through 28 above.

30.     Papertech has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, making, using, offering to sell, and/or selling Kobayashi's Patented Technology.

31.     Papertech's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

<div align="center">

COUNT II
Patent Infringement (Inducement)

</div>

32.     Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 1 through 28 above.

33.     Papertech has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, actively inducing and causing others (i) to induce manufacturers and owner operators of such products to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

34.     Papertech's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

<div align="center">

* * *

</div>

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

WHEREFORE, Plaintiff, Kobayashi Ventures, L.L.C. respectfully requests that this Honorable Court grant to it the following relief:

a. a preliminary injunction followed by a permanent injunction (i) enjoining Papertech from engaging in patent infringement as detailed in this Complaint, (ii) enjoining Papertech from inducing others to engage in patent infringement as detailed in this Complaint, and (iii) mandating that Papertech provide immediate written notice of the infringement to customers to whom Papertech has sold products and/or systems containing Kobayashi's Patented Technology;

b. an interim order mandating Papertech to escrow five (5%) percent of the net sales price of all products and systems it has at any time sold which use Kobayashi's Patented Technology, including pre-judgment interest calculated from the date of sale to present at the applicable prime interest rate(s);

c. an order requiring Papertech to account for and pay to Kobayashi Ventures damages for patent infringement, including interest on damages;

d. treble damages pursuant to 35 U.S.C. § 284;

e. an order granting to Kobayashi Ventures costs and reasonable attorneys' fees to be assessed against Papertech, particularly in view of ongoing, willful infringement; and

f. such other and further relief which the Court deems just and proper.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301 340-2020

STEIN, SPERLING, BENNETT, DE JONG,
DRISCOLL & GREENFEIG, P.C.


By:  *Jeffrey M. Schwaber /dcp*

Jeffrey M. Schwaber
(Federal Bar No. 35466)
25 West Middle Lane
Rockville, Maryland 20850
Telephone:  (301) 340-2020
Facsimile:  (301) 354-8110

Attorneys for Kobayashi Ventures, LLC

<u>DEMAND FOR JURY TRIAL</u>

Kobayashi Ventures, LLC elects a trial by jury of all issues and claims in this action.


*Jeffrey M. Schwaber /dcp*

Jeffrey M. Schwaber

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\146.complaint.12.27.07.final.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033.

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _10th_ day of _December_, 2007.

Jacklin Associates, Inc.

By: _John N Irwin_

On this _10_ day of _Dec_, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

_Nancy Vanning_
NOTARY PUBLIC

My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents ("Patent Materials").

PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means    prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term. Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.      Payments

2.1     Initial Payment. Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2     Ongoing Payments.

        (a)     During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment"). The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b). Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement. When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied. In the event that funds from Net Royalty Collections payable to Seller under the terms hereof are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations. In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

        (b)     During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

        As an example:

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

2.3     Statements and Payments. All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

      2.4    <u>Records</u>.    Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.      Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

      (i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

      (ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.      PARAGRAPH INTENTIONALLY DELETED

5.      Representations and Warranties of Seller

5.1    Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2    Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS". Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to. (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.    Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1    Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2    Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.    License

7.1    <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2    <u>No Other Rights</u>. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.    Miscellaneous

8.1    <u>Limitation of Liability</u>. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT.    THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2    <u>Limitation on Consequential Damages</u>. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.    THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3     Compliance With Laws.    Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4     Confidentiality.    For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure. Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5     Governing Law; Venue/Jurisdiction.    This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6     Notices.    All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services: FedEx, U.S.P.S., DHL or UPS.

|  |  |
|---|---|
| If to Purchaser | If to Seller |
| Jacklin Associates, Inc. | International Paper Company |
| Attention: President | Attention: Chief Counsel, Intellectual Property |
| 259 North Radnor Chester Road | 6285 Tri-Ridge Blvd. |
| Suite 210 | Loveland, OH 45140 |
| Wayne, Pennsylvania 19087 | |

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal. Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7     Severability.    If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8    <u>Waiver</u>. Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9    <u>Successors and Assigns</u>. Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit. Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect. All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    <u>Independent Contractors</u>. Seller and Purchaser are independent contractors. Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    <u>Payment of Maintenance Fees.</u> Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser. In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller. Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment. Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status. If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14 <u>Revocation of Sale of Assigned Patents and Assigned Agreements.</u> If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect. In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller. Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    <u>Miscellaneous</u>. This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                                              PURCHASER:

International Paper Company                          Jacklin Associates, Inc.

By:_____                          By:_____

Name:_____                          Name:_____

Title:_____                          Title:_____


Effective Date:  August _____, 2007

EXHIBIT A

<u>ASSIGNED AGREEMENTS</u>

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

<u>ASSIGNED PATENTS</u>

| <u>Patent or Application No.</u> | <u>Serial No.</u> | <u>Country</u> | <u>Filing Date</u> | <u>Title of Patent and First Named</u> Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

<u>DELIVERABLES</u>

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

## EXHIBIT D
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)     the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)     all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)     all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)     damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

MAR-19-1996  05:55                                                           P.02/02

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at *Loveland, OH* on
*10-19-2007*.

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____
Name: *NORMAN MARSOLAN*
Title: *DIRECTOR, R+D*
*(Signature MUST be notarized)*

STATE OF *OHIO*           )
                          } ss.
COUNTY OF *CLERMONT*      )

On *10-19-2007*, before me, *JANE A. Tomlinson*, Notary Public in and for
said State, personally appeared *NORMAN MARSOLAN*, personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to
me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument
the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)



**Jane A. Tomlinson**
**Notary Public, State of Ohio**
**My Commission Expires**
**June 19, 2012**

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 12th day November, 1998, among **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 and for and on behalf of itself and its successors and assigns (hereinafter referred to collectively and individually as "CHAMPION", or the "Party") and **PAPERTECH, INC.** a Canadian Corporation, having an office at Number 204-2609 Westview Drive, North Vancouver, B.C., Canada V7N 4M2 (hereinafter referred to as "LICENSEE" or the "Party").

### WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system described or claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1ˢᵗ) sale of CV² System in each country, within six (6) months prior to the date of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV² System less thirty percent (30%) of such most favorable price, which cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6    "Subsidiary" shall mean:

1.6.1   Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2   Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7    "CV² System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV² System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV² System.

1.8    "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9    "Commercial Sale" shall mean the CV² System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV² System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10   "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of CV² System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If a CV² System is sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for such CV² System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV² System.

H:\MCKNDH\FARREL\AGREEMENT\LICENSE\PAPERTECH_SECOND.DOC'                                      11/12/98

2

## ARTICLE II-LICENSE GRANT

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell CV² System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the CV² System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each CV² System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said CV² System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of CV² System for each of said CV² Installations.

3.2    During the term of this Agreement for each CV² System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the System of said CV² System Installation (e.g. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of CV² System for each of said CV² Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1 and 3.2 and do not require a royalty payment hereunder where the purchaser or transferee of the CV² System is not the manufacturer of product for commercial sale. Sales by LICENSEE to CHAMPION or a Subsidiary of CHAMPION under Article VIII also do not require a royalty payment hereunder.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    Within sixty (60) days of the termination of any Reporting Period, LICENSEE shall render to CHAMPION all royalty fees due and payable to CHAMPION on account of CV² Systems sold and accepted by the customer during such Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All

payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, value added taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority which LICENSEE shall be entitled to withhold and remit to such taxing authority.    LICENSEE shall deliver the original or to CHAMPION certified copies of receipts covering payment of any taxes to such taxing authority with the written report of paragraph 4.3 below.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based provided however, that acceptance shall be deemed if CHAMPION does not object to or question any account or statement within six (6) months of its receipt.

## ARTICLE V - RECORDS

5.1  LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder.  LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment. So as to avoid undue interference with LICENSEE's business, CHAMPION's rights of verification shall be exercised reasonably and in a manner that will not unduly interfere with LICENSEE's business and, in any event, not more than twice in any period of twelve (12) months.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the royalties due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize the CV$^2$ System.  LICENSEE shall promote and commercially exploit CV$^2$ System and satisfy the demand for said CV$^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems.  In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all confidential information disclosed to a party (the "receiving party") by or through the other party (the "disclosing party"), including any confidential information obtained by receiving party visually through an inspection of any sample, device, document or like tangible thing submitted to the receiving party by or through the disclosing party or by observation at facilities of the disclosing party or the disclosing party's Subsidiaries excluding, however, such information which:

7.1.1  Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by the receiving party, or its employees; or

7.1.2  Had been independently developed by the receiving party or was otherwise in the receiving party's lawful possession prior to disclosure, as shown by written records or other reasonable evidence; or

7.1.3  Is hereafter lawfully disclosed to the receiving party by a third party which did not acquire the information under an obligation of confidentiality from or through the disclosing party; or

7.1.4  Is disclosed by the receiving party pursuant to judicial action or governmental regulation or requirement; provided that the receiving party shall notify the disclosing party of any order or request to disclose Information in sufficient time to allow the disclosing party a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to the receiving party shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to the receiving party shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2    During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, the receiving party shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that the receiving party employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the disclosing party by an authorized officer. Notwithstanding the foregoing, the receiving party may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of the receiving party assisting the receiving party in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of the receiving party under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed the receiving party's

U/MCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                                          11/12/98

5

standard employment agreement which the receiving party warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3    The receiving party shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of the disclosing party by an authorized officer.

7.4    The receiving party agrees that all documentary, electronic or like tangible Confidential Information, in any form including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through the disclosing party and documentary, electronic or like tangible Confidential Information which is generated by or for the receiving party which embodies or is based upon Confidential Information are and shall remain the exclusion property of the disclosing party, and the receiving party shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or expiration  of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to the disclosing party.

### ARTICLE VIII - THE INSTALLATION OF CV$^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the CV$^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of CV$^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the CV$^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available CV$^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of CV$^2$ System in addition to the said ten (10) units of the CV$^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a CV$^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All CV$^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specifications, guarantees and warranties at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for CV$^2$ System as of the date of sale or license of CV$^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a CV² System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the CV² System, publications pertaining to the CV² System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE TO USE THE CV² SYSTEM AND PATENT RIGHTS ON THE TERMS OF THIS LICENSE. CHAMPION REPRESENTS AND WARRANTS THAT IT HAS THE LAWFUL RIGHT TO ENFORCE PATENT RIGHTS TO THE EXTENT PROVIDED BY THE LAWS OF THE RELEVANT JURISDICTION TO PREVENT THE USE OF THE CV² SYSTEM BY PARTIES NOT AUTHORIZED BY CHAMPION TO USE IT.  EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING  SENTENCE  THERE  ARE  NO  WARRANTIES  OR  REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO CV² SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.i.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR (I) ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, OR FOR (II) ANY PATENT INFRINGEMENT OR OTHER DISPUTES BETWEEN CHAMPION OR ITS SUBSIDIARIES AND THIRD PARTIES BASED UPON THE ACTIONS OF CHAMPION OR IT'S SUBSIDIARIES, OR FOR (III) ANY ACTS, NEGLIGENCE OR OMISSIONS OF CHAMPION OR ITS SUBSIDIARIES.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of

LICENSEE, and  CHAMPION shall not be responsible for any such activities.  LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of CV² System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction. Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

U:\PCTECH\FARRELL\AGREEMENT\LICENSE\PAPERTECH_SECOND.DOC                                11/12/98

10

## ARTICLE XXI - COMMUNICATIONS

21.1   It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:          For Business Matters:
                         Champion International Corporation
                         1 CHAMPION Plaza
                         Stamford, CT 06921

                               ATTN:     Richard Piela
                                         Director, Capital Project
                                         Support and MRO

                         For Legal Matters:
                         Champion International Corporation
                         1 Champion Plaza
                         Stamford, CT 06921

                               ATTN:     Richard C. Stewart, II
                                         Chief Patent Counsel

If to LICENSEE:

                         For Business Matters:
                         Patertech, Inc.
                         #204-2609 Westview Drive
                         North Vancouver, B.C.
                         Canada V7N 4M2

                               ATTN: Kari K. Hilden
                                     General Manager

Payments shall be made to the address indicated hereinabove for notices relating to business matters.   The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited.   The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

## ARTICLE XXII - ASSIGNABILITY

22.1   LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this

agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _____

Name: _____

Title: _____

PAPERTECH, INC.

By: _____

Name: KARY HILDEN

Title: PRESIDENT

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) Divisional of US Patent Application No. 08/829,231

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 12th day November, 1998, among **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 and for and on behalf of itself and its successors and assigns (hereinafter referred to collectively and individually as "CHAMPION", or the "Party") and **PAPERTECH, INC.** a Canadian Corporation, having an office at Number 204-2609 Westview Drive, North Vancouver, B.C., Canada V7N 4M2 (hereinafter referred to as "LICENSEE" or the "Party").

### WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system described or claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5  "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of CV$^2$ System in each country, within six (6) months prior to the date of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV$^2$ System less thirty percent (30%) of such most favorable price, which cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6  "Subsidiary" shall mean:

　　1.6.1  Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

　　1.6.2  Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7  "CV$^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV$^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV$^2$ System.

1.8  "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9  "Commercial Sale" shall mean the CV$^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV$^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10  "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of CV$^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If a CV$^2$ System is sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for such CV$^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV$^2$ System.

## ARTICLE II-LICENSE GRANT

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell CV² System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the CV² System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each CV² System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said CV² System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of CV² System for each of said CV² Installations.

3.2    During the term of this Agreement for each CV² System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the System of said CV² System Installation (e.g. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of CV² System for each of said CV² Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1 and 3.2 and do not require a royalty payment hereunder where the purchaser or transferee of the CV² System is not the manufacturer of product for commercial sale. Sales by LICENSEE to CHAMPION or a Subsidiary of CHAMPION under Article VIII also do not require a royalty payment hereunder.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    Within sixty (60) days of the termination of any Reporting Period, LICENSEE shall render to CHAMPION all royalty fees due and payable to CHAMPION on account of CV² Systems sold and accepted by the customer during such Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All

payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, value added taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority which LICENSEE shall be entitled to withhold and remit to such taxing authority.  LICENSEE shall deliver the original or to CHAMPION certified copies of receipts covering payment of any taxes to such taxing authority with the written report of paragraph 4.3 below.

4.3     Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based provided however, that acceptance shall be deemed if CHAMPION does not object to or question any account or statement within six (6) months of its receipt.

## ARTICLE V - RECORDS

5.1  LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder.  LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment. So as to avoid undue interference with LICENSEE's business, CHAMPION's rights of verification shall be exercised reasonably and in a manner that will not unduly interfere with LICENSEE's business and, in any event, not more than twice in any period of twelve (12) months.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1     It is understood by the parties hereto that the royalties due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize the $CV^2$ System.  LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems.  In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all confidential information disclosed to a party (the "receiving party") by or through the other party (the "disclosing party"), including any confidential information obtained by receiving party visually through an inspection of any sample, device, document or like tangible thing submitted to the receiving party by or through the disclosing party or by observation at facilities of the disclosing party or the disclosing party's Subsidiaries excluding, however, such information which:

7.1.1    Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by the receiving party, or its employees; or

7.1.2    Had been independently developed by the receiving party or was otherwise in the receiving party's lawful possession prior to disclosure, as shown by written records or other reasonable evidence; or

7.1.3    Is hereafter lawfully disclosed to the receiving party by a third party which did not acquire the information under an obligation of confidentiality from or through the disclosing party; or

7.1.4    Is disclosed by the receiving party pursuant to judicial action or governmental regulation or requirement; provided that the receiving party shall notify the disclosing party of any order or request to disclose Information in sufficient time to allow the disclosing party a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to the receiving party shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to the receiving party shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2    During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, the receiving party shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that the receiving party employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the disclosing party by an authorized officer. Notwithstanding the foregoing, the receiving party may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of the receiving party assisting the receiving party in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of the receiving party under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed the receiving party's

standard employment agreement which the receiving party warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3    The receiving party shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of the disclosing party by an authorized officer.

7.4    The receiving party agrees that all documentary, electronic or like tangible Confidential Information, in any form including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through the disclosing party and documentary, electronic or like tangible Confidential Information which is generated by or for the receiving party which embodies or is based upon Confidential Information are and shall remain the exclusion property of the disclosing party, and the receiving party shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or expiration  of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to the disclosing party.

## ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specifications, guarantees and warranties at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a CV² System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the CV² System, publications pertaining to the CV² System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE TO USE THE CV² SYSTEM AND PATENT RIGHTS ON THE TERMS OF THIS LICENSE. CHAMPION REPRESENTS AND WARRANTS THAT IT HAS THE LAWFUL RIGHT TO ENFORCE PATENT RIGHTS TO THE EXTENT PROVIDED BY THE LAWS OF THE RELEVANT JURISDICTION TO PREVENT THE USE OF THE CV² SYSTEM BY PARTIES NOT AUTHORIZED BY CHAMPION TO USE IT. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO CV² SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

U/HCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                                11/12/98

7

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR (I) ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, OR FOR (II) ANY PATENT INFRINGEMENT OR OTHER DISPUTES BETWEEN CHAMPION OR ITS SUBSIDIARIES AND THIRD PARTIES BASED UPON THE ACTIONS OF CHAMPION OR IT'S SUBSIDIARIES, OR FOR (III) ANY ACTS, NEGLIGENCE OR OMISSIONS OF CHAMPION OR ITS SUBSIDIARIES.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of

LICENSEE, and  CHAMPION shall not be responsible for any such activities.  LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims  and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5   In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6   If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7   Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

## ARTICLE XVII - SEVERABILITY

17.1   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1   This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction. Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1   The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1   Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1   It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:          For Business Matters:
                         Champion International Corporation
                         1 CHAMPION Plaza
                         Stamford, CT 06921

                              ATTN:      Richard Piela
                                         Director, Capital Project
                                         Support and MRO

                         For Legal Matters:
                         Champion International Corporation
                         1 Champion Plaza
                         Stamford, CT 06921

                              ATTN:      Richard C. Stewart, II
                                         Chief Patent Counsel

If to LICENSEE:

                         For Business Matters:
                         Patertech, Inc.
                         #204-2609 Westview Drive
                         North Vancouver, B.C.
                         Canada V7N 4M2

                              ATTN: Kari K. Hilden
                                    General Manager

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

## ARTICLE XXII - ASSIGNABILITY

22.1   LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this

agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2   CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3   Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1   This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1   This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _____

Name: _____

Title: _____

PAPERTECH, INC.

By: _____

Name: KARL HILDEN

Title: PRESIDENT

## SCHEDULE A

### PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) Divisional of US Patent Application No. 08/829,231

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

# INTERNATIONAL  PAPER

**INTERNAL MEMORANDUM**

## STAMFORD OFFICE
## LEGAL DEPARTMENT

**PHONE (203) 358-7681**                                    **FAX (203) 358-2941**

TO : Christa Ryan                              DATE : August 16, 2000
FROM : Elaine Wilson,                          CC :
         Sr. Administrative Assistant
SUBJECT : Royalty Payment

Enclosed please find a check in the amount of $21,084.54, representing a royalty payment from Papertech for the $CV^2$ patent license. Please deposit same into our account number 1002-0000-80184.

— Elaine



**papertech**

Papertech Inc., #301 - 2609 Westview Drive, North Vancouver, B.C. Canada V7N 4M2
Telephone: (604) 990-1600, FAX (604) 990-1605

THE ROYAL BANK OF CANADA
North Shore Region Business Banking Centre
1789 Lonsdale Avenue
North Vancouver, B.C. V7M 2J6

331

U.S. DOLLAR AMOUNT   CHEQUE NO.   3310

PAY
TO THE
ORDER OF

Twenty One Thousand Eighty Four ————————————————————————54/100
Amount in United States Dollar

DATE 7/31/00      US$***AMOUNT 21,084.54 USD

Champion International Corp.
One Champion Plaza
Stamford, Connecticut U.S.A. 06921

U.S. FUNDS

PER _____

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

⑈003310⑈ ⑆04000⑈003⑆ 400⑈149⑈1⑈

PAPERTECH INC.

Champion International Corp.          7/31/00                    CHEQUE NO.
                                                                 3310              3310

Royalties2...................................21,084.54

See attached Calculation Sheet.



Date: July 31, 2000

Champion International Corp. (IP)
One Champion Plaza
Stamford, Connecticut U.S.A.
06921

**RECEIVED**

AUG 14 2000

**PATENT DEPT.**

**Attention: Rich Stewart**

---

**Subject:    Champion (IP) – Royalty Payment #2**

---

**IP – Ticonderoga**
$69,525.00 x 5% = $3,476.25 less 10% Tax withholding =        $ 3,128.62

**Pacifica Papers – Pt. Alberni**
$93,038.84 x 5% = $4,651.94 less 10% Tax withholding =        $ 4,186.75

**IP – Riegelwood**
$150,000 x 5% = $7,500.00 less 10% Tax withholding =        $ 6,750.00

**IP – Lockhaven**
$54,837.00 x 5% = $2,741.85 less 10% Tax withholding =        $ 2,467.66

**Smurfit-Stone – NB**
$47,811.64 x 5% = $2,390.58 less 10% Tax withholding =        $ 2,151.52

**Westvaco, Wickliffe, KY**
$53,333.00 x 5% = $2,666.65 less 10% Tax withholding =        $ 2,399.99

|  |  |
|---|---|
| **Total Payment** | $21,084.54 |
| Cheque #3310 | |
| Dated July 31/00 | |

**Sincerely,**

*Darlene Hildén,*
*Director of Finance & Administration*
**Papertech Inc.**

---

Papertech Inc., #301 – 2609 Westview Dr., North Vancouver, B.C. Canada, V7N 4M2, phone: 604/990-1600, fax 604/990-1606
E-mail: info@papertek.com – Website: http://www.papertek.com



# INTERNATIONAL PAPER

RICHARD C. STEWART, II
CHIEF COUNSEL - INTELLECTUAL PROPERTY
PHONE      (845) 577-7312
FACSIMILE  (845) 577-7403

1422 LONG MEADOW ROAD
TUXEDO, NY 10987
E-MAIL STEWART@CHAMPINT.COM

August 23, 2000

**VIA DHL**
Kari K. Hilden, General Manager
Papertech, Inc.
204 - 2609 Westview Drive
North Vancouver, BC V7N 4M2
CANADA

Re:    Papertech, Inc. License Agreement/CV$^2$ Process Monitoring System

Dear Mr. Hilden:

Article 12.1 of the License Agreement between Champion International Corporation ("Champion") and Papertech, Inc. ("Papertech") states that:

> "If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms."

Champion has granted a fully paid up license to Honeywell-Measurex. In consideration Honeywell-Measurex paid to Champion a lump sum payment of $1.13 million.

It is not clear to me that the lump sum payment terms of the Honeywell-Measurex license are more favorable to the licensee than the running royalty terms of the Papertech license. However, if that is Papertech's position and if Papertech desires a fully paid up license under the lump sum payment terms of the Honeywell-Measurex license, please so indicate as specified in the license and I will raise the issue with my management for consideration.

Very truly yours,

*Richard C. Stewart, II /ew*

Richard C. Stewart, II
Chief Counsel - Intellectual Property Dept.

RCS/ew
g:\legal\wilsde\letters\hilden.ltr


*Champion International Corp. (International Paper Co.)*
1 CHAMPION Plaza
Stamford, CT
06921  USA

**Attention: Mr. Richard Piela**, Director, Capital Project, Support and MRO

**Subject:** **Termination of the License Agreement between Champion International Corp. ("Champion") and PT Papertech Inc. ("Papertech")**

*Dear Mr. Piela,*

This is to officially advise you that we wish to terminate our subject agreement, dated November 12th, 1998 with Champion International Corp. as per the agreement Article 16. As stated in Clause 16.3 this termination will go in effect 30 days following your receipt of this notice.

We believe you are in breach of the agreement. We have not received satisfactory responses to our many issues that govern the agreement including how our agreement compares with your other licensees. You have not met the obligations of your agreement and left us no choice but to terminate it.

It is unfortunate that we have come to this decision, but hope you understand our reasons for doing this.

**Sincerely,**

**Kari Hilden** (Mr.)
**General Manager**
**Papertech Inc.**



August 23, 2004

International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, Ohio
45140-8318

Attention: Richard C. Stewart II

Dear Sir:

**License Agreement dated November 12, 1998 between Champion International and Papertech (the "License Agreement")**

We acknowledge receipt of your letter to Mr. Kari Hilden dated July 16, 2004 which was sent to our old address and forwarded to us last week.

We were confused and surprised by your request for royalty payments and reports under the License Agreement. That agreement was terminated several years ago and that will explain why we have not provided and you have not requested payments or reports for the past several years.

Please check your records. Thank you.

Yours truly,

E. Michael Heaven
General Manager

F

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

**ATTORNEYS AT LAW**
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN•
MILLARD S. BENNETT•
ALEXIA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN□
DAVID C. DRISCOLL, JR.•
STUART S. GREENFEIG•
ANN G. JAKABCIN•
JEFFREY M. SCHWABER▪
DARCY A. SHOOP▪
DONALD N. SPERLING◊
PAUL T. STEIN•

MD., DC., VA., FL.◊
MD., DC., VA., NY.▫
MD., DC., PA., NJ.□
MD., DC., VA.•
MD., DC., NY.▫
MD., VA., NC.▪
MD., DC.·
MD. ONLY•

RONALD M. BOLT•
E. ANDREW COLE•
JAMES W. DAWSON, JR.•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III▫
JEFFREY FENSTER•
ROBERT J. GARAGIOLA•
MELIHA PÉREZ HALPERN•
MONICA G. HARMS•
JONATHAN F. LIEBERMAN•
IVONNE C. LINDLEY•
MARY CRAINE LOMBARDO□
DARLA J. McCLURE•
DIEGO J. ROJAS•
DAVID A. ROSEN•
KAREN N. SHAPIRO•

OF COUNSEL:
KEVIN P. FAY•
BETH McINTOSH IRVING•
ALAN S. KERXTON•
SUE ANN MAHAFFEY•
DEANNA L. PETERS•
DAVID R. PODOLSKY•
WILLIAM J. SCOTT•

OUR FILE NUMBER
2071656-1

November 27, 2007

_**VIA EMAIL & FEDERAL EXPRESS**_
Lang Michener LLP
1500-1055 West Georgia Street
P.O. Box 11117
Vancouver, B.C., Canada
V6E 4N7

Attn:   Karl E. Gustafson, Q.C.

RE: _Kobayashi Ventures, LLC/Papertech, Inc._

Dear Mr. Gustafson:

I am in receipt of your November 21, 2007 letter on behalf of Papertech. Papertech has taken the position -- now through you -- that the November 12, 1998 License Agreement with Champion International Corp. has been terminated. As I am confident you are aware, Papertech continues to use the previously licensed technology, although now without a license to do so. Apparently it has done so since Papertech purported to terminate its license in October, 2000.

Notice is hereby given that Papertech shall immediately cease and desist from the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717,456

U.S. Patent No. 5,821,990

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

Lang Michener
November 27, 2007
Page 2

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

Of course, Papertech remains liable for damages associated with its use of the assigned Technology until now, which is something we can address separately. Of primary importance at this juncture is receipt of written confirmation from you that Papertech not only has ceased its use of the formerly licensed Technology, but has also notified any and all of its customers that this technology is no longer licensed for use and must not be used for any purpose whatsoever. Please provide this confirmation in writing within seven (7) days of the date of this letter.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
cc:   Kobayashi Ventures, LLC
L:\CLIENTS\K\Kobayashi Ventures.LLC\Recovery of Royalties.001\Papertech\54-2 gustafson ltr.doc

§JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

Kobayashi Ventures, LLC

## DEFENDANTS

Papertech, Inc.

(b)  County of Residence of First Listed Plaintiff   Fairfax
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Stein Sperling, et al  (301-340-2020)
25 W. Middle Lane, Rockville, MD  20850

Attorneys (If Known)  Lang Michener LLP
1500-1055 West Georgia Street, P.O. Box 11117
Vancouver, British Colombia, Canada V6E 4N7

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title 35

Brief description of cause:
patent infringement

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
to be determined

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY

N/A

(See instructions):

JUDGE

DOCKET NUMBER

DATE
December 27, 2007

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #                AMOUNT                APPLYING IFP                JUDGE

RECEIVED
MAG JUDGE  DEC 2 8 2007

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.    Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**        Example:        U.S. Civil Statute: 47 USC 553
                                                 Brief Description: Unauthorized reception of cable service

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS 44 is used to reference related pending or closed cases if any. If there are related pending or closed cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

**ATTORNEYS AT LAW**
**25 WEST MIDDLE LANE**
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

———

TELEPHONE (301) 340-2020

———

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN•
MILLARD S. BENNETT•
ALEXIA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN•
DAVID C. DRISCOLL, JR.•
STUART S. GREENFEIG•
MONICA G. HARMS•
ANN G. JAKABCIN•
DARLA J. MCCLURE•
JEFFREY M. SCHWABER•
KAREN N. SHAPIRO•
DARCY A. SHOOP•
DONALD N. SPERLING•
PAUL T. STEIN•

RONALD M. BOLT•
E. ANDREW COLE•
J. MICHAEL COLLITON•
JAMES W. DAWSON, JR.•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III•
JEFFREY FENSTER•
ROBERT J. GARAGIOLA•
MELIHA PEREZ HALPERN•
JONATHAN F. LIEBERMAN•
IVONNE C. LINDLEY•
MARY CRAINE LOMBARDO•
ASAF NAGLER•
DIEGO J. ROJAS•

MD., DC., VA., FL.•
MD., DC., VA., NY.•
MD., DC., PA., NJ.•
MD., DC., VA.•
MD., DC., NY.•
MD., VA., NC.•
MD., DC.•
MD. ONLY•

OF COUNSEL:
KEVIN P. FAY•
BETH McINTOSH IRVING•
ALAN S. KERXTON•
DEANNA L. PETERS•
DAVID R. PODOLSKY•
WILLIAM J. SCOTT•

December 27, 2007

RECEIVED
DEC 28 2007
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

OUR FILE NUMBER
2071656-7

**HAND DELIVERED**
US District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314

RE:     *Kobayashi Ventures LLC v Papertech Inc.*

Dear Clerk:

Please find enclosed for filing an original Complaint for filing in the above matter. Along with the original Complaint, please find the following items:

1.  Civil Cover Sheet;
2.  Check in the amount of $350.00 for the filing fee;
3.  Summons (x3) for the Defendant;
4.  Complaint (with Jury Demand) and supporting exhibits;
5.  Additional copy of the Complaint for the Defendant (**to be served via private process**); and
6.  An additional second copy of the Complaint to be date-stamped and returned to the undersigned via courier.

Thank you for your attention to this matter and please do not hesitate to contact my office with any questions.

Very truly yours,



Jeffrey M. Schwaber

JMS:clg
Enclosures
L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\10 letter to clerk.1.doc

```
Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 100003670
Cashier ID: rbroaden
Transaction Date: 12/27/2007
Payer Name: STEIN
-----------------------------------------
CIVIL FILING FEE
  For: STEIN
  Amount:          $350.00
-----------------------------------------
CHECK
  Remitter: STEIN
  Check/Money Order Num: 77592
  Amt Tendered: $350.00
-----------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

FILING FEE NEW SUIT
207CV612
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**FILED**

DEC 2 7 2007

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
2:07CV612 CRIMINAL RULE 57.4

In Case Number ___PENDING___, Case Name KOBAYASHI VENTURES LLC v PAPERTECH INC

Party Represented by Applicant: ___PLAINTIFF: KOBAYASHI VENTURES LLC___

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

PERSONAL STATEMENT

FULL NAME (no initials, please)   ALEXIA KENT BOURGERIE

Bar Identification Number   14443        State MARYLAND

Firm Name   STEIN SPERLING BENNETT DE JONG DRISCOLL & GREENFEIG, P.C.

Firm Phone # 301-340-2020        Direct Dial # 301-838-3232        FAX # 301-354-8132

E-Mail Address  abourgerie@steinsperling.com

Office Mailing Address 25 West Middle Lane, Rockville, Maryland 20850

Name(s) of federal court(s) in which I have been admitted  Maryland and District of Columbia

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am ____ am not __X__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

_____
(Applicant's Signature)

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

_____        12/26/07
(Signature)                                                    (Date)

Yvonne Corsino Lindley (65785 - VA Bar No.)
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid ___√___  or Exemption Granted _____

The motion for admission is GRANTED _____  or DENIED _____

_____        _____
(Judge's Signature)                                (Date)

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

**ATTORNEYS AT LAW**
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

———

TELEPHONE (301) 340-2020

———

WRITER'S DIRECT DIAL:
(301) 838-3269

WRITER'S DIRECT FAX:
(301) 354-8169

WRITER'S E-MAIL ADDRESS:
cgrube@steinsperling.com

FRED A. BALKIN‹
MILLARD S. BENNETT•
ALEXIA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN»
DAVID C. DRISCOLL, JR.•
STUART S. GREENFEIG•
MONICA G. HARMS•
ANN G. JAKABCIN•
DARLA J. MCCLURE•
JEFFREY M. SCHWABER»
KAREN N. SHAPIRO•
DARCY A. SHOOP•
DONALD N. SPERLING•
PAUL T. STEIN•

MD., DC., VA., FL.•
MD., DC., VA., NY.»
MD., DC., PA., NJ.n
MD., DC., VA.•
MD., DC., NY.x
MD., VA., NC.*
MD., DC.•
MD. ONLY°

RONALD M. BOLT•
E. ANDREW COLE•
J. MICHAEL COLLITON•
JAMES W. DAWSON, JR.•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III«
JEFFREY FENSTER•
ROBERT J. GARAGIOLA•
MELIHA PÉREZ HALPERN»
JONATHAN F. LIEBERMAN•
IVONNE C. LINDLEY•
MARY CRAINE LOMBARDOn
ASAF NAGLER•
DIEGO J. ROJAS•

OF COUNSEL:
KEVIN P. FAY•
BETH McINTOSH IRVING•
ALAN S. KERXTON•
DEANNA L. PETERS•
DAVID R. PODOLSKY•
WILLIAM J. SCOTT°

OUR FILE NUMBER

2071656-7

December 27, 2007

**HAND DELIVERED**
US District Court for the
Eastern District of Virginia
401 Courthouse Square
Alexandria, VA 22314

RE:    *Kobayashi Ventures LLC v Papertech Inc.*

Dear Clerk:

Please find enclosed for filing an original and one copy of an Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1(D) and Local Criminal Rule 57.4 to be filed on behalf of Alexia Kent Bourgerie. Also enclosed is the $50.00 filing fee.

Should you have any questions, or need additional information, please do not hesitate to contact me.

Very truly yours,

Chris Grube

Enclosures
L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\10 letter to clerk.2.doc

```
Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 1
Receipt Number: 104605671
Cashier ID: rbroaden
Transaction Date: 12/27/2007
Payer Name: ALEXIA BOURGERIE
----------------------------------------
PRO HAC VICE
 For: ALEXIA BOURGERIE
 Case/Party: D-VAE-1-08-CR-PROHAC-001
 Amount:       $50.00
----------------------------------------
CHECK
 Remitter: STEIN
 Check/Money Order Num: 77645
 Amt Tendered: $50.00
----------------------------------------
Total Due:    $50.00
Total Tendered: $50.00
Change Amt:    $0.00

PRO HAC VICE

267CV612
ALEXIA BOURGERIE
```

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

FILED

DEC 2 7 2007

CLERK U.S. DISTRICT COURT
NORFOLK, VA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL CRIMINAL RULE 57.4

2:07cv612

In Case Number ___PENDING___ , Case Name KOBAYASHI VENTURES LLC v PAPERTECH INC

Party Represented by Applicant: ___PLAINTIFF: KOBAYASHI VENTURES LLC___

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

PERSONAL STATEMENT

FULL NAME (no initials, please) ___ALEXIA KENT BOURGERIE___
Bar Identification Number ___14443___    State ___MARYLAND___
Firm Name ___STEIN SPERLING BENNETT DE JONG DRISCOLL & GREENFEIG, P.C.___
Firm Phone # 301-340-2020 ___ Direct Dial # 301-838-3232 ___ FAX # 301-354-8132
E-Mail Address abourgerie@steinsperling.com
Office Mailing Address 25 West Middle Lane, Rockville, Maryland 20850

Name(s) of federal court(s) in which I have been admitted ___Maryland and District of Columbia___

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am ____ am not __X__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

_____
(Applicant's Signature)

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

_____    12/26/07
(Signature)                                            (Date)

Yvonne Corsino Lindley (65785 - VA Bar No.)
(Typed or Printed Name)

| Court Use Only: | |
|---|---|
| Clerk's Fee Paid __✓__ or Exemption Granted _____ | JAN - 3 |
| The motion for admission is GRANTED __✓__ or DENIED _____ | /s/ |

Robert G. Doumar
Senior United States District Judge

_____
(Judge's Signature)                (Date)

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KOBAYASHI VENTURES, LLC,      :
                                :

        Plaintiff             :

                                :

      v.                     :       Case No. 2:07-cv-00612-RGD-TEM

                                :

PAPERTECH INC.,              :

                                :

        Defendant.         :

## PLAINTIFF'S MOTION FOR LEAVE TO FILE
## FINANCIAL INTEREST DISCLOSURE STATEMENT

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., pursuant to Fed. R. Civ. P. 7 and Local Rule 7, moves for leave to file its Financial Interest Disclosure Statement pursuant to Fed. R. Civ. P. 7.1 and Local Rule 7.1.

As set forth in the accompanying Brief which is incorporated herein, on Thursday, December 27, 2007, Plaintiff filed its Complaint in this case. In so doing, Plaintiff inadvertently did not simultaneously file its Financial Interest Disclosure Statement and therefore seeks leave to file same. Attached hereto is Plaintiff's Financial Interest Disclosure Statement which it hereby lodges with the Court.

WHEREFORE, in consideration of the grounds stated in the accompanying Brief and the record herein, Plaintiff respectfully requests that this Honorable Court grant "Plaintiff's Motion for Leave to File Financial Interest Disclosure Statement."

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

By: _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By: _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\146 motion for leave.REVISED.doc

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

|  |  |  |
|---|---|---|
| KOBAYASHI VENTURES, LLC, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Case No. 2:07-cv-00612-RGD-TEM |
| | : | |
| PAPERTECH INC., | : | |
| | : | |
| Defendant. | : | |

**FINANCIAL INTEREST DISCLOSURE STATEMENT**

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and

Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for

Kobayashi Ventures, LLC in the above captioned action certifies that (1) Soze, LLC, a Delaware

limited liability company is the parent of Kobayashi Ventures, LLC, (2) the members of Kobayashi

Ventures, LLC comprise James Dechman and John Fiore, and (3) other than stated hereinabove

there is nothing to report under Local Rule 7.1(A)(1)(a) and (b).

By: _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By: _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email:  jschwaber@steinsperling.com
Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\10 financial disclosure statement.rev.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　:　　Case No. 2:07-cv-00612-RGD-TEM
　　　　　　　　　　　　　　　　　　　:
PAPERTECH INC.,　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　　　　:

## ORDER

UPON CONSIDERATION OF "Plaintiff's Motion for Leave to File Financial Interest

Disclosure Statement ("Motion for Leave")" and any response thereto, it is this _____ day of

_____, 2008,

ORDERED, by the United Stated District Court for the Eastern District of Virginia that

Plaintiff's Motion for Leave be and hereby is GRANTED, and therefore it is further,

ORDERED, that Plaintiff's Financial Interest Disclosure Statement lodged with

Plaintiff's Motion for Leave be and hereby is accepted for filing as of the date of filing of the

Motion for Leave.

_____
United States District Court for the Eastern District of Virginia
The Honorable Robert G. Doumar

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\10 motion for leave.ORDER.doc

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　　　:　　Case No. 2:07-cv-00612-RGD-TEM
　　　　　　　　　　　　　　　　　　:
PAPERTECH INC.,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　　　:


**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE**
**TO FILE FINANCIAL INTEREST DISCLOSURE STATEMENT**

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber,

Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.,

submits this brief in support of its Motion for Leave to File Financial Interest Disclosure

Statement, stating as follows:

　　　　1.　　On Thursday, December 27, 2007, Plaintiff filed its Complaint in this case.  In so

doing, Plaintiff inadvertently did not simultaneously file its Financial Interest Disclosure

Statement and therefore seeks leave to file same.

　　　　2.　　The Financial Interest Disclosure Statement is needed by the Court to enable

Judges and Magistrate Judges to evaluate possible disqualification or recusal.

　　　　3.　　There is no prejudice associated with this filing of the Financial Interest

Disclosure Statement.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

By:  _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By:  _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email:  jschwaber@steinsperling.com
Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\146 brief in support of motion for leave.doc

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,   :
             :
   Plaintiff       :
             :
  v.           :   Case No. 2:07-cv-00612-RGD-TEM
             :
PAPERTECH INC.,      :
             :
   Defendant.     :

## PLAINTIFF'S MOTION FOR CHANGE OF VENUE

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., pursuant to 28 U.S.C. § 1404(a), Fed. R. Civ. P. 7 and Local Rule 7, moves for a change of venue from the Norfolk Division to the Alexandria Division, and as grounds therefor states as follows:

As set forth in the accompanying Brief which is incorporated herein, on Thursday, December 27, 2007, Plaintiff filed its Complaint in this case in the Alexandria Division. By random assignment, the Court transferred this case to the Court's Norfolk Division. This change unduly burdens Plaintiff, and is inconvenient for the parties and witnesses. The United States District Court has the discretion, pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses and in the interest of justice, to transfer any civil action to any other district or division where it might have been brought. That relief is appropriate in this case.

WHEREFORE, in consideration of the grounds stated in the accompanying Brief and the record herein, Plaintiff respectfully requests that this Honorable Court grant "Plaintiff's Motion

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

for Change of Venue," and thereby transfer this case to the Alexandria Division of the Eastern

District of Virginia.


By: _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By: _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\403 mot to change venue.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KOBAYASHI VENTURES, LLC,　　　　　:

　　　　Plaintiff　　　　　　　　　　　:

　　v.　　　　　　　　　　　　　　　　:　　　　Case No. 2:07-cv-00612-RGD-TEM

PAPERTECH INC.,　　　　　　　　　　 :

　　　　　Defendant.　　　　　　　　　:

## <u>ORDER</u>

UPON CONSIDERATION of Plaintiff's Motion for Change of Venue ("the Motion")

pursuant to 28 U.S.C. § 1404(a), Fed. R. Civ. P. 7 and Local Rule 7, and any response thereto, it

is this _____ day of January, 2008,

**ORDERED**, by the United States District Court of the Eastern District of Virginia,

Norfolk Division, that the Motion be and hereby is GRANTED, and therefore it is further,

**ORDERED**, that this case shall be transferred to the Alexandria Division of the Eastern

District of Virginia.

_____
United States District Court for the Eastern District of Virginia
The Honorable Robert G. Doumar

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\403 order to change venue.doc

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,     :

       Plaintiff           :

                        :

     v.                  :     Case No. 2:07-cv-00612-RGD-TEM

                        :

PAPERTECH INC.,          :

                        :

       Defendant.       :

---

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR CHANGE OF VENUE

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., submits this brief in support of its Motion for Change of Venue, and states as follows:

<u>PERTINENT FACTS</u>

1.     On Thursday, December 27, 2007, Plaintiff filed its Complaint in this case in the Eastern District of Virginia, Alexandria Division.

2.     By random assignment, the Court transferred this case to the Court's Norfolk Division, another division of the Eastern District – as referenced in Local Rule 3.

3.     Plaintiff is a small company based in Fairfax, Virginia, with limited resources and not connected with Norfolk, Virginia.

4.     Alexandria is within 18 miles of Fairfax, while Norfolk is over 180 miles from Fairfax.

5.     The distance that must be traveled to litigate this case in Norfolk, Virginia represents an undue burden on Plaintiff, and poses an inconvenience to the parties and witnesses generally.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

APPLICABLE LAW AND ARGUMENT

A.      THE COURT'S AUTHORITY

Pursuant to 28 U.S.C. § 1404(a), a district court, "[f]or the convenience of the parties and witnesses, in the interest of justice, … may transfer any civil action to any other district or division where it might have been brought." The decision whether to grant a motion to transfer venue is within the sound discretion of the district court. Beam Laser Sys., Inc. v. Cox Commc'ns, Inc., 117 F. Supp. 2d 515, 517 (E.D.Va. 2000). Congress has committed any decision to transfer to the district court's discretion. See In re Ralston Purina Co., 726 F.2d 1002, 1005 (4th Cir. 1984).

When considering a motion to transfer venue, the Court must consider the plaintiff's choice of venue, the convenience of the parties and witnesses, and the interest of justice. See GTE Wireless v. Qualcomm, Inc., 71 F. Supp. 2d 517, 519 (E.D. Va. 1999). See also Agilent Techs., Inc. v. Micromuse, Inc., 316 F. Supp. 2d 322, 326 (E.D. Va. 2004) (in making a transfer of venue determination, the court must consider the following factors related to convenience and justice: (1) plaintiff's choice of venue, (2) convenience of the parties and witnesses, and (3) the interest of justice).

B.      PLAINTIFF'S PROPER FORUM CHOICE IS ENTITLED TO DEFERENCE

The initial choice of forum, from among those possible under the law, is a privilege given to a plaintiff. Medicenters of America, Inc. v. T & V Realty & Equipment Corp., 371 F. Supp. 1180, 1184 (E.D.Va.1974). In balancing the convenience and justice factors, courts generally give "substantial weight" to the plaintiff's choice of forum. Telepharmacy Solutions, Inc. v. Pickpoint Corp., 238 F. Supp. 2d 741, 743 (E.D. Va.2003). See also Acterna, L.L.C. v. Adtech,

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Inc., 129 F. Supp. 2d 936, 938 (E.D. Va.2001) (plaintiff's choice of forum is ordinarily entitled to substantial weight).

A plaintiff's choice of forum typically is entitled to substantial deference. Cognitronics Imaging Sys., Inc. v. Recognition Research Inc., 83 F. Supp. 2d 689, 696 (E.D. Va. 2000); Medicenters, 371 F. Supp. at 1184. A plaintiff's chosen venue is not given such substantial weight when the plaintiff selects a forum other than its home forum and the claims bear little or no relation to the chosen forum. Telepharmacy Solutions, 238 F. Supp. 2d at 743; Intranexus, Inc. v. Siemens Med. Solutions Health Serv. Corp., 227 F. Supp. 2d 581, 583 (E.D. Va. 2002); Acterna, 129 F. Supp. 2d at 939.

C.    COURTS LOOK FOR THE "PREFERRED FORUM"

In patent infringement actions, courts also consider whether the forum where the case was filed or the forum to which a defendant seeks a transfer is "the preferred forum" for the action. GTE Wireless, Inc., 71 F. Supp. 2d at 519. "The preferred forum" is the location of the center of the accused activity. Id. If the activities are not centered in either location, then neither forum is the "preferred forum." Lycos, Inc. v. TiVo, Inc., 499 F. Supp. 2d 685, 691 n.4 (E.D. Va. 2007). In this case, the court will determine whether to transfer the action based solely on the three convenience and justice factors: "(1) plaintiff's choice of venue, (2) convenience of the parties and witnesses, and (3) the interest of justice" Id. See, e.g., Agilent Techs., 316 F. Supp. 2d at 326-30 & n.3 (concluding that Virginia was not the preferred forum for the action and then balancing the other three convenience and justice factors to determine whether transfer to the Southern District of New York was warranted).

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

D.    ARGUMENT

1.    Plaintiff's Choice of Venue

Section 28 U.S.C. 1404(a) requires a court to consider a plaintiff's choice of venue. Plaintiff's initial choice of division, the Alexandria Division, is entitled to deference in this case. Plaintiff has not selected a forum other than its home forum, and the forum selected has a substantial relationship to the claims in the case. Furthermore, the Alexandria Division, being closer in proximity to Plaintiff's place of business, is a more "preferable" division than the Norfolk Division, as no activities have been centered in the Norfolk region. The greater the connection between a plaintiff's chosen forum and plaintiff's cause of action, the more weight a court will give to plaintiff's choice. GTE Wireless, Inc., 71 F. Supp. 2d at 519. Because Plaintiff owns the patents, is based in Fairfax, Virginia, and chose a nearby venue in Alexandria, the Court should give substantial weight to this selection.

2.    The Interest of Justice

Section 28 U.S.C. 1404(a) also requires a court to consider the "interest of justice," an analysis encompassing factors unrelated to witness and party convenience. Agilent, 316 F. Supp. 2d at 329. This "interest of justice" analysis includes considering circumstances such as "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment." Bd. of Trustees v. Baylor Heating and Air Conditioning, 702 F. Supp. 1253, 1260 (E.D. Va. 1988). In the Agilent case, a patent infringement case brought in the Eastern District of Virginia in which the defendant moved to have the case transferred to New York, the court employed the circumstances articulated in Bd. of Trustees in weighing this factor. 316 F. Supp. 2d at 329. After holding that there was no

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

related action pending; that any district court could handle federal issues comparably; that access to the premises was a non-issue; and that the possibility of unfairness, inability to join parties, and possibility of harassment were also non-issues, the court noted that plaintiff's selection of the "rocket docket" weighed slightly in plaintiff's favor. Id. In this case, Plaintiff stands in a similar position as the plaintiff in the Agilent case, and this factor should weigh, in Plaintiff's favor.

     3.    The Convenience of the Parties and Witnesses

Finally, 28 U.S.C. § 1404(a) requires the Court to consider the convenience of the parties and witnesses. This case is comparable to the Agilent case, in which the court decided that both New York and Virginia equally were inconvenient to plaintiff, New York was more convenient to the defendant, and therefore consideration of the convenience of the parties favored transferring the matter to New York. 316 F. Supp. 2d at 328-329. See also Koh, 250 F. Supp. 2d at 638 (favoring the forum where more material witnesses and documents are located for the purpose of access during discovery); Lycos, 499 F. Supp. 2d at 695 (rejecting Virginia in favor of Massachusetts where no witnesses or documents were located in Virginia).

Similarly, with Defendant Papertech being a Canadian company, the choice between Alexandria and Norfolk should be inconsequential to Defendant Papertech, as regardless Defendant Papertech is still hundreds of miles from its primary business location. For Plaintiff and witnesses, however, Alexandria is a much more convenient location than Norfolk. Plaintiff is a small company based in Fairfax, Virginia, with limited resources and not connected with Norfolk, Virginia. Alexandria is within 18 miles of Fairfax, while Norfolk is over 180 miles away from Fairfax. Witnesses necessarily will be near to Alexandria – not Norfolk, such that the

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

distance that must be traveled to participate in this case represents an undue burden on the parties and witnesses.

* * *

Therefore, Plaintiff respectfully submits a transfer of venue to the Alexandria Division, as is appropriate and should be accomplished in this case.


By:     _____/s/_____
        Jeffrey M. Schwaber
        Virginia Bar No. 35466
        Alexia Kent Bourgerie, *pro hac admission*
        Attorneys for Plaintiff, Kobayashi Ventures, LLC
        Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
        25 West Middle Lane
        Rockville, Maryland  20850
        Telephone:  (301) 838-3210 (Jeffrey Schwaber)
        Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
        Email: jschwaber@steinsperling.com
        Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
        Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
        Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By:     _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email:  jschwaber@steinsperling.com
Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\403 brief in support mot to change venue.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

JAN 29 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KOBAYASHI VENTURES, LLC,          :
                                  :
          Plaintiff               :
                                  :
     v.                           :          Case No. 2:07-cv-00612-RGD-TEM
                                  :
PAPERTECH INC.,                   :
                                  :
          Defendant.              :

**ORDER**

UPON CONSIDERATION OF "Plaintiff's Motion for Leave to File Financial Interest

Disclosure Statement ("Motion for Leave")" and any response thereto, it is this _29th_ day of

_January_ 2008,

ORDERED, by the United Stated District Court for the Eastern District of Virginia that

Plaintiff's Motion for Leave be and hereby is GRANTED, and therefore it is further,

ORDERED, that Plaintiff's Financial Interest Disclosure Statement lodged with

Plaintiff's Motion for Leave be and hereby is accepted for filing as of the date of filing of the

Motion for Leave.

                    _____/s/_____
                    Robert G. Doumar
                    **Senior United States District Judge**

                    _____
                    United States District Court for the Eastern District of Virginia
                    The Honorable Robert G. Doumar

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\PLEADINGS\10 motion for leave.ORDER.doc

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KOBAYASHI VENTURES, LLC,                    :
                                                            :
      Plaintiff                                   :
                                                            :
      v.                                           :     Case No. 2:07-cv-00612-RGD-TEM
                                                            :
PAPERTECH INC.,                                    :
                                                            :
      Defendant.                                :

## FINANCIAL INTEREST DISCLOSURE STATEMENT

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for Kobayashi Ventures, LLC in the above captioned action certifies that (1) Soze, LLC, a Delaware limited liability company is the parent of Kobayashi Ventures, LLC, (2) the members of Kobayashi Ventures, LLC comprise James Dechman and John Fiore, and (3) other than stated hereinabove there is nothing to report under Local Rule 7.1(A)(1)(a) and (b).

By:              /s/

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-3929

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 8th day of January, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

N/A

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user:

Kari K. Hilden
Papertech Inc.
108 – 245 Fell Avenue
North Vancouver, B.C., Canada

By:     _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone: (301) 838-3210 (Jeffrey Schwaber)
Facsimile: (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile: (301) 354-8132 (Alexia Kent Bourgerie)
Email: abourgerie@steinsperling.com

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\10 financial disclosure statement.rev.doc

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| EASTERN | District of | VIRGINIA |
|---|---|---|

KOBAYASHI VENTURES, LLC
12587 FAIR LAKES CIRCLE, SUITE 308
FAIRFAX, VA 22033

Norfolk Division

                                Plaintiff

                V.

PAPERTECH INC.
108 - 245 FELL AVENUE
NORTH VANCOUVER, B.C., CANADA

                                Defendant

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:    2:07cv612

TO: (Name and address of Defendant)

PAPERTECH INC.
108 - 245 FELL AVENUE
NORTH VANCOUVER, B.C., CANADA

SERVE:  KARI K. HILDEN

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

IVONNE C. LINDLEY
JEFFREY M. SCHWABER
STEIN SPERLING BENNETT DE JONG DRISCOLL & GREENFEIG, P.C.
25 WEST MIDDLE LANE
ROCKVILLE, MD 20850

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

Fernando Galindo

1/29/08

CLERK                                          DATE

(By) DEPUTY CLERK    Lisa Woodcock

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                Date               *Signature of Server*

_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

## NOTICE

### CONSENT TO TRIAL BY MAGISTRATE JUDGE

Pursuant to Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c) you have the right to have your case conducted before a United States magistrate judge upon consent of all parties. In order to proceed before a magistrate judge, a consent form must be filed with the Clerk's Office. It may be filed jointly or separately. The consent form may be printed from the U.S. District Court website (listed below) or obtained from the Clerk's Office. Please refer to the previously mentioned rule for further information.

### FINANCIAL INTEREST DISCLOSURE STATEMENT

Pursuant to Local Rule 7.1, a financial disclosure statement must be filed by a "nongovernmental corporation, partnership, trust, [or] other similar entity that is a party to, or that appears in, an action or proceeding in this Court." This statement should be filed in duplicate with the party's "first appearance, pleading, petition, motion, response, or other request addressed to the Court". The financial interest disclosure statement may be printed from the U.S. District Court website (listed below) or obtained from the Clerk's Office. Please refer to the previously mentioned rule for further information. Failure to file the financial interest disclosure statement as required by Local Rule 7.1 will result in this first submission being filed subject to defect by the Clerk.

### WEBSITE AND CLERK'S OFFICES ADDRESSES

The website address for the U.S. District Court for the Eastern District of Virginia is www.vaed.uscourts.gov. If you do not have access to a computer, contact one of the Clerk's Offices listed below to obtain either of these forms:

Albert V. Bryan United States Courthouse
401 Courthouse Square
Alexandria, VA 22314
(703) 299-2101

Walter E. Hoffman United States Courthouse
600 Granby Street
Norfolk, VA 23510
(757) 222-7201

Lewis F. Powell, Jr. United States Courthouse
1000 East Main Street
Richmond, VA 23219
(804) 916-2220

U.S. Postal Office and Courthouse Building
101 25th Street
PO Box 494
Newport News, VA 23607
(757) 247-0784

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK AND NEWPORT NEWS DIVISIONS**

```
FILED
AUG - 6 2007
CLERK,    DISTRICT COURT
........ ..., VA
```

In re: Motions in Civil Actions          :
                                          :
                                          :
                                          :

## ORDER

A party filing a motion, response or other pleading requiring a ruling, hearing or determination by the Court shall, as soon as the same is ready therefor, have the obligation and duty to bring it to the attention of the Clerk for decision or, if a hearing is desired, to arrange for a convenient and timely hearing date with all parties and the deputy clerk for Judge Doumar, namely Lori Baxter, telephone 757-222-7244.

All parties shall comply with the provisions of Rule 7(F)(1) and (2), Local Rules of Practice, which reads as follows:

(F)    Briefs Required:

(1)    All motions, unless otherwise directed by the Court and except as noted hereinbelow in subsection 7(F)(2), shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies. Unless otherwise directed by the Court, the opposing party shall file a responsive brief and such supporting documents as are appropriate, within eleven (11) days afer service and the moving party may file a rebuttal brief within three (3) days after the service of the opposing party's reply brief. No further briefs or written communications may be filed without first obtaining leave of Court.

(2)    Briefs need not accompany motions: a. for a more definite statement; b. for an extension of time to respond to pleadings, unless the time has already expired; and c. for a default judgment.

The Clerk shall provide a copy of this order to each plaintiff or counsel at the time a complaint is filed, and shall attach copies to the complaint for service upon all defendants.

                                            /s/
**IT IS SO ORDERED.**                Robert G. Doumar
                                     Senior **United States District** Judge

                                     Robert G. Doumar
                                     **United States Senior District Judge**

**Date:** August 6, 2007

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### OFFICE OF THE CLERK

Walter E. Hoffman U.S. Courthouse
600 Granby Street, Room 193-B
Norfolk, Virginia  23510

Fernando Galindo
Clerk of Court

Telephone
(757) 222-7201
(CIVIL)

**TO ALL COUNSEL:**

## PROCEDURE FOR CIVIL MOTIONS

This case has been assigned to Senior United States District Judge Robert G. Doumar.

Pursuant to Local Rule 7, a memorandum of law shall accompany all motions (unless excepted by the rule).  After all briefs are in, it is incumbent upon counsel for the moving party to confer with opposing counsel and advise the Clerk's Office by letter when a ruling or determination by submission is desired.  See Local Rule 26 for discovery motion procedures.

Requests for ruling or determination without oral argument should be addressed to the Civil Docket Section, Clerk's Office, U. S. District Court, Room 193-B, 600 Granby Street, Norfolk, Virginia 23510.

Requests for oral argument should be communicated promptly by counsel to Judge Doumar's courtroom deputy, LORI BAXTER, telephone (757) 222-7244.

Absent a request for hearing, the motions described on the reverse of this notice automatically will be referred for decision to Judge Doumar promptly after receipt of briefs.

ALL COURT PAPERS IN THIS CASE MUST BE FILED in the Civil Section of the Clerk's Office, Room 193-B.

FERNANDO GALINDO, CLERK

<u>MOTIONS TO BE DETERMINED</u>

<u>WITHOUT ORAL ARGUMENT</u>

I.   <u>GENERAL</u>

    A.   The motions listed in II below  automatically will be referred for decision to Judge Doumar.

    B.   Other motions will be referred for decision to Judge Doumar when:

        1.   Directed by the Rule 16(b) order.
        2.   Directed by Judge Doumar or his staff either orally or in writing.
        3.   Requested by counsel.

II.  <u>THE FOLLOWING MOTIONS ARE REFERRED FOR DECISION BEFORE INITIAL PRETRIAL CONFERENCE:</u>

    A.   WITHOUT EXCEPTION - whether answer filed or not - <u>UNLESS deadline for initial pretrial conference (Rule 16, FRCP) is approaching:</u>

        1.   For change of venue to another court or divisional office of this court.
        2.   To stay and/or for arbitration.
        3.   To remand to state court.
        4.   To join necessary party(ies).  Rule 19, FRCP

    B.   WITH EXCEPTION - unless an answer is also filed by every defendant and/or unless the deadline for initial pretrial conference is approaching:

        1.   Rule 12 motions to dismiss for:

            a.   Insufficiency of process of service (motion to quash).
            b.   For failure to state a claim upon which relief may be granted.
            c.   More definite statement.
            d.   Lack of jurisdiction.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**FILED**

JAN 2 9 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KOBAYASHI VENTURES, LLC,

     Plaintiff,

     v.                                                                    Civil Action No. 2:07cv612

PAPERTECH, INC.,

     Defendant.

## ORDER

This matter comes before the Court upon the Plaintiff's January 11, 2008, Motion for

Change of Venue from the Norfolk Division to the Alexandria Division pursuant to 28 U.S.C. §

1404(a), Fed. R. Civ. P. 7, and Local Rule 7.

The Court recognizes that traveling to Norfolk, Virginia, to litigate this case would place

a burden on the Plaintiff. However, transfer of certain cases to the Norfolk Division has become

necessary due to the high volume of patent cases filed in the Alexandria Division. Therefore,

hearings in this case will be held by teleconference where appropriate. If the case proceeds to

trial, the undersigned will consider holding the trial in Alexandria, Virginia. The Plaintiff's

Motion for Change of Venue is hereby **DENIED**.

The Clerk of the Court is **DIRECTED** to deliver a copy of this Order to all counsel of

record in this case.

     **IT IS SO ORDERED.**

                                   /s/

                           Robert G. Doumar
                           Senior United States District Judge

January 29, 2008
Norfolk, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KOBAYASHI VENTURES LLC )
      ,      )
   Plaintiff,    )
v.         )  Case No. 2:07CV612-RGD-TEM
          )
PAPERTECH INC.    )
          )
   Defendant.   )

## NOTICE OF APPEARANCE

   Defendant PT Papertech Inc., erroneously named and sued as Papertech Inc., by counsel,

files this Notice of Appearance notifying the Court and opposing counsel that Dabney J. Carr IV

and the law firm of Troutman Sanders LLP will serve as counsel in this matter on behalf of PT

Papertech Inc.

           PT PAPERTECH INC.


           By_____/s/_____
              Of Counsel

Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
dabney.carr@troutmansanders.com
(804) 697-1238
(804) 698-5119 (Fax)

Of Counsel:
J. Rick Taché (CA Bar #195100)
Janet L. Hickson (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 26th day of February, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jeffrey M. Schwaber
Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850
jschwaber@steinsperling.com

Alexia Kent Bourgerie
Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850
abourgerire@steinsperling.com

<div style="text-align:center">/s/</div>

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
(804) 697-1238
(804) 698-5119 (Fax)

#1703502

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KOBAYASHI VENTURES LLC )
                                              )
            ,                                 )
                Plaintiff,                    )
v.                                            )          Case No. 2:07CV612-RGD-TEM
                                              )
PAPERTECH INC.                                )
                                              )
                Defendant.                    )

**DEFENDANT PT PAPERTECH INC.'S**
**FINANCIAL DISCLOSURE STATEMENT**

Pursuant to Local Rule 7.1 of the Eastern District of Virginia and to enable Judges and

Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel for

Defendant PT Papertech Inc. (erroneously named and sued as Papertech Inc.), certifies that there

are no parents, trusts, subsidiaries and/or affiliates of said party that have issued shares or debt

securities to the public and that no publicly held entity owns more than ten percent of the stock

of PT Papertech Inc.

PT PAPERTECH INC.

By_____/s/_____
                    Of Counsel

Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia 23218-1122
dabney.carr@troutmansanders.com
(804) 697-1238
(804) 698-5119 (Fax)

Of Counsel:
J. Rick Taché (CA Bar #195100)
Janet L. Hickson (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 26th day of February, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Jeffrey M. Schwaber
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> jschwaber@steinsperling.com
>
> Alexia Kent Bourgerie
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerire@steinsperling.com

> _____/s/_____
> Dabney J. Carr, IV, VSB #28679
> (dabney.carr@troutmansanders.com)
> TROUTMAN SANDERS LLP
> P. O. Box 1122
> Richmond, Virginia  23218-1122
> (804) 697-1238
> (804) 698-5119 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC. | ) | |
| | ) | |
| Defendant. | ) | |

**PT PAPERTECH INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE
12(B)(2), OR IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE
PURSUANT TO 28 U.S.C. § 1406**

Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and

referred to herein as "Papertech") moves this Court, pursuant to Federal Rule of Civil Procedure

12(b)(2), for an order dismissing the Complaint because this Court does not have personal

jurisdiction over Papertech.   In the alternative, Papertech requests that the Court enforce the

forum and venue selection clause in the License Agreement at issue here and transfer this case

to the United Stated District Court for the Southern District of New York pursuant to 28 U.S.C.

§ 1406.   The grounds for this motion are more fully set for the in the Brief in Support of PT

Papertech Inc.'s Motion To Dismiss For Lack Of Personal Jurisdiction Pursuant To Federal

Rule Of Civil Procedure 12(B)(2), Or In The Alternative, Motion To Transfer Venue Pursuant

To 28 U.S.C. § 1406, which is filed concurrently herewith.


PT PAPERTECH INC.


By_____/s/_____
Of Counsel

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
(804) 697-1200
(804) 697-1339 (Fax)


Of Counsel:
J. Rick Taché (CA Bar #195100)
Janet L. Taché (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 28th day of February, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Jeffrey M. Schwaber
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> jschwaber@steinsperling.com
>
> Alexia Kent Bourgerie
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerire@steinsperling.com

<div style="text-align:center">/s/</div>

> Dabney J. Carr, IV, VSB #28679
> (dabney.carr@troutmansanders.com)
> TROUTMAN SANDERS LLP
> P. O. Box 1122
> Richmond, Virginia  23218-1122
> (804) 697-1238
> (804) 698-5119 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC. | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF PT PAPERTECH INC.'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO
TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406**

Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech") moves this Court, pursuant to Federal Rule of Civil Procedure 12(b)(2), for an order dismissing the Complaint because this Court does not have personal jurisdiction over Papertech.  In the alternative, Papertech requests that the Court enforce the forum and venue selection clause in the License Agreement at issue here and transfer this case to the United Stated District Court for the Southern District of New York pursuant to 28 U.S.C. § 1406.

## I.

## <u>INTRODUCTION</u>

Plaintiff Kobayashi Ventures LLC ("Kobayashi") filed this lawsuit against Papertech alleging that Papertech is liable to Kobayashi for infringing patents purportedly now owned by Kobayashi.  The Court should, however, dismiss this lawsuit because: (1) Papertech's contacts with Virginia are insufficient to establish either general or specific jurisdiction under the Due Process Clause given that, among other reasons, Kobayashi does not have the right to sue for allegedly infringing activity occurring prior to December 10, 2007, and consequently, Kobayashi's claims *cannot* arise out of Papertech's minimal contacts with Virginia, all of which

occurred before that date; and (2) personal jurisdiction over Papertech based upon Federal Rule of Civil Procedure 4(k)(2) does not exist since Papertech is subject to jurisdiction in New York, as evidenced by the forum and venue selection clause memorialized in the license agreement, entered into by Papertech with the prior owner of the patents-in-suit, (hereafter the "License Agreement"), Complaint ("Comp."), ¶9, at issue in this case.  Therefore, Papertech is not subject to personal jurisdiction in Virginia, and the Court should grant Papertech's motion to dismiss.

        In the alternative, Papertech requests that the Court enforce the forum and venue selection clause contained within the License Agreement and transfer this case to the United Stated District Court for the Southern District of New York.  The Complaint arises out of the License Agreement because Kobayashi alleges that Papertech "[f]ailed to pay all royalties due under the License Agreement" and that Papertech "failed to give proper notice" of termination of the License Agreement.  Comp., ¶19.  Paragraph 27 of the Complaint places in issue whether Papertech "legitimately terminated the License Agreement," and paragraph 14 of the Complaint quotes from and relies upon a provision of the License Agreement.  In addition, the prayer for relief seeks an interim order placing in escrow 5% of Papertech's net sales "of all products and systems it has **at any time** sold," which is the same percent of the Royalty payments required under the License Agreement. (emphasis added).  *See also* Comp., ¶10.  Moreover, the License Agreement is attached as Exhibit 3 to the Complaint and is incorporated into the Complaint by reference.  Comp., ¶9.  Kobayashi specifically brings into issue the validity and terms of the License Agreement, and whether Papertech breached the License Agreement by failing to pay all royalties due.  Accordingly, this case involves a controversy or claim arising out of or relating to the License Agreement, or a breach thereof, and should have been brought in New York in accordance with the forum and venue selection clause in the License Agreement.

## II.

## STATEMENT OF FACTS

### A.    Contractual Relationships Between the Parties and Third Party Corporations

Kobayashi, which appears to be merely a holding company, filed the instant lawsuit alleging that certain Papertech products infringe patents purportedly owned by Kobayashi. Comp., ¶ 6.  These patents were originally owned by Champion International Corporation ("Champion").  Champion granted non-exclusive licenses to use these patents (collectively referred to herein as the "Champion patents") to various companies, including Papertech. Through a series of purchase agreements and patent assignments, the Champion patents are now purportedly owned by Kobayashi.

### 1.    License Agreement between Papertech and Champion/International Paper

The Complaint alleges that Papertech entered into a License Agreement with Champion on or about November 12, 1998. Comp., ¶9.  Under the License Agreement, Champion granted Papertech the non-exclusive right to make, use, and sell the patented subject matter of the Champion patents at issue in this case. *See* Comp., Ex. 3.  The License Agreement contained the following forum and venue selection clause, which dictates that any suit arising out of or related to the License Agreement be filed in New York:

> 18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflicts of laws of said State which would direct the use of laws of another jurisdiction.  ***Any suit*** brought by either party against the other party ***on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York***, and, if the United States District Court declines jurisdiction for any reason, then in the Supreme Court First Department State of New York.  ***The Parties hereby consent to the personal jurisdiction of the courts*** and hereby designate the Secretary of State of the State of New York for receipt of service of process.

*See* Comp., Ex. 3, ¶18.1 (emphasis added).

3

**2.    Plaintiff Allegedly Acquired Title to the Patents on December 10, 2007**

The Complaint alleges a series of transactions by which Kobayashi allegedly acquired title to the Champion patents. According to the Complaint, International Paper Company ("International Paper") acquired Champion as a result of a merger executed on December 31, 2000, and thereby became the owner of the Champion patents. Comp., ¶ 8. Jacklin Associates, Inc. ("Jacklin") thereafter allegedly acquired title to the Champion patents on or about October 19, 2007, as a result of a Patent Purchase Agreement between International Paper and Jacklin. The Patent Purchase Agreement indicates that the License Agreement with Papertech was also assigned to Jacklin. *See* Comp., Ex. 2. International Paper expressly granted Jacklin the right to all causes of action and enforcement rights related to the patents, including remedies for past infringement. Comp., Ex. 2 at Ex. D.

Kobayashi did not acquire title to the Champion patents until December 10, 2007, as a result of an alleged assignment from Jacklin to Kobayashi ("Patent Assignment"). *See* Comp., Ex. 1. Notably, the patent assignment from Jacklin *did not* transfer to Kobayashi the right to sue for damages based on alleged infringement that occurred prior to December 10, 2007. *Id.* Because Jacklin did not expressly grant Kobayashi the right to sue for past infringement, Jacklin continues to retain the exclusive right to sue for infringement occurring prior to December 10, 2007. *See* Comp., Ex. 2.

**3.    The Disputed Termination of Papertech's License Agreement**

The Complaint alleges that Papertech sent a termination letter to Champion, dated September 27, 2000, purporting to terminate the License Agreement thirty days after receipt of the letter. Comp., ¶12. This termination letter is attached to the Complaint as Exhibit 6 and is incorporated by reference. The termination letter indicates that Papertech stated that Champion was in breach of the License Agreement. Comp., Ex. 6. The Complaint includes allegations by Kobayashi that the attempted termination by Papertech was ineffective. *See* Comp., ¶19 ("[a]ttempted to unilaterally terminate the License Agreement but failed to give proper notice."); *see also* Comp., ¶27 ("…had [Papertech] legitimately terminated the License Agreement…").

Further indicating that Kobayashi regarded the License Agreement as still in effect, Kobayashi alleges that on or about November 1, 2007, Kobayashi Ventures "notified Papertech in writing of its failure to make royalty payments." Comp., ¶16.

Notably, more than seven years have passed since Papertech notified Champion of Papertech's termination of the License Agreement. If Papertech effectively terminated the License Agreement, the fact that Kobayashi's predecessors-in-title knew or should have known of Papertech's alleged infringement for more than six years raises defenses of laches and estoppel. If however Papertech failed to effectively terminated the License Agreement, as alleged by Kobayashi, the License Agreement is a defense to the patent infringement claims. Regardless of the interpretation of these facts, both are fatal to Kobayashi's lawsuit.

**B.    Prior Litigation Concerning the Champion Patents Pending in New York**

In addition to the License Agreement at issue in this case, Champion entered into a similar license agreement with Carotek, Inc. ("Carotek"). Champion's license agreement with Carotek included the *identical* forum and venue selection clause as that contained within the Papertech License Agreement, in which the parties agreed to personal jurisdiction in New York. On December 11, 2007, Carotek, under threat of having its license agreement terminated by Kobayashi, filed a lawsuit for declaratory judgment against Kobayashi in the United States District Court for the Southern District of New York seeking a finding that, among other things, it had not breached its license agreement with Champion (referred to herein as the "Carotek lawsuit"). Carotek specifically claims is that Kobayashi's predecessors-in-title failed to honor the "most favored license" provision of the Carotek license agreement, whereby, *inter alia*, Carotek was entitled to the benefits of the most favorable royalty terms extended to any other licensee of the Champion patents. The centerpiece of that claim is the fact that Kobayashi's predecessor-in-interest failed to enforce the License Agreement with Papertech, which Carotek was likely unaware had been terminated, thereby removing Papertech's obligation to pay royalties.

Notably, Kobayashi did not challenge personal jurisdiction in the Carotek lawsuit.  *See* Carotek's Complaint and Kobayashi's corresponding answer and counterclaim attached as Exhibits A and B to the Declaration of J. Rick Taché ("Taché Decl.") filed with this Motion.  In the Carotek lawsuit, Carotek claimed, as part of its allegations, that Carotek did not owe any royalties to Kobayashi because Kobayashi, and all of the predecessors in interest in the Champion patents, failed to enforce the royalty provision of the License Agreement against Papertech.  Kobayashi filed this lawsuit against Papertech less than two weeks after the Carotek lawsuit was filed.

C.    **The Present Lawsuit**

On or about December 27, 2007, and presumably in response to Carotek's declaratory judgment action against Kobayashi, Kobayashi filed the instant lawsuit against Papertech alleging that various Papertech products infringe the Champion patents.[1]  In its Complaint, Kobayashi seeks both equitable and monetary relief based, in part, on allegations that the License Agreement between Champion and Papertech was never terminated.  *See, e.g.*, Comp., ¶19 ("[Papertech] [a]ttempted to unilaterally terminate the License Agreement but failed to give proper notice.").  Kobayashi also claims that Papertech's products improperly infringe on the Champion patents.

Kobayashi asserts that jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a), and 35 U.S.C. § 281.  Kobayashi specifically alleges that "this Court has personal jurisdiction over Papertech because Papertech conducts business in the Commonwealth of Virginia, has availed

_____

[1]    In the interests of cooperation, Papertech waived service of process, which allowed Kobayashi to avoid serving Papertech through the Hague Convention in exchange for various discovery concessions.  Papertech waived service on February 6, 2008, and so its response to Kobayashi's Complaint is due on May 6, 2008 pursuant to Fed. R. Civ. P. 12(a)(1)(A)(ii).  *See* Correspondence from R. Taché to J. Schwaber dated February 26, 2008, attached as Ex. C to Taché Decl.

6

itself of the rights and benefits of Commonwealth law, and has engaged in substantial and continuing contacts with and within the Commonwealth." Comp., ¶ 4. Contrary to these assertions, however, Papertech has not purposefully availed itself of the rights and benefits of Virginia law and has not engaged in substantial and continuing contacts with Virginia sufficient to create personal jurisdiction over Papertech in Virginia.

**D.      Papertech's Minimal Contacts with Virginia**

Indeed, Papertech's contacts with Virginia are far from substantial and continuing. Rather, Papertech's contacts with Virginia are more appropriately characterized as sporadic, at best, and do not provide a basis for personal jurisdiction.

More specifically, Papertech is a corporation organized and existing under the laws of the province of British Columbia, Canada, with its principal place of business in Vancouver, British Columbia. Declaration of Michael Heaven ("Heaven Decl.") ¶ 6 (filed with this Motion). At its Vancouver facility, Papertech manufactures a paper process monitoring system known as the WebVision® System. *Id.* at ¶ 7.

Papertech does not take any affirmative steps to seek out contacts with Virginia. For example, Papertech is not licensed to do business in Virginia and does not pay taxes in Virginia. Papertech does not maintain agents, bank accounts, employees, or offices in Virginia. Papertech does not target marketing or advertising to Virginia and does not market its products through a distributor or sales agent in Virginia. Papertech also does not maintain either sales or service offices and operations in Virginia. Indeed, Papertech has no offices, assets, employees, contractors, or representatives of any kind in Virginia. *Id.* at ¶ 8.

Furthermore, Papertech's availability to Virginia residents is typically limited to the following avenues: (1) a generally accessible Canadian website[2]; (2) a toll free phone line through which Virginia residents can call Papertech; and (3) potential exposure to Virginia

---

[2]      Papertech's website – www.papertech.ca -- is registered as a Canadian ".ca" instead of a U.S. ".com".

residents at industry trade shows periodically held in various locations throughout the world.  *Id.* at ¶¶ 9-11.  All three of these avenues require a Virginia resident to initiate contact with Papertech.  Moreover, while Papertech's website can process product information requests, purchases *cannot* be made through the website.  In addition, Papertech's website does not focus on potential customers in any specific geographic location.  With respect to trade shows, the pulp and paper industry has trade shows all over the world.  For example, between October and December 2007, there were thirty two pulp and paper industry trade shows that occurred throughout the world; sixteen of which were in the United States; none were held within the Commonwealth of Virginia.  Papertech has *never* attended a trade show in Virginia.  *Id.*

Consistent with these facts, Papertech's contacts with Virginia are minimal, at best. Indeed, Papertech has only sold and/or delivered four WebVision® Systems to two companies with facilities in Virginia – Georgia Pacific Corporation ("Georgia Pacific")[3] and Greif Brothers – all of which occurred between July 2000 and July 2007.  While Grief Brothers is a Virginia corporation with facilities in Virginia, Georgia Pacific is not, and the sales to Georgia Pacific were made through states other than Virginia.  More specifically, Georgia Pacific, which, at all times relevant, was a Georgia corporation, purchased products from Papertech pursuant to a master purchase agreement between the two companies which was signed December 20, 2004 and renewed January 23, 2006.  These purchases, made in accordance with the master purchase agreement negotiated with Georgia Pacific's corporate offices in Atlanta and Green Bay, included the purchase of two WebVision® Systems on July 13, 2000 and August 24, 2006 that were ultimately shipped to and installed Georgia Pacific facilities in Virginia.  The four WebVision® Systems that have been sold and/or installed in Virginia represent less than one-half of 1% of Papertech's total sales between November 12, 1998 and the present.  *Id.* at ¶¶ 12-15.

---

[3]     In 2005, Georgia Pacific was acquired by Koch Industries, Inc., a Kansas corporation. Heaven Decl., ¶ 12.  For simplicity sake, the two entities are referred to collectively as "Georgia Pacific" in this Motion.

Moreover, although Papertech warrants its WebVision® Systems, Papertech does not maintain on-going service contracts or maintenance agreements with either Greif Brothers or Georgia Pacific. If either of these two entities experience difficulties with their WebVision® Systems, need to order replacement parts, or require other customer assistance; they are required to contact Papertech's office in Canada for assistance. Since 2002, when Papertech began recording information about customer service calls, Grief brothers and Georgia Pacific (their facilities located in Virginia) have placed only sixteen (16) such calls to Papertech. This number represents a minute fraction of the almost two thousand one hundred (2,100) such calls that have been made to Papertech throughout the world during that same time frame.[4] *Id.* at ¶¶ 16-17.

In short, all of the above facts provide strong support for this Court to dismiss this case based upon a lack of personal jurisdiction. In the alternative, these facts support this Court transferring this case to New York.

## III.

## THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER PAPERTECH

When a defendant challenges the court's personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the burden is on the plaintiff to prove, by a preponderance of the evidence, that the court may properly exercise jurisdiction over the defendant. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). The jurisdictional facts alleged by the plaintiff must not be vague or conclusory, nor may the plaintiff merely extract the language from the Virginia long arm statute and apply it to the defendant. *Id.*

This Court may examine whether personal jurisdiction exists based on either Virginia's long-arm statute or Federal Rule of Civil Procedure 4(k)(2), which is essentially a federal long-arm statute. Here, no personal jurisdiction exists under either statute because (1) Kobayashi

---

[4] Papertech's records indicate that during this time period, it received 2084 service/parts calls from its customers worldwide.

cannot show that general or specific jurisdiction exists to satisfy the Due Process Clause of the Fifth Amendment; and (2) Rule 4(k)(2) does not apply because Papertech is subject to personal jurisdiction in New York.

A.    **Virginia's Long Arm Statute Does Not Convey Jurisdiction Over Papertech**

Virginia's long-arm statute – Va. Code Ann. § 8.01-328.1 – provides the statutory framework for determining whether personal jurisdiction exists over Papertech.  Whether personal jurisdiction exists under § 8.01-328.1 is appropriately limited by the bounds of constitutional due process considerations.  *See Danville Plywood Corp. v. Plain & Fancy Kitchens*, 218 Va. 533, 534-35 (1977) ("The purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over non-residents who engage in some purposeful activity in Virginia.").  Therefore, in determining whether personal jurisdiction exists over Papertech, this Court must undertake a constitutional due process analysis.  *Reynolds & Reynolds Holdings, Inc. v. Data Supplies, Inc*., 301 F. Supp. 2d 545, 550 (E.D. Va. 2004).

*International Shoe Co. v. Washington*, 326 U.S. 310, (1945), and its progeny set forth the due process framework for determining whether personal jurisdiction exists over a foreign defendant, such as Papertech.  In particular, the defendant must have sufficient "minimum contacts" with the forum state so as to not offend "traditional notions of fair play and substantial justice."  *International Shoe*, *supra*, 326 U.S. at 316.  Under the "minimum contacts" test, a defendant may be subject to either specific jurisdiction or general jurisdiction.  The court can exercise *specific* jurisdiction over the defendant where the cause of action "arises out of" or "relates to" the defendant's contacts with the forum state.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).  A defendant's contacts with the forum must be significantly more extensive before the court can exercise *general* jurisdiction over it as to causes of action not arising out of the defendant's contacts with the forum state.  *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414-16 (1984).

1.      **General jurisdiction does not exist**

Because Papertech's contacts with Virginia are minimal, at best, this Court does not have general jurisdiction over Papertech.  In order for general jurisdiction to exist, a non-resident's contacts with the forum state must be "continuous and systematic." *Helicopteros*, *supra,* 466 U.S. at 416; *LSI Industries Inc., v. Hubbell Lighting, Inc*., 232 F.3d 1369, 1375 (Fed. Cir. 2000).  Neither the Supreme Court nor the Federal Circuit has established a specific test for analyzing whether a defendant's activities within a state are "continuous and systematic." *LSI Indus*., *supra*, 232 F.3d at 1375.  "Instead, a court must look at the facts of each case to make such a determination." *Id*.

The cases dealing with general jurisdiction emphasize that jurisdiction does not exist if the non-resident defendant has no regular place of business in the forum state, is not licensed to do business in the forum state, and does not have systematic and continuous contacts with the forum state.  *Helicopteros*, *supra*, is instructive in that regard.  In *Helicopteros*, a federal court in Texas did not have general jurisdiction over a foreign corporation that purchased helicopters, equipment, and training services in Texas, sent its chief executive there for negotiations, sent personnel there for training, and accepted checks drawn on a Texas bank.  *Id*. at 416-18.

The contacts in *Helicopteros* were far greater than Papertech's contacts in the present case.  Again, as detailed above, Papertech is a Canadian corporation, and the only possible contacts that Papertech has with Virginia are that (1) less than one-half of 1% of its sales since November 12, 1998, have been made and/or delivered to Virginia; (2) Virginia residents must access Papertech's Canadian website or take the initiative to call Papertech to obtain product information or purchase products from Papertech; and (3) Virginia residents may be exposed to Papertech by actively attending industry trade shows occurring outside of Virginia.   These contacts are insufficient to establish general jurisdiction over Papertech.

In particular, Papertech's sales and/or deliveries of its products to Virginia constitute, at most, doing business *with* Virginia, but not doing business *in* Virginia.  *See Helicopteros*, *supra*, 466 U.S. at 418.  Engaging in commerce with those who do business in a forum state, or

residents of a forum state, does not, in and of itself, constitute the kind of activity that constitutes a "continuous and systematic presence" within a state's borders. *Id.* In addition, since 1998, the date on which Papertech entered into the License Agreement with Champion, *less than one-half of 1%* of Papertech's sales have any possible relationship with Virginia. *See Chino v. D&T Trucking Company*, 2006 U.S. Dist. LEXIS 30653 (E.D. Va. 2006) (refusing to exercise jurisdiction where only .11 percent of the non-resident defendant's business was related to Virginia). Since the date that Kobayashi allegedly acquired the Champion patents, not a single sale or installation of a Papertech product has occurred within Virginia.

Moreover, the mere fact that Virginia residents can access Papertech's Canadian website or call Papertech certainly cannot constitute continuous and systematic contacts with Virginia. Indeed, if simply having a toll free phone line or a foreign website constituted continuous and systematic contacts with Virginia, due process requirements would be meaningless. The recent U.S. District Court opinion in *Silver Ring Splint Co. v. Digisplint Inc.*, 508 F. Supp. 2d 508 (W.D. Va. 2007), is also instructive in this regard. In *Silver Ring*, the plaintiff sued a Canadian corporation in the Western District of Virginia for copyright and trade dress infringement as well as unfair practices. The defendant filed a motion to dismiss for lack of personal jurisdiction, claiming that it did not have sufficient contacts with Virginia to allow for the exercise of jurisdiction. The court found that it did not have specific or general jurisdiction over the defendant under Virginia's long-arm statute.[5]

The *Silver Ring* defendant's contacts with Virginia consisted of the following: (1) a single sale to a Virginia customer; (2) maintenance of a website accessible by Virginians; (3) distribution of information at two trade shows in the U.S. to at least one Virginian; (4) two blast e-mails that may have been sent to Virginians; (5) an advertisement in two issues of a trade

---

[5] The district court did not dismiss the case, instead finding that it had jurisdiction based on FRCP 4(k)(2). As discussed, *infra*, in section III., B., FRCP 4(k)(2) does not provide a basis for the exercise of jurisdiction in this action.

periodical with numerous Virginia subscribers; (6) an e-mail received from a Virginian and responded to by the defendant; and (7) a continued willingness to do business with Virginians should any choose to contact the defendant.  *Id.* at 512.  Based on these factors, the court declined to find general jurisdiction under Virginia's long-arm statute, stating, "[I]f general jurisdiction were found in this case, the limitations on personal jurisdiction would be essentially obliterated for almost any business with an online presence.  To justify general jurisdiction, contacts with the state must be 'continuous and systematic.'"  *Id.*

Similarly, Papertech's limited contacts with Virginia do not rise to the level of "systematic and continuous" contacts sufficient to subject it to general jurisdiction in this Court; let alone since December 27, 2007.  As best stated by the district court in *Silver Ring*, "[i]n the internet age, a generally available website, some limited promotional activities, and a single sale simply cannot constitute "continuous and systematic" contacts.  *Silver Ring*, *supra*, 508 F. Supp. 2d 512.

### 2.    Specific jurisdiction does not exist

Likewise, Papertech is not subject to specific jurisdiction in this Court.  To determine whether specific jurisdiction satisfies due process, courts must consider three factors: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is reasonable and fair."  *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1202 (Fed. Cir. 2002).  The plaintiff bears the burden of establishing the first two factors.  If the plaintiff is successful in doing so, the burden shifts to the defendant to establish that the assertion of personal jurisdiction is not reasonable or fair.  *Id*.

### a.    Papertech has not directed its activities at Virginia residents

The first prong in determining whether specific jurisdiction exists is "whether the defendant purposefully directed its activities at residents of the forum" and availed itself of the benefits and protections of the forum's laws.  *Silent Drive*, *supra*, 326 F.3d at 1202.  "The objective of the purposeful availment requirement is to provide predictability and give notice to

the defendant that it is subject to suit in the forum state, so that the company can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Shamsuddin v. Vitamin Research Products*, 346 F. Supp. 2d 804 (D. Md. 2004).

Again, *Silver Ring Splint Co. v. Digisplint Inc.*, *supra*, is instructive in this determination. After declining to assert general jurisdiction over the defendant, the district court likewise declined to assert specific jurisdiction over the defendant, holding that the defendant did not purposefully direct its activities at Virginia residents based on the same contacts with Virginia detailed above in section IV(A)(1). *Silver Ring, supra,* 508 F. Supp. 2d at 512. In that regard, and relying on *Graduate Management Admission Council v. Raju*, 241 F. Supp. 2d 589 (E.D. Va. 2003), the *Silver Ring* court held that the availability and use of a website by Virginians was not the same as an intentional direction of activities toward Virginia. In so holding, the Court relied upon the Fourth Circuit's test for evaluating the sufficiency of contacts with the forum state made via electronic means, which states:

> [A] [s]tate may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan*, *Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 713-15 (4th Cir. 2002)(citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). The *Silver Ring* Court determined that the single sale initiated via fax by a Virginian and the fact that the defendants few other non-internet marketing attempts could also have been seen by Virginians, did not amount to "purposeful availment." Accordingly, the court held that the defendant's contacts with the state of Virginia were insufficient to support specific jurisdiction under the Due Process Clause. *Id*. at 513.

Much like the defendants in *Helicopteros* and *Silver Ring*, Papertech's contacts with Virginia fall far short of the extent necessary to support specific jurisdiction. Papertech's

14

contacts with Virginia are minimal, at best. Indeed, Papertech had sales and/or installations of just four WebVision® Systems in Virginia amounting to less than one-half of 1 % of its total world wide sales since 1998. Importantly, these sales and/or installations of the WebVision® System by Papertech occurred prior to Kobayashi allegedly acquiring the Champion patents. In addition, Papertech had service calls initiated by Virginia residents reaching out to Papertech; rather than as a result of any purposeful action by Papertech; totaling less than .006% of Papertech's total world wide recorded service calls during the available time periods. Just as the court in *Silver Ring* declined to exercise specific jurisdiction under similar circumstances, the result should be no different here.

Moreover, as discussed, *supra*, under *Zippo*, the exercise of personal jurisdiction over a non-resident defendant based on the ownership of a "passive" website such as Papertech's that merely posts general information or advertising, but does not allow for direct purchases to be made through the site, violates constitutional due process. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See also Alitalia-Linee Aeree Italiane, S.p.A. v. Casinoalitalia.com*, 128 F. Supp. 2d 340, 349 (E.D. Va. 2001)(citing cases). *See also ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625-26 (4th Cir. 1997) (holding that defendant, which conducted its business entirely through mail order and had never "targeted" advertising at the forum state, was not subject to personal jurisdiction in the forum state). Indeed, nothing on Papertech's website – which is registered as a Canadian ".ca" instead of a U.S. ".com" – suggests that Papertech intended to target Virginia residents any more than it intended to target residents of other states.

In short, the lack of sales to Virginia residents, in combination with a lack of advertising targeted to Virginia and the maintenance of a passive website, precludes any claim by Kobayashi that Papertech has purposefully directed its efforts at Virginia residents.

   b.    Kobayashi's claims do not arise out of or relate to Papertech's limited
         contacts with Virginia

Kobayashi also must show that its claims "arise out of" or "relate to" Papertech's activities within Virginia. *Silent Drive*, *supra*, 326 F.3d at 1202. Kobayashi cannot make this showing.

As frequently reiterated by the Federal Circuit, a plaintiff must have held legal title at the time of the infringement to bring a suit for damages. *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991). The sole exception to this rule is when an assignment of a patent contains an *express provision* also assigning a right of action for past infringement. *Id.* at 1579 n.7; *see also Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996). Such an assignment must be express, and can not be inferred from an assignment of the patent itself. *See, e.g., Jones v. Berger*, 58 F. 1006 (D. Md. 1893).

In addition, Kobayashi must have standing at the time suit was filed. Standing cannot be conferred *nunc pro tunc*. *Enzo Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998)

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignment in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Enzo Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998), *quoting from Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310 (D. Del. 1995).

Here, Kobayashi did not have legal title to sue for any alleged infringement that occurred before December 10, 2007 and, consequently, it did not have standing when this lawsuit was filed and its claims cannot arise out of Papertech's limited contacts with Virginia. More

specifically, the plain language of the patent assignment from Jacklin to Kobayashi only gives Kobayashi the right to sue for infringement that occurred on or after December 10, 2007 – the date of the patent assignment.  The right to sue for alleged infringement that occurred prior to December 10, 2007, continues to remain with Jacklin.  *See* Comp., Ex. A.

Yet, all sales and installations of the allegedly infringing product to residents and/or facilities in Virginia occurred *prior to* the alleged December 10, 2007, assignment of the patents to Kobayashi.  Since Papertech's minimal contacts with Virginia occurred before Kobayashi acquired the rights in the Champion patents on December 10, 2007, Kobayashi does not have standing to sue Papertech for any issues relating to these contacts and, therefore, Kobayashi's claims in this case simply cannot arise out of activities within Virginia.

  c. <u>Asserting personal jurisdiction over Papertech is not reasonable or fair</u>

Even if this Court finds that Papertech purposefully directed its activities at residents of Virginia and that Kobayashi's claims legally arise out of those activities, jurisdiction should not be exercised over Papertech because it would be unreasonable and contrary to the traditional notions of "fair play and substantial justice."  *See Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995).  Courts look at the following five factors to determine whether exercising personal jurisdiction over a foreign defendant would be reasonable and fair: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interests in obtaining relief, (4) the interstate judicial system's interesting in obtaining the most efficient resolution of controversies, and (5) the shared interest of several states in furthering substantive social policies.  *Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1363 (Fed. Cir. 2001).

Here, the burden on Papertech in trying this case in Virginia is high, and Virginia's interest in this case is minimal, at best.  Papertech is too far removed from Virginia for personal jurisdiction to be reasonable.  Papertech's principal place of business is thousands of miles away from Virginia and in another country.  It would be unduly burdensome on Papertech to be forced to defend an action so far away from its familiar locale and business operations – and in a state in which it never submitted to jurisdiction.  Further, all of Papertech's corporate records

and personnel, as well as its manufacturing facilities, are in Vancouver.  The simple factor of distance precludes Papertech from actively participating in its defense and renders personal jurisdiction over Papertech unreasonable in this matter.

Despite Kobayashi's previous motion to transfer this case between divisions within this district, which are only 180 miles apart, Kobayashi now conveniently ignores the undue burden that traveling to Virginia would place on Papertech.  Moreover, Kobayashi is nothing more than a holding company that purportedly acquired the Champion patents less than two weeks before filing this lawsuit.  As such, Kobayashi is not a traditional plaintiff in the sense that it likely does not possess or control any documents that will be at the heart of discovery in this case, nor does it likely employ any witnesses with knowledge relevant to this lawsuit – i.e., those involved in or familiar with: (1) the License Agreement; (2) the pulp and paper industry; (3) the technology at issue in the Champion patents; or (4) the preparation and prosecution of the Champion patents.  Therefore, the bulk of discovery in this case will be directed to non-parties such as International Paper and Jacklin – none of which reside in Virginia – and little, if any, discovery will be specifically directed to Kobayashi.

Additionally, as discussed *infra* in Section III., Champion and Papertech agreed to a forum and venue selection clause when they executed the License Agreement, which specifically requires that any suits arising out of or related to the License Agreement be heard in the United States District Court for the Southern District of New York.  As further detailed herein, this case arises out of or relates to the License Agreement because: (1) a central issue in this case will be whether the License Agreement is still in effect; (2) Kobayashi seeks payment for royalties under that agreement dating back to its inception in 1998; and (3) Kobayashi bases its claim of patent infringement solely on the fact that Papertech entered into and later terminated the License Agreement.  In fact, immediately prior to the filing of the present action, counsel for Kobayashi made a point "to clarify" that Kobayashi's patent infringement claim "derives specifically from products that were licensed pursuant to a License Agreement which [Papertech] claims to have terminated."  *See* Correspondence from J. Schwaber to R. Taché

18

dated December 6, 2007, attached as Ex. D to Taché Decl.  Thus, the terms of the License Agreement are directly at issue, and finding that personal jurisdiction exists over Papertech in Virginia would be inherently unfair and unreasonable because it would deprive Papertech of its negotiated right to have disputes related to the License Agreement heard in New York. Moreover, such a finding would reward Kobayashi's attempt to improperly enforce the License Agreement that was properly terminated by Papertech more than seven years ago, while allowing Kobayashi to selectively ignore the forum and venue selection clause negotiated and agreed to by Champion – Kobayashi's predecessor in interest in the License Agreement.

In short, Kobayashi has not and cannot show that facts exist sufficient to support specific jurisdiction over Papertech.

**B.    Federal Rule of Civil Procedure 4(k)(2) Does Not Convey Jurisdiction Over Papertech**

Though not specifically alleged in its Complaint, Kobayashi may belatedly attempt to hinge personal jurisdiction on Federal Rule of Civil Procedure 4(k)(2).  Rule 4(k)(2) does not convey jurisdiction over Papertech, however, because Kobayashi cannot establish all of the elements of that rule.  In particular, to establish jurisdiction under Rule 4(k)(2), a plaintiff must show: (1) the claim arises under federal law; (2) the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state; and (3) the court's exercise of jurisdiction would be consistent with the Constitution and the laws of the United States.  *Base Metal Trading, Ltd. V. OJSC Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002).

While patent infringement claims arise under federal law, thereby satisfying the first prong of this test, Kobayashi certainly cannot satisfy the second element of this rule because Papertech admits that it is subject to personal jurisdiction in New York based on the forum and venue selection clause in the License Agreement.  As such, personal jurisdiction does not exist under Rule 4(k)(2).

## IV.

## <u>THE COURT SHOULD TRANSFER THIS CASE TO NEW YORK</u>

When a case is improperly filed in the wrong district court, 28. U.S.C. § 1406 authorizes the court to either dismiss the case or, if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.  Although Papertech respectfully submits that the Court should dismiss this case for lack of personal jurisdiction for the reasons previously set forth, at a minimum the Court should enforce the forum and venue selection clause in the License Agreement and transfer the case to New York pursuant to § 1406.  This Court need not decide the personal jurisdiction issue, because a court may transfer a case, even if personal jurisdiction is lacking, to a district in which the case might have been brought. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S.Ct. 1184, 1190 - 93 (2007); *Goldlawr, Inc. v. Heiman*, 82 S.Ct. 913, 915-16 (1962); *In re Carefirst of Maryland v. Carefirst Urgent Care Center*, LLC, 305 F.3d 253, 255-56 (4th Cir. 2002).

The purported assignment of the Champion patents to Kobayashi alleged in the Complaint includes the license agreements granted by the prior owners of the patents.  Comp., Ex. 1.  Kobayashi alleges in the Complaint that the License Agreement was not legitimately terminated and, therefore, that the License Agreement is still in effect.  Comp., ¶¶ 19 and 27.  Accordingly, one of the central issues in this case will involve whether Papertech properly terminated the License Agreement.  Furthermore, Kobayashi also claims that Papertech "[f]ailed to pay all royalties due under the License Agreement" and, in its prayer for relief, seeks an interim escrow order of a 5% royalty for all products that Papertech "has at any time sold," which would include the time frame when the License Agreement was in effect prior to the disputed termination.  Comp., ¶ 19.

In addition, as part of the alleged chain of title in the Complaint, Kobayashi relies upon and incorporates by reference the Patent Purchase Agreement assigning the Champion patents from International Paper to Jacklin, which is attached as Exhibit 2 to the Complaint.  Comp., ¶7.  The Patent Purchase Agreement, dated October 19, 2007, included an assignment of certain

listed license agreements in paragraph 3(ii), and the "Assigned Agreements," which are listed in exhibit A to the Patent Purchase Agreement, including the License Agreement with Papertech at issue in this case.[6]  Comp., Ex. 2.  *See also, Heidelberg Harris, Inc. v. Loebach*, 145 F.3d 1454, 1458 - 60 (Fed. Cir. 1998) (holding that patent assignment is subject to outstanding licenses); *Keystone Type Foundry v. Fastpress Co.*, 272 F. 242, 245 - 46 (2d Cir. 1921); *Sanofi v. Med-Tech Veterinarian Prods.*, 565 F.Supp. 931, 939 - 40 (D.N.J. 1983).

Thus, the disputes in this case arise out of or relate to the terms of the License Agreement, and/or an alleged breach of the License Agreement.  Under the terms of the License Agreement, any suit brought "on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof" had to be brought in the United States District Court for the Southern District of New York.  Comp., Ex. 3 at ¶ 18.1.  The License Agreement is attached to the Complaint as Exhibit 3 and is incorporated by reference.  Comp., ¶9.  Therefore, the Court may consider the document on a Rule 12(b)(6) motion to dismiss without converting the motion to a summary judgment motion.  *See, Simons v. Montgomery County Police Officers,* 762 F.2d 30, 32 (4th Cir. 1985); *Fellores v. Winter,* No. 2:06cv551, 2007 WL 2471527, at *1(E.D. Va. Aug. 23, 2007); *Basnight v. HRSA-ILA Mgmt,* No. 2:04cv782, 2006 WL 2850650, at *6 (E.D. Va. Sept. 28, 2006); *Norfolk Fed'n of Bus. Dists. v. Dep't of Hous. & Urban Dev.*, 932 F.Supp. 730, 736 (E.D. Va. 1996); and *Davis v. Hudgins,* 896 F.Supp. 561, 566 (E.D. Va. 1995).

Forum selection clauses, the enforceability of which is governed by federal law, are presumptively enforceable.  According to the Supreme Court, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1,

---

[6] Given that Papertech had terminated the License Agreement *more than seven years* prior to the date of the Patent Purchase Agreement, its inclusion in the list of "Assigned Agreements" is, at best, puzzling.

10 (1972). The Supreme Court itself upheld the validity of forum selection clauses in a number of cases. *See, e.g., Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589-95 (1991); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985); *Bremen*, *supra*, 407 U.S. at 8-18 (1972).

In accordance with these principles, "it is well-established that [forum selection] clauses will be enforced unless it clearly can be shown that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Karl Koch Erecting Co. v. New York Convention Ctr. Dev. Corp.*, 838 F.2d 656, 659 (2d Cir. 1988). In *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993), the court listed the following factors for courts to consider in determining if a forum selection clause is unreasonable:

> (1) if their incorporation into the agreement was the result of fraud or overreaching . . . ; (2) if the complaining party "will for all practical purposes be deprived of his day in court," due to the grave inconvenience or unfairness of the selected forum . . . ; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy . . . ; or (4) if the clauses contravene a strong public policy of the forum state.

*Id.* at 1363 (citations omitted).

Considering these factors in relation to the case at hand, Papertech submits that enforcing the forum and venue selection clause in the License Agreement would not be unreasonable. Kobayashi will not be deprived of its day in court if the case is transferred to New York, nor will Kobayashi be deprived of a remedy if this case proceeds in New York. Indeed, the Carotek lawsuit arising out of the Carotek license agreement, which also involves the Champion patents, is already pending in New York, and Kobayashi has not raised any objections to the venue. Furthermore, both the License Agreement at issue in this case, and the Patent Purchase Agreement attached as Exhibit 2 to the Complaint, state that the agreements shall be interpreted, construed, and enforced in accordance with the laws of the State of New York. Comp., Ex. 2 at ¶ 8.5; Comp., Ex. 3 at ¶18.1. The New York court will presumably be more familiar with the laws of the State of New York. Indeed, because the outcomes of both

this lawsuit and the Carotek lawsuit are potentially determinative of each other, and both of which must be decided in accordance with the laws of New York, at the very least, the forum and venue selection clause should be enforced.

Thus, if this action is not dismissed for lack of personal jurisdiction, it should be transferred to the United States District Court for the Southern District of New York.

## V.

## <u>CONCLUSION</u>

This Court should dismiss this case because the Court does not have personal jurisdiction over Papertech under either the Virginia long-arm statute or the Federal long-arm statute since (1) Papertech's limited contacts with Virginia fall far short of the necessary contacts to establish either general or specific jurisdiction and (2) Papertech is subject to personal jurisdiction in New York. In the alternative, Papertech respectfully requests that this Court enforce the forum and venue selection agreement in the License Agreement and transfer this case to the United States District Court for the Southern District of New York.

PT PAPERTECH INC.

By_____/s/_____
                    Of Counsel

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1200
(804) 697-1339 (Fax)

<u>Of Counsel:</u>
J. Rick Taché (CA Bar #195100)
Janet L. Taché (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 28th day of February, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Jeffrey M. Schwaber
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> jschwaber@steinsperling.com
>
> Alexia Kent Bourgerie
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerire@steinsperling.com

> _____/s/_____
> Dabney J. Carr, IV, VSB #28679
> (dabney.carr@troutmansanders.com)
> TROUTMAN SANDERS LLP
> P. O. Box 1122
> Richmond, Virginia  23218-1122
> (804) 697-1238
> (804) 698-5119 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF J. RICK TACHÉ IN SUPPORT OF PT PAPERTECH INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406

I, J. Rick Taché, declare:

1.    I am an attorney licensed to practice law before all courts of the State of California, the U.S. District Court for the Central District of California, the U.S. District Court for the Eastern District of Michigan, the U.S. District Court for the Western District of North Carolina, the U.S. District Court for the District of Arizona, and the Court of Appeals for the Federal Circuit, and I am a partner in the law firm of Snell & Wilmer L.L.P., counsel of record for Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech") in the above-entitled lawsuit. I have personal knowledge of the facts set forth below and if called to testify as a witness I could competently testify to them.

2.    I make this declaration in support of Papertech's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(B)(2), or in the Alternative, Motion to Transfer Venue Pursuant to 28 U.S.C. § 1406.

3.    Attached as Exhibit A is a true and correct copy of the lawsuit entitled *Carotek,*

*Inc. v. Kobayashi Ventures LLC,* U.S. District Court case no. 07 CV 11163 (referred to herein as the "Carotek lawsuit").

4.    Attached as Exhibit B is a true and correct copy of Kobayashi Ventures LLC's ("Kobayashi") answer and counterclaim in the Carotek lawsuit.

5.    In the interests of cooperation, I entered into a service agreement with Kobayashi's counsel, Jeffrey Schwaber, which allowed Kobayashi to avoid serving Papertech in this case through the Hague Convention in exchange for various discovery concessions. Pursuant to that agreement, Papertech waived service of process on February 6, 2008, and so its response to Kobayashi's Complaint is due on May 6, 2008 pursuant to Fed.R.Civ. P. 12(a)(1)(A)(ii).  Attached as Exhibit C is a true and correct copy of correspondence from me to Mr. Schwaber dated February 26, 2008 reflecting this agreement.

6.    Attached as Exhibit D is a true and correct copy of correspondence from Mr. Schwaber to me dated December 6, 2007, in which Mr. Schwaber clarified that Kobayashi's patent infringement claim in this suit "derives specifically from products that were licensed pursuant to a License Agreement" between Papertech and Champion International Corporation.

I, declare under penalty of perjury that the foregoing is true and correct.

Executed this _27th_ day of February, 2008, at Costa Mesa, California.

J. Rick Taché

8599227

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROTEK, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>KOBAYASHI VENTURES, LLC )<br><br>Defendant ) | **JUDGE BUCHWALD**<br>**07 CV 11163**<br><br>Civil Action. No. |

**FILED**
**U.S. DISTRICT COURT**
**2007 DEC 11 PM 3:15**
**S.D. OF N.Y.**

### DECLARATORY JUDGMENT COMPLAINT
### AND
### COMPLAINT FOR AFFIRMATIVE MONETARY RELIEF

#### (*Jury Trial Demanded*)

COMES NOW Plaintiff Carotek, Inc. ("Carotek") and files this Complaint for a Declaratory Judgment and Complaint for Affirmative Monetary Relief against Defendant Kobayashi Ventures, LLC (hereinafter "Kobayashi"). Plaintiff respectfully alleges and states the following:

#### JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 (a)(1), (b) and (c)(1), 28 U.S.C. § 1338, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.  Upon information and belief, Carotek and Kobayashi are citizens of different States, and the sum or value of the claim being asserted herein by Carotek is greater than $75,000, calculated in accordance with  28 U.S.C. § 1332 (b).

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

1

3.    Defendant has sufficient contacts with New York, this District and Division to satisfy this Court's exercise of personal jurisdiction over it.

4.    Defendant has contractually agreed that this Court is the proper forum and has contractually consented to personal jurisdiction in the State of New York pursuant to the Governing Law provision, Section XVIII, in the license agreement at issue.

## PARTIES

5.    Plaintiff Carotek is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business at 700 Sam Newell Road, Matthews, N.C. 28105.

6.    Upon information and belief, Defendant Kobayashi is a privately held company not organized under the laws of the State of North Carolina. Upon further information and belief, Defendant Kobayashi purports to be the assignee of all right, title and interest of that certain license agreement ("Agreement") between Carotek and Champion International Corporation, dated December 8, 1998.

7.    On or about October 29, 2007, an attorney representing Kobayashi forwarded to Carotek, by means of a letter to its attorney, a demand that Carotek furnish Kobayashi a copy of the above-referenced license agreement together with an accounting of "annual fees" allegedly due from Carotek under the Agreement.

8.    On or about November 26, 2007, an attorney representing Kobayashi forwarded to Carotek and its attorney a letter purporting to place Carotek on formal "notice of default" and threatening to terminate the Agreement on the thirty-first day after the date of the letter.

2

9.     The same November 26, 2007 letter references numerous patents, and demands that Carotek "immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof" covered by the listed patents.

10.     The explicit allegations, threats, demands for payment of money, and demands that Carotek cease and desist carrying out its legitimate business activities under the Agreement as made by Defendant Kobayashi in its original correspondence with Carotek, and subsequently, give rise to an actual and justiciable controversy between Carotek and Kobayashi within the meaning of 28 U.S.C. § 2201(a).

### CLAIM FOR DECLARATION THAT CAROTEK HAS NOT BREACHED THE LICENSE AGREEMENT OF DECEMBER 8, 1998

11.     Paragraphs 1- 10 are incorporated by reference herein as though set forth in their entirety.

12.     Carotek denies the claims and the allegations by Defendant that it has breached the Agreement.

13.     There is an actual and justiciable controversy within the meaning of 28 U.S.C.2201(a) between Carotek and Kobayashi as to, inter alia, whether Carotek has breached the Agreement, whether Carotek owes any past royalty payments under the Agreement, and whether Carotek owes any royalty payments for future activity under the Agreement.

14.     Plaintiff seeks pursuant to 28 U.S.C. §§ 2201 and 2202, a Declaratory Judgment that Carotek has not breached the Agreement, that Carotek owes Kobayashi no past royalty payments under the Agreement, and Carotek will not owe any royalty payments for future activity under the Agreement.

3

## CLAIM FOR MONETARY RELIEF

15.    Paragraphs 1- 14 are incorporated by reference herein as though set forth in their entirety.

16.    Carotek has made substantial payments under the Agreement for a period of years commencing shortly after execution of the Agreement in December, 1998.

17.    The Agreement, Article XII, contains a "most favored license" provision whereby, inter alia, Carotek was and is entitled to the benefits of the most favorable royalty terms extended to any other licensee.

18.    The Agreement, Article XII, contains a "most favored license" provision whereby, inter alia, the licensor Champion was and is obligated to inform Carotek of more favorable royalty terms extended to any other licensee, and to extend those more favorable royalty terms to Carotek.

19.    Upon information and belief, the licensor Champion extended more favorable royalty terms to at least one other licensee, either expressly, by implication, by acquiescence and/or operation of law, but breached the Agreement by failing and refusing to advise Carotek of the extension of such more favorable royalty terms to Carotek and by failing and refusing to extend those more favorable terms to Carotek. As a proximate result of such breaches, failures and refusals, Carotek continued to pay royalties to Champion at the original, less favorable, royalty rate specified in the Agreement, and, upon information and belief, has paid in excess of $100,000 in royalties not due and owing under the Agreement.

20.    On or about June 7, 2005 Carotek informed International Paper, the then successor to Champion, of its rights under the Agreement, pointing out that it had learned of a

4

more favorable royalty term extended to another licensee, and invited comment. No reply was ever received to that letter, and Carotek by operation of the Agreement became entitled to the more favorable rate extended to the other licensee–which royalty rate was and is "zero."

21.    Over two years passed before Kobayashi advised Carotek of its ownership of the Agreement and its intention to enforce the Agreement, as set out above.

22.    Kobayashi is bound by the obligations of the original licensor under the Agreement, and took whatever rights it has under such Agreement subject to any and all rights, defenses and claims to which Carotek is entitled in law or in equity.

23.    Carotek is entitled to have and recover of Kobayashi amounts in excess of $100,000, including interest at the legal rate as a result of the breach of the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carotek prays:

A.    That this Court declare that Plaintiff Carotek has not breached the Agreement, and that the Agreement remains in full force and effect to Carotek's benefit;

B.    That this Court declare that Plaintiff Carotek owes no royalties to Kobayashi under the Agreement;

C.    That Kobayashi, its agents, servants, employees, and attorneys and all those in active concert or participation with it, be enjoined, pending trial, from instituting, prosecuting or threatening any action against Plaintiff in this court or elsewhere;

D.    That Carotek have and recover from Kobayashi such royalty amounts as it may prove were wrongly paid under the Agreement;

5

E.  That Defendant, its agents, servants, employees, attorneys and all those in active concert or participation with it be enjoined from alleging that Carotek has breached the Agreement, or is infringing any patent referenced in the Agreement;

F.  That this Court award Plaintiffs interest, costs, attorneys' fees, expenses and such further relief that this Court deems just and equitable; and

G.  That all issues so triable be tried by jury.

This the 11th day of December, 2007.

Respectfully submitted,

_____
John Garretson (2595395)
Raymond R. Castello (RC 2106)
FISH & RICHARDSON P.C.
Citigroup Center - 52nd Floor
153 East 53rd Street
New York, NY 10022-4661
Tel: 212-765-5070

6

# ADAMS EVANS P.A.
### INTELLECTUAL PROPERTY ATTORNEYS

W. THAD ADAMS, III
J. SCOTT EVANS
STEPHEN S. ASHLEY, JR.
MATTHEW J. LADENHEIM
JONATHAN M. HINES
BRANDON C. TREGO
KATHRYN A. GROMLOVITS
SETH L. HUDSON

2180 Two Wachovia Center
301 South Tryon Street
Charlotte, North Carolina 28282-1991
Telephone: (704) 375-9249
Facsimile: (704) 375-0729

PATENTS
TRADEMARKS
COPYRIGHTS
UNFAIR COMPETITION
TRADE SECRETS
INTERNET LAW

June 2, 2005

**CONFIDENTIAL**
**ATTORNEY/CLIENT PRIVILEGED**

Joe C. Young, Esq.
1515 Mockingbird Lane, Suite 520
Charlotte, NC  28209

RE:  **Our File No. 2969/4; Carotek, Inc. ("Carotek") License Agreement with Champion International Corporation ("Champion")**

Dear Joe:

I appreciate you consulting me regarding Carotek's license agreement with Champion. Based on the facts provided to me in our conversation on May 17, 2005, it is my opinion that Carotek can claim the benefit of the "most favored licensee" clause in their contract with Champion. It is also my opinion that Carotek should be able to recover the money paid as royalties during the time when the other licensee was not paying any royalties.

The facts forming the basis of my opinion are those you provided in our conversation on May 17, 2005. More detailed knowledge of the facts involved might alter my opinion. A discussion of the relevant facts and legal authorities in support of my opinion follow.

First, I should briefly revisit the relevant facts as I understand them from our conversation. You indicated that on September 24, 1998, Carotek entered into a license agreement with Champion. You further indicated that this 1998 license agreement contained what is commonly known as a "most favored licensee" clause in Article XII. You also indicated that at some subsequent unknown date Carotek was informed, and believes, that another Champion licensee stopped making royalty payments. Finally, you indicated that to Carotek's knowledge there has been no attempt by Champion to collect royalty payments from the non-paying licensee.

A "most favored licensee" clause, also sometimes known as a "most favored nation" clause, is a common clause in patent license agreements. While the specific wording of these "most favored licensee" clauses vary widely, the basic meaning is the same. The licensor agrees that if a second licensee pays a lower royalty rate than the one stated in the license agreement, the first licensee can

Joe C. Young, Esq.
June 2, 2005
Page 2

also pay the lower royalty rate. In other words, no other licensee should get a better royalty rate than the licensee who is a party to a contract containing a "most favored licensee" clause.

There are several cases that shed light upon the meaning and purpose of a "most favored licensee" clause in a patent license agreement. The purpose of a "most favored licensee" clause is to "guarantee that no other licensee will be given the opportunity to use the patent at a more favorable rate." Epic Systems Corporation v. Allcare Health Management System, Inc., 2002 WL 31051023 (N.D. Tex.) citing Cardinal of Adrian, Inc. v. Amerock Corp., 208 U.S.P.Q. 822, 823 (E.D. Mich. 1979). A "most favored licensee" clause protects a licensee against competitive disadvantage. Carpenter Technology Corp. v. Armco, Inc., 800 F.Supp. 215, 224 (E.D. Penn. 1992).

My opinion that Carotek can claim the benefit of the "most favored licensee" clause of its contract with Champion, as well as recover royalties paid while the other licensee was not paying any royalties, is substantially based on St. Joseph Iron Works v. Farmers Mfg. Co., 106 F.2d 29, 4th Cir. 1939). This case is directly on point for Carotek's situation with Champion and is controlling precedent in the Fourth Circuit.

In St. Joseph Iron Works, licensor St. Joseph Iron Works ("St. Joseph") filed a suit against licensee Farmers Manufacturing Company ("Farmers") to recover royalties under a patent licensing agreement. Farmers then filed a counterclaim for royalties already paid due to a breach of the "most favored licensee" clause of their contract with Farmers. The District Court found in favor of Farmers, the licensee, and the Fourth Circuit affirmed the District Court's finding.

The facts in St. Joseph Iron Works are similar to the facts of Carotek's situation with Champion. In St. Joseph Iron Works, Farmers entered into a patent licensing agreement with St. Joseph. This patent licensing agreement contained a "most favored licensee" clause. Later St. Joseph equipped another customer's machine to manufacture the invention covered by the patent licensed to Farmers. St. Joseph did not collect royalties from this other customer and did not notify Farmers of the agreement with the other customer. Farmers discovered that the other customer was not paying royalties and stopped paying royalties. St. Joseph then filed suit to collect the royalties and Farmers counterclaimed to recover the royalties paid while the other customer was not paying royalties.

The court in St. Joseph Iron Works observed that "since it was manifestly to the advantage of the defendant to be free of the obligation to pay royalties . . ., we may assume that [the defendant] would have availed itself of this privilege under . . . the contract if [the defendant] had been notified by plaintiff that a license without royalty had been granted." St Joseph Iron Works, 106 F.2d at 296. In the present situation, it would also be manifestly to the advantage of Carotek to be free of the obligation to pay royalties, and Carotek would have chosen to not pay royalties if Champion had decided to grant an express license without royalty payments.

Joe C. Young, Esq.
June 2, 2005
Page 3

In St. Joseph Iron Works, the court stated, "It was plaintiff's duty, upon licensing any other person to use the methods or processes covered by the [patents] upon more favorable terms or royalty rates than those accorded defendant, to give immediate written notice to defendant so that defendant might avail itself of these terms. Failure to give such notice was a clear breach of the contract." Id. at 299. Thus, it is clear that it was Champion's duty to notify Carotek that another licensee was given more favorable terms and Champion breached this duty. In my opinion, by breaching this duty to notify Carotek about the other licensee's terms, Champion unmistakably breached the contract with Carotek.

If Champion had notified Carotek that another licensee was not paying royalties, Carotek could have, upon election, stopped making royalty payments too. See St. Joseph Iron Works at 299. ("It was plaintiff's duty under the contract to notify defendant, and, had it done so, defendant, upon its election, would automatically have been entitled to the same terms, i.e. to be relieved of payment of royalties.")

The St. Joseph Iron Works court also directly addresses the issue of what damages are recoverable in this type of situation when it stated:

> There can be no question but that a breach of the contract in this vital matter precluded the recovery of royalties; for if defendant had been give the opportunity by proper notice to be free of royalties, as was [the other licensee] it would admittedly have exercised its right in premises. And we think it equally clear that defendant is entitled to recover of plaintiff on its counterclaim the royalties which it paid in ignorance of its rights and as a result of the failure of the plaintiff to give notice which the contract required. The payment of the royalties was a damage which it sustained as a result of the plaintiff's breach of contract; and it may recover them of plaintiff as damages for the breach.

St. Joseph Iron Works, 106 F.2d at 299.

Applying this rubric to the present case, it appears as if Carotek can fully recover any royalties paid to Champion while the other licensee was not paying any royalties. Champion was only able to collect these royalties by breaching the contract with Carotek. The recovery of these already-paid royalties by Carotek would serve as damages for Champion's breach of the contract.

While there are some factual distinctions between the St. Joseph Iron Works case and the present case, I believe these differences are insubstantial and would not change the result of the St. Joseph Iron Works case or my opinion about Carotek's case.

One factual difference is that the licensing agreement in St. Joseph Iron Works dealt with pending patent applications whose claims were eventually rejected. However, the court mentions

Joe C. Young, Esq.
June 2, 2005
Page 4

the irrelevance of this fact on several occasions. The court, when discussing St. Joseph's lack of notification to Farmers about the other licensee's more favorable terms, stated, "[f]ailure to give such notice was a clear breach of the contract; and the breach was not cured by the subsequent rejection of the claims." St. Joseph Iron Works, 106 F.2d at 298. Further, the court reasoned that upon notification Farmers would have been relieved of royalty payments "whether the claims of the patent were ultimately allowed or not. It was the provision of the license relating to the claims, and not the validity of the claims, which fixed the duty of the plaintiff and the right of the defendant." Id. at 299. This finding by the St. Joseph Iron Works court may become especially relevant in Carotek's situation if, for instance, it is discovered that the other licensee stopped paying royalties because the patents involved are invalid.

Another factual difference is the nature of the license agreement with the licensee not paying any royalties. In St. Joseph Iron Works, the licensor installed a machine with the equipment necessary to produce the invention covered by the patent for the non-paying licensee. There was no original written license agreement and from the start, this licensee never made any royalty payments. The court found that St. Joseph had granted an implied license to use the patent without making any royalty payments. Here, both the licensees have express license agreements with Champion. The legal issue is whether Champion, by allowing one licensee to stop paying royalties, created a new implied license agreement with the non-paying licensee.

I believe Carotek has a strong and convincing argument that Champion granted an implied license to the other licensee when they were allowed to cease making royalty payments. This implied license obviously has different terms then the written license agreement, which included making royalty payments. In the words of the Supreme Court,

> No formal granting of a license is necessary in order to give it effect.
> Any language used by the owner of the patent, or any conduct on his
> part exhibited to another from which that other may properly infer
> that the owner consents to his use of the patent in making or using it,
> or selling it, upon which the other acts, constitutes a license.

De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927).

The Federal Circuit has also discussed implied licenses. "[C]ourts and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997). Thus, by allowing another licensee to stop making royalty payments or by failing to collect royalty payments, Champion has granted an implied license to the other licensee to use the patents without payment. Carotek, because of the "most favored licensee" clause in its contract with Champion, has a right to the same terms.

Joe C. Young, Esq.
June 2, 2005
Page 5

_____

Therefore, subject to the limitations of the facts available to me, it is my opinion that Champion has breached its contract with Carotek. Champion breached the contract by granting an implied license with more favorable terms to another licensee and failing to notify Carotek of the option to have the same terms. As a result of this breach of contract, Carotek should be allowed to recover the royalty payments made while the other licensee was enjoying the more favorable terms of no royalty payments.

Please let me know if I have based my opinions on any inaccurate information or if you feel my opinions are otherwise erroneous. I hope that this information will assist you in advising your client with regard to the above-referenced issues.

Best regards,

Very truly yours,

Adams Evans P.A.

W. Thad Adams, III

WTA,III:KAG:cms/2969&4.opn

# CARO EK, INC.

June 7, 2005

Mr. Richard C. Stewart, II
Chief Counsel
International Property Department
International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, OH 45140-8316

Re:    License Agreement Dated September 8, 1998 Between Champion International and
       Carotek, Inc.

Dear Mr. Stewart:

It is our understanding that Papertech, Inc., whom we believe is a licensee of Champion's CV2
System Patents, has not paid any royalties on the patents for a considerable time period.

We are aware that Papertech has sold numerous systems in the United States and abroad and
since they are not paying royalties it places Carotek at a competitive disadvantage.

We attach a letter from our intellectual property attorneys stating their advice to Carotek. We
would appreciate your review.

Very truly yours,

*J. Addison Bell*

J. Addison Bell
CEO

JAB:hf

Enc.

cc: Deryl Bell, President – Carotek, Inc.
    Joe C. Young, Attorney

RECEIVED
OCT 3 1 2007

700 Sam Newell Road / P. O. Box 1395 / Matthews, North Carolina 28106
Office: (704) 847-4408    FAX: (704) 847-4465

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN·
MILLARD S. BENNETT·
ALEXIA KENT BOURGERIE·
DAVID S. DE JONG·
JOLIE S. DEUTSCHMAN·
DAVID C. DRISCOLL, JR.·
STUART C. GREENFEIG·
ANN G. JAKABCIN·
JEFFREY M. SCHWABER·
DARCY A. SHOOP·
DONALD N. SPERLING·
PAUL T. STEIN·

MD., DC., VA., FL.◆
MD., DC., VA., NY.▸
MD., DC., PA., NJ.▪
MD., DC., VA.●
MD., DC., NY.●
MD., VA., NC.●
MD., DC·
MD. ONLY·

RONALD M. BOLT·
E. ANDREW COLE·
JAMES W. DAWSON, JR.·
BRIAN K. DELLA ROCCA·
FRANK W. DUNHAM, III◆
JEFFREY FENSTER·
ROBERT J. GARAGIOLA·
MELIHA PÉREZ HALPERN·
MONICA G. HARMS·
JONATHAN F. LIEBERMAN·
IVONNE C. LINDLEY·
MARY CRAINE LOMBARDO·
DARLA J. McCLURE·
DEANNA L. PETERS·
DIEGO J. ROJAS·
DAVID A. ROSEN·
KAREN N. SHAPIRO·

OF COUNSEL:
KEVIN P. FAY·
ALAN S. KERXTON·
SUE ANN MAHAFFEY·
BETH McINTOSH IRVING·
DAVID R. PODOLSKY·
WILLIAM J. SCOTT·

OUR FILE NUMBER
2070656-1

November 26, 2007

*VIA FEDERAL EXPRESS & FIRST CLASS MAIL*
J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC  28209

RE:    *Default Notice to Carotek, Inc. from Kobayashi Ventures, LLC*

Gentlemen:

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain license agreement between Carotek, Inc. and Champion dated December 8, 1998 (the "Agreement"). I am taking the liberty of writing to both of you since it is unclear from Mr. Bell's correspondence whether Mr. Young is indeed representing Carotek in this matter and since Mr. Young has not responded to my November 9, 2007 letter. Please let me know with whom I should communicate going forward.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 2

I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717,456

U.S. Patent No. 5,821,990

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 3

As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
cc:    Kobayashi Ventures, LLC
L:\CLIENTS\K\KobayashiVentures.LLC\Recovery of Royalties.001\Carotek\54-1 bell.young.ltr.doc

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 8th day December, 1998 between **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 (hereinafter referred to as "CHAMPION", or the "Party") and **CAROTEK, INC.** a corporation organized and existing under the laws of North Carolina, having an office at 700 Sam Newell Road, P.O Box 1395, Matthews, North Carolina 28106 (hereinafter referred to as "LICENSEE" or the "Party").

## WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1ˢᵗ) sale of $CV^2$ System in each country, within six (6) months prior to the date

of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of $CV^2$ System less twenty-five percent (25%) of such most favorable price, which Cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6     "Subsidiary" shall mean:

1.6.1  Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2     Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7     "$CV^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single $CV^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed $CV^2$ System.

1.8     "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9     "Commercial Sale" shall mean the $CV^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the $CV^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10  "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

## ARTICLE II-LICENSE GRANT

2.1     Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2     LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3     Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1     During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a <u>bona fide</u> purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2     During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a <u>bona fide</u> purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1. and 3.2. and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.

3.4     During the term of this Agreement and beginning January 1, 1999 , LICENSEE shall pay to LICENSOR minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per calendar year. Minimum guaranteed annual fees shall be paid to LICENSOR within thirty (30) days after the end of the calendar year for which such fees are due and payable. With respect to any calendar year, LICENSEE shall be entitled to a credit for any royalties under paragraphs 3.1 and 3.2 actually paid to LICENSOR under this Article III during such calendar year against minimum guaranteed annual fees for such year.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1     LICENSEE shall render to CHAMPION all royalties fees due and payable to CHAMPION on account of sales of $CV^2$ System during the preceding Reporting Period.  All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

Caroteck.$CV^2$ License                    3

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, Value Added Taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

## ARTICLE V - RECORDS

5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder. LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the license fees due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize $CV^2$ System. LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems. In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all information disclosed to LICENSEE by or through CHAMPION, including any information obtained by LICENSEE visually through an inspection of any sample, device, document or like tangible thing submitted to LICENSEE by or through CHAMPION or by observation at facilities of CHAMPION or CHAMPION Subsidiaries excluding, however, such information which:

Caroteck.$CV^2$ License                              4

7.1.1  Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by LICENSEE, or its employees; or

7.1.2  Had been independently developed by the LICENSEE or was otherwise in LICENSEE's lawful possession prior to disclosure, as shown by written records; or

7.1.3  Is hereafter lawfully disclosed to the LICENSEE by a third party which did not acquire the information under an obligation of confidentiality from or through CHAMPION.

7.1.4  Is disclosed by LICENSEE pursuant to judicial action or governmental regulation or requirement; provided that LICENSEE shall notify CHAMPION of any order or request to disclose Information in sufficient time to allow CHAMPION a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to LICENSEE shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain.  In addition, any combination of features disclosed to LICENSEE shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2  During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, LICENSEE shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that LICENSEE employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the CHAMPION by an authorized officer.  Notwithstanding the foregoing, LICENSEE may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of LICENSEE assisting LICENSEE in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of LICENSEE under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed LICENSEE's standard employment agreement which LICENSEE warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3  LICENSEE shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of CHAMPION by an authorized officer.

7.4  LICENSEE agrees that all documentary, electronic or like tangible Confidential Information, including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through CHAMPION and documentary, electronic or like tangible Confidential Information which is generated by or for LICENSEE which embodies or is based upon Confidential Information are and shall remain the exclusion property of CHAMPION, and LICENSEE shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or

Caroteck.CV² License                    5

expiration of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to CHAMPION.

### ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specification and guarantees, and shall be warranted by LICENSEE. The said performance specification, guarantees and warranties shall be at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

### ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1     CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1     CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE, THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2   IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty

Caroteck.$CV^2$ License                    7

terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of LICENSEE, and CHAMPION shall not be responsible for any such activities. LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

Caroteck.CV² License                    8

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect in the event that:

16.3.1    All the material claims of Patent Rights have been held invalid in a final unappealable judgment of a court of competent jurisdiction; or

16.3.2    A patent or proprietary right infringement dispute arises with respect to Patent rights between CHAMPION or its Subsidiary and a third party, based upon the facts of which an intellectual property attorney of ordinary skill in the art could conclude should be resolved in said third party's favor; or

16.3.3    Other material events or reasons making it impossible or unreasonable for LICENSEE to continue its performance under this Agreement.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction.  Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:          For Business Matters:
                              Champion International Corporation
                              1 CHAMPION Plaza
                              Stamford, CT 06921

                              ATTN:      Richard Piela
                                         Director, Capital Project
                                         Support and MRO

                         For Legal Matters:
                              Champion International Corporation
                              1 Champion Plaza
                              Stamford, CT 06921

                              ATTN:      Richard C. Stewart, II
                                         Chief Patent Counsel

If to LICENSEE:

                         Carotek Inc.
                         700 Sam Newell Road
                         P.O. Box 1395
                         Matthews, North Carolina 28106

                         ATTN:  Addison Bell

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

### ARTICLE XXII - ASSIGNABILITY

22.1     LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2     CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this

Caroteck.CV$^2$ License                    11

Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

## ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

## ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _Gerard P. Clouet_

Name: _GERARD P. CLOUET_

Title: _VICE PRESIDENT_

CAROTEK INC.

By: _J. Addison Bell_

Name: _J. Addison Bell_

Title: _CEO_

## SCHEDULE A

### PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) US Patent No.5,821,990
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Caroteck.CV$^2$ License                    14

## Champion License Royalties

### End User Sales

Royalty = 5% of "Net Sales Price"

"Net Sales Price" =

1. + "Cost of Services" = 10% of the "Total Gross Selling Price" for "$CV^2$ System"
   - Cost of consulting, engineering, installing, supervising and like services performed by or for Carotek for the sale and installation
2. + "Gross Price of Commercial Sales"
   - NOT DEFINED
3. - Packaging Charges
4. - Transportation Charges
5. - Insurance against loss or damage in transit
6. - Sales, excise use and similar taxes directly incurred in connection with the relevant "Commercial Sale"
7. - Import duties and levies and selling commissions by resellers and agents who are not subsidiaries of Carotek

NOTEs:
1. Definition of "Gross Price of Commercial Sales" is not provided.
2. "$CV^2$ System" is defined as shall include but is not limited all hardware components of sale.
3. Could the "Gross Price of Commercial Sales" be the selling price of the hardware only? We do not price our system this way.
4. Could the "Gross Price of Commercial Sales" be the "Total Gross Selling Price" less the "Selling Price of Services"

### Distributor or Reseller Sales

Royalty = 8% of "Net Sales Price"

"Net Sales Price" =

1. + "Cost of Services" = 10% of the "Total Gross Selling Price" for "$CV^2$ System"
   - Cost of consulting, engineering, installing, supervising and like services performed by or for Carotek for the sale and installation
2. + "Gross Price of Commercial Sales"
3. - Packaging Charges
4. - Transportation Charges
5. - Insurance against loss or damage in transit
6. - Sales, excise use and similar taxes directly incurred in connection with the relevant "Commercial Sale"
7. - Import duties and levies and selling commissions by resellers and agents who are not subsidiaries of Carotek

**Champion Purchases (1-10)**

"Fully Absorbed Manufacturing and Installation Cost" =

1. The most favorable price offered by Carotek and accepted by a third party, other than the price for the first (1st) sale of the "$CV^2$ System" in each country, within the last (6) months.
2. Less twenty-five (25%)

**Champion Purchases (10+)**

No less favorable to Champion than the most favorable terms and conditions offered to a third party for the purchase sale or installation of a "$CV^2$ System" as of the date of purchase/sale or license to Champion less the license fee which would have been due and payable to Champion less the license fee which would have been due and payable to Champion if such purchase/sale had been made to a third party.

Purchase Price =

1. + Lowest most favorable Sale Price
2. - Champion license fee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

CAROTEK, INC.,                              :
                                            :          07 Civ. 11163 (NRB) (RLE)
                    Plaintiff/Counter-defendant,  :
                                            :          **DEFENDANT/COUNTER-**
                                            :          **PLAINTIFF'S**
        -against-                           :          **ANSWER AND**
                                            :          **COUNTERCLAIM**
                                            :
KOBAYASHI VENTURES, LLC,                    :
                                            :
                    Defendant/Counter-plaintiff.  :

----------------------------------------------------------x

## ANSWER AND COUNTERCLAIM

Kobayashi Ventures, LLC ("Kobayashi Ventures"), by and through its attorneys,

Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., and Gallagher, Harnett &

Lagalante LLP, hereby answers Plaintiff's Complaint, stating as follows:

To the specifically enumerated paragraphs of the Complaint, by like paragraphs,

Kobayashi Ventures avers as follows:

1.      Kobayashi Ventures denies each and every allegation contained in paragraph 1

of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden

with respect thereto.

2.      Kobayashi Ventures denies each and every allegation contained in paragraph 2

of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden

with respect thereto.

3.      Kobayashi Ventures denies each and every allegation contained in paragraph 3

of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden

with respect thereto.

4.    Kobayashi Ventures denies each and every allegation contained in paragraph 4 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

5.    Kobayashi Ventures is without sufficient knowledge or information to either admit or deny the allegations contained in paragraph 5 of the Complaint.

6.    Kobayashi Ventures denies each and every allegation contained in paragraph 6 of the Complaint, except admits that it is a privately held limited liability company which is organized and existing under the laws of the State of Delaware. Kobayashi Ventures admits that it is the assignee of, *inter alia*, all right, title, and interest in the License Agreement.

7.    Kobayashi Ventures denies each and every allegation contained in paragraph 7 of the Complaint and leaves the document referred to in paragraph 7 to speak for itself. Kobayashi Venture admits only that its counsel sent to Carotek a letter dated October 29, 2007.

8.    Kobayashi Ventures denies each and every allegation contained in paragraph 8 of the Complaint and leaves the document referred to in paragraph 8 to speak for itself. Kobayashi Venture admits only that its counsel sent to Carotek a letter dated November 26, 2007.

9.    Kobayashi Ventures denies each and every allegation contained in paragraph 9 of the Complaint and leaves the document referred to in paragraph 9 to speak for itself.

10.    Kobayashi Ventures denies each and every allegation contained in paragraph 10 of the Complaint, except admits that there is an actual and justiciable controversy between the parties as set forth in paragraphs 28 through 74, below.

### AS AND FOR KOBAYASHI VENTURE'S RESPONSE
### TO CAROTEK'S CLAIM FOR DECLARATION THAT
### CATOTEK HAS NOT BREACHED THE
### LICENSE AGREEMENT OF DECEMBER 8, 1998

11.    Kobayashi Ventures adopts and incorporates by reference its answers to paragraphs 1 through 10 above as if fully set forth herein.

12.    Kobayashi Ventures denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 12 of the Complaint.

13.    Kobayashi Ventures denies each and every allegation contained in paragraph 10 of the Complaint, except admits that there is an actual and justiciable controversy between the parties as set forth in paragraphs 28 through 74, below.

14.    Kobayashi Ventures denies each and every allegation contained in paragraph 14 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

### AS AND FOR KOBAYASHI VENTURE'S RESPONSE
### TO CAROTEK'S CLAIM FOR MONETARY RELIEF

15.    Kobayashi Ventures adopts and incorporates by reference its answers to paragraphs 1 through 14 above as if fully set forth herein.

16.    Kobayashi Ventures denies each and every allegation contained in paragraph 16 of the Complaint.

17.    Kobayashi Ventures denies each and every allegation contained in paragraph 17 of the Complaint and leaves the document referred to in paragraph 17 to speak for itself.

18.    Kobayashi Ventures denies each and every allegation contained in paragraph 18 of the Complaint and leaves the document referred to in paragraph 18 to speak for itself.

3

19.     Kobayashi Ventures denies each and every allegation contained in paragraph 19 of the Complaint.

20.     Kobayashi Ventures denies each and every allegation contained in paragraph 20 of the Complaint and leaves the document referred to in paragraph 20 to speak for itself.

21.     Kobayashi Ventures denies each and every allegation contained in paragraph 21 of the Complaint and leaves the document referred to in paragraph 21 to speak for itself, except admits that it advised Carotek of its ownership of the Agreement and its intention to enforce the agreement.

22.     Kobayashi Ventures denies each and every allegation contained in paragraph 22 of the Complaint and leaves the document referred to in paragraph 22 to speak for itself.

23.     Kobayashi Ventures denies each and every allegation contained in paragraph 23 of the Complaint.

### AS AND FOR A FIRST DEFENSE

24.     The Complaint fails to state a claim upon which relief can be granted.

### AS AND FOR A SECOND DEFENSE

25.     Defendant further intends to rely upon all defenses, legal and/or equitable, which may be available to it based upon the facts as may become known before and during the trial of this matter.

### AS AND FOR A THIRD DEFENSE

26.     Any and all other claims or allegations contained in the Complaint, not otherwise expressly admitted or denied herein, are hereby denied.

4

## AS AND FOR A FOURTH DEFENSE

27.     The Complaint is barred, in whole or in part, by fraud, illegality, and the statute of limitations.

## **COUNTERCLAIM**

28.     Counter-plaintiff Kobayashi Ventures, LLC ("Kobayashi Ventures"), by and through its attorneys, Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., and Gallagher, Harnett & Lagalante LLP, hereby sues and demands injunctive relief and legal damages in its favor and against Counter-defendant Carotek, Inc. ("Carotek"), on grounds as follows:

## INTRODUCTION

29.     This is an action brought by Kobayashi Ventures for patent infringement since December 27, 2007, arising under the patent laws of the United States, Title 35, United States Code, and for unpaid royalties due since December 8, 1998 under a License Agreement which terminated on December 27, 2007. The licensor, Kobayashi Ventures, exclusively owns, among other things, three U.S. patents and a variety of foreign patents that relate to the invention(s) of synchronizing cameras to the speed of a moving web. Since at least December 27, 2007, Carotek willfully and materially has infringed upon such patents belonging to Kobayashi Ventures ("Kobayashi's Patented Technology," detailed in ¶ 36 below). Previously Carotek did not pay royalties it owed and which remain due and owing.

30.     Kobayashi's Patented Technology has been pivotal in the web monitoring industry and its direct customers, the paper, plastics and printing industries—facilitating digital monitoring and capturing of events during the manufacturing process to increase production efficiencies. Kobayashi's Patented Technology has accomplished that which

previously had not been possible, enabling the production of higher quality product at great savings to manufacturers and ultimately to consumers. With conscious disregard for the patent laws of the United States of America, the License Agreement, and Kobayashi's Patented Technology, Carotek has been violating U.S. patent laws, the License Agreement, and the legal rights of Kobayashi Ventures, among others. In this Counterclaim, Kobayashi Ventures seeks necessary injunctive relief and legal damages in its favor and against Carotek.

## PARTIES

31.     Kobayashi Ventures is a limited liability company organized and existing under the laws of the State of Delaware. The business of Kobayashi Ventures is to manage, market, consult, develop, manufacture, create, own, distribute, purchase, sell and/or license patents and other intellectual property.

32.     Upon information and belief, Carotek is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Matthews, North Carolina. Carotek provides event capturing camera products, equipment, systems and software (collectively, "Event Capturing Systems" or "ECS Systems" or "ECS" or "ECS II" or "ECS v.10" or "Mobile ECS" or "Shippable ECS" or "Portable Laptop ECS") used in the paper, printing and other web monitoring industries. These systems in fact incorporate and rely on Kobayashi's Patented Technology.

## JURISDICTION AND VENUE

33.     Subject matter jurisdiction is based on 28 U.S.C. §§ 1331, 1338, and 1367, and 35 U.S.C. § 281.

34.     This Court has personal jurisdiction over Carotek as Plaintiff/Counter-defendant in this action.

35.    Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. 1400(b).

FACTUAL ALLEGATIONS

36.    On or about December 10, 2007, by written assignment executed and delivered

by Jacklin Associates, Inc. to Kobayashi Ventures, Kobayashi Ventures became, and now is,

the owner, *inter alia*, of all right, title, and interest in and to such letters patent (previously and

hereinafter referenced as "Kobayashi's Patented Technology"), having the exclusive right to

make, use, sell, offer for sale, and import into the U.S. the following inventions:

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finnish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

Attached hereto as <u>Exhibit 1</u> and incorporated herein by reference is the Patent

Assignment.  Such Patent Assignment was recorded in the Patent and

Trademark Office on December 11, 2007 at Reel/Frame 020218/0844.

37.    On or about October 19, 2007, by written assignment executed and delivered

by International Paper Company ("International Paper") to Jacklin Associates, Inc., Jacklin

Associates became the owner, *inter alia*, of all right, title, and interest in and to such letters

patent (identified in ¶ 6 above), then having the exclusive right to make, use, and sell

Kobayashi's Patented Technology.  Attached hereto as <u>Exhibit 2</u> and incorporated herein by

7

reference is the Patent Purchase Agreement, Exhibit D of which is the Assignment of Patent Rights. Such Assignment of Patent Rights was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0823.

38.    International Paper became the owner of all right, title, and interest in and to such letters patent (identified in ¶ 6 above) by virtue of assignment from each of the inventors to its predecessor company Champion International Corporation ("Champion"), which became International Paper through a merger. The inventors' assignment was executed March 2, 1995 and recorded in the Patent and Trademark Office on March 6, 1995 at Reel/Frame 007382/0557, and the merger document was executed December 31, 2000 and recorded in the Patent and Trademark Office on November 26, 2007 at Reel/Frame 020143/0440.

39.    On or about December 8, 1998, Carotek entered into a License Agreement with Champion, acquiring patent rights to what is now known as Kobayashi's Patented Technology. Attached hereto as Exhibit 3 and incorporated herein by reference is the License Agreement.

"Article III—Royalties" of the License Agreement states in pertinent part as follows:

LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

"Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for the $CV^2$ System.

"Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise used and similar taxes directly incurred by LICENSEE in connection with the

relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

Therefore:

Royalty Due Per $CV^2$ System Sold to bona fide purchaser = 0.05 x 1.10 x [Gross Price of Commercial Sale – Directly Incurred LICENSEE costs (packaging + transport + transport insurance + taxes + duties + third party commissions)]

40.    Carotek alleges having made some royalty payments under the License Agreement.

41.    "Article XII—Most Favored License" of the License Agreement states as follows:

12.1    If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

[Underscore added.]

42.    On June 7, 2005, Carotek, by its CEO J. Addison Bell, sent a letter to International Paper by its Chief Counsel Richard C. Stewart, II taking an erroneous position based on the most favored license provision at Article XII of the License Agreement that

another licensee Papertech, Inc. "ha[d] not paid any royalties on the patents for a considerable

time period[,]" and therefore Carotek had no obligation to make royalty payments and was

entitled to recover royalty payments previously made. Attached hereto as <u>Exhibit 4</u> and

incorporated herein by reference is this letter.

      43.     On October 29, 2007, Kobayashi Ventures provided to Carotek a letter stating

as follows:

> This law firm has been engaged to represent Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain License Agreement between your company and Champion dated December 8, 1998 (the "Agreement"). Kobayashi is in the process of assessing and pursuing its claims arising, inter alia, out of that Agreement and out of the patent rights associated with the proprietary process monitoring system referenced therein.
>
> Please provide me within ten (10) days of the date of this letter with a copy of your most recent license agreement with Champion International Corporation, along with an accounting of any and all payments made by your company either pursuant to the Agreement or otherwise as a result of your use of the proprietary process monitoring system and related technology as referenced therein. To the extent you have not already done so, please provide promptly the minimum guaranteed annual fees set forth in Paragraph 3.4 of the license agreement for each of the years since the execution of that agreement. These funds should be made payable to Kobayashi Ventures, LLC, and remitted to my attention within the same ten (10) day period delineated above. Upon receipt of the minimum royalty payments, we will apply those sums to your company's account, which will more fully be assessed upon receipt of the documents requested herein.
>
> Thank you for your anticipated cooperation and for your immediate attention to this matter. I look forward to hearing from you.

Attached hereto as <u>Exhibit 5</u> and incorporated herein by reference is this letter.

      44.     On October 31, 2007, by letter from Carotek to Kobayashi Ventures, Carotek

referred Kobayashi Ventures to counsel Joe C. Young.

      45.     On November 9, 2007, Kobayashi Ventures provided to Carotek, by its

counsel Joe C. Young, a letter stating in pertinent part as follows: .

> In light of the fact that you now have this matter and presumably have had a chance to review the referenced Agreement, I would appreciate hearing from you promptly regarding the issues raised in my letter. Of particular importance is the need to bring current the arrearage on the minimum royalty payments set forth in the Agreement.

Attached hereto as <u>Exhibit 6</u> and incorporated herein by reference is this letter.

46.    On November 26, 2007, Kobayashi Ventures provided to Carotek, by its CEO

J. Addison Bell and its counsel Joe C. Young, a default notice letter stating in pertinent part as

follows:

> I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.
>
> Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):
>
> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Attached hereto as Exhibit 7 and incorporated herein by reference is this default notice letter.

47.     Section 16.5 of the License Agreement states in pertinent part, "in the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of CV2 System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which as not been held invalid in a final unappealable judgment of a court of competent jurisdiction." This section of the License Agreement makes it abundantly clear that Carotek proactively was given an effective actual notice of infringement by way of termination of the License Agreement, if it chose to continue to make, cause to be made, used, sold, and offered for sale products embodying the Kobayashi Patented Technology.

48.     The License Agreement terminated on December 27, 2007.

49.     After termination of the License Agreement, Carotek continued and continues to this day—without permission—to make, cause to be made, use, sell, and offer for sale products embodying Kobayashi's Patented Technology.

12

50.    A number of times, including the above mentioned letters, Carotek has been

notified in writing of its failure to make royalty payments, and its infringement of

Kobayashi's Patented Technology since December 27, 2007.

51.    In summary, Carotek's actions include the following:

o    1998: Entered into the License Agreement;

o    1998 to License Agreement termination:  Failed to pay all
royalties due under the License Agreement and upon information and
belief knowingly grossly underpaid royalties owed;

o    1998 to License Agreement termination: Failed to file the
mandatory reports as required under section 4.3 of the License
Agreement detailing all systems sold incorporating   Kobayashi's
Patented Technology;

o    2005: Attempted to avoid royalty payments and sought return
of royalty payments based on an objectively erroneous interpretation of
most favored license provision of the License Agreement;

o    2007: Ignored requests for payment due under the License
Agreement prior to termination; and

o    Since at least December 27, 2007 to present:  Willfully
infringing upon Kobayashi's Patented Technology and benefiting to the
detriment of the licensees who have paid nearly $2,250,000 in royalties
from an unfair advantage in the marketplace by its willful infringement
of Kobayashi's Patented Technology.

52.    Through its actions such as those identified hereinabove, Carotek willfully is

infringing upon Kobayashi's Patented Technology.

53. Further, at all times relevant hereto, Carotek has been obligated, among other

things, to mark on its products and integrated systems which use Kobayashi's Patented

Technology the words, "U.S. Patent(s) [and the number(s) of the patent rights applicable

thereto]" or such other patent marking as Carotek reasonably may have been directed from the

13

then holder of Kobayashi's Patented Technology. Upon information and belief, Carotek

consistently has failed to do so.

54.    Further, at all times relevant hereto, Carotek has been obligated, among other

things, to submit a semiannual report detailing all sales of systems incorporating Kobayashi's

Patented Technology. Section 4.3 of the License Agreement states in part, "Accompanying

each royalty payment shall be a written report showing the computation of such royalty

payment with supporting information in sufficient detail for CHAMPION to understand the

basis for computation. LICENSEE shall render such written statement even if no royalty

payment is due and payable to CHAMPION for a Reporting Period." Upon information and

belief, Carotek consistently has failed to file these mandatory reports.

55.    Since at least December 27, 2007, Carotek has, with full knowledge of the

ownership by others identified above, of Kobayashi's Patented Technology, infringed upon

Kobayashi's Patented Technology by engaging in conduct such as the following:

(a)    making, causing to be made, using, selling, and offering for

sale, without marking, license, permission and/or payment, products such as

the following: synchronizing event capturing systems, cameras and

enclosures, and lights and enclosures, including mobile ECS and shippable

ECS, portable laptop ECS, and ECS v. 10. These products among others,

marketed and sold by Carotek, embody Kobayashi's Patented Technology in a

manner such that the technology utilized by Carotek is substantially identical

or sufficiently similar to Kobayashi's Patented Technology, and/or such

products otherwise are within and therefore embody Kobayashi's Patented

Technology; and

14

(b)    actively inducing and causing others, such as manufacturers and owner operators of such products: (i) to make, cause to be made, use, sell, and offer for sale products that embody Kobayashi's Patented Technology, without marking, license, permission, and/or payment, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

56.    Carotek will continue its acts of infringement unless enjoined by this Court. At the least, Carotek should be immediately barred from the continued use of technology it admittedly agreed to license under the License Agreement subsequently terminated.

57.    Carotek has installed numerous ECS Systems embodying Kobayashi's Patented Technology. Unknowingly, the end customers who have purchased the systems have become unwitting accomplices to Carotek's willful infringement as Carotek has induced these parties into believing that Kobayashi's Patented Technology incorporated into the ECS marketed and sold by Carotek have been appropriately licensed, paid for and marked.

58.    Absent entry of an injunction, the rights of the web monitoring industry and its direct customers, the paper, plastics and printing industries, likely will be irreparably harmed. Specifically, failure to provide to Kobayashi Ventures the equitable relief requested herein would allow Carotek to force its unfair advantage upon the marketplace as Carotek's competitors are under a royalty fee obligation. If Carotek's infringement effectively were to be condoned by not granting to Kobayashi Ventures the equitable relief sought herein, then Carotek will continue to gain market share at the expense of its royalty paying competitors and use its infringement to further its unfair competitive advantage. Such unfair competitive advantage would be harmful to the web monitoring industry as a whole, to the paper,

packaging, plastics, and printing industries, and to Kobayashi Ventures and the licensees of Kobayashi's Patented Technology, and ultimately to the downstream consumers.

59.      Remedies available at law are inadequate to compensate for an injury such as that described in herein.

60.      The balance of hardships between Kobayashi Ventures and Carotek warrants granting to Kobayashi Ventures an equitable remedy. Denying the legitimate royalty paying operators in the web monitoring industry and Kobayashi Ventures the equitable relief sought herein will cause Kobayashi Ventures to suffer additional immediate and real irreparable harm. This is due to the fact that for example there are multiple pending web monitoring projects up for competitive bid at this time. A failure to grant the equitable relief sought herein would amount to a tacit consent allowing Carotek to win business at the expense of the other legitimate royalty-paying bidders in the industry. Carotek should not be purporting to legitimately bid on these contracts since it lacks a valid license to Kobayashi's Patented Technology. Granting to Carotek not only the ongoing ability to bid but also the ongoing ability to benefit from a significant pricing advantage as a direct result of its ill-gotten price disparity would be doubly damaging to the market. The resulting damage to the web monitoring industry and its customers would be impossible to reverse after the fact, given that the legitimate winning bid amount and bidder would be indeterminate and the well poisoned. In contrast, granting the limited equitable relief sought simply would place Carotek in the rightful position it chose to be in by failing to timely cure its default. Absent the relief sought, Carotek would continue to profit from its infringement at the expense of the legitimate licensees and customers in the web monitoring industry.

16

61.    For reasons described hereinabove, the public interest would be well served by granting to Kobayashi Ventures the equitable relief sought herein. The very purpose of the United States Patent and Trademark Office as well as the statutory scheme governing intellectual property rights throughout the United States of America will be threatened if companies are permitted to misappropriate protected, patented and/or otherwise proprietary technology for themselves without cost or ramification. A denial of the equitable relief sought herein materially would also disserve the public interest in the manner described in ¶¶ 57 and 59 above. Additionally, should an infringer such as Carotek gain sufficient market share that it drives legitimate, properly acting competitors out of business, this would have an anticompetitive effect by reducing the number of options available to consumers.

### AS AND FOR A FIRST COUNTERCLAIM
Patent Infringement

62.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 61 above.

63.    Since at least December 27, 2007, Carotek has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, making, using, offering to sell, and/or selling Kobayashi's Patented Technology.

64.    Pursuant to 35 U.S.C. § 271 Kobayashi Ventures reserves all rights to amend its COUNTERCLAIM to encompass additional acts of Patent Infringement including but not limited to discovery of unreported sales resulting from Carotek's failure to comply with the mandatory reporting requirements of Section 4.3 of the License Agreement.

65.    Carotek's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

17

## AS AND FOR A SECOND COUNTERCLAIM
### Patent Infringement (Inducement)

66.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 65 above.

67.    Carotek has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, actively inducing and causing others, such as manufacturers and owner operators of such products, (i) to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

68.    Pursuant to 35 U.S.C. § 271 Kobayashi Ventures reserves all rights to amend its counterclaim to encompass additional acts of Patent Infringement (Inducement) including but not limited to discovery of unreported sales resulting from Carotek's failure to comply with the mandatory reporting requirements of Section 4.3 of the License Agreement.

69.    Carotek's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

## AS AND FOR A THIRD COUNTERCLAIM
### Breach of License Agreement

70.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 69 above.

71.    Under the License Agreement, Carotek had contractual obligations to, among other things, make royalty payments pursuant to Articles III and IV; maintain and make available pertinent records relating to license fee payments, royalties and the like pursuant to Article V; maintain confidentiality pursuant to Article VII; mark pursuant to Article XIV;

upon termination immediately cease design, manufacture, sale and installation of subject products pursuant to Section 16.5; *et cetera.*

72.    Carotek materially breached the License Agreement by failing to perform as required by the License Agreement, including but not limited to failure to comply with the Articles/Sections identified in ¶ 68 above.

73.    Carotek's material breaches of the License Agreement proximately have caused damages to Kobayashi Ventures estimated at $720,000.

74.    Kobayashi Ventures and its predecessor Licensors duly have performed all duties required of Licensor under the License Agreement.

WHEREFORE, Counter-plaintiff, Kobayashi Ventures, L.L.C. respectfully requests that this Honorable Court grant to it the following relief:

A.    A preliminary injunction followed by a permanent injunction (i) enjoining Carotek from engaging in patent infringement as detailed in this Complaint, (ii) enjoining Carotek from inducing others to engage in patent infringement as detailed in this Complaint, and (iii) mandating that Carotek provide immediate written notice of the infringement to customers to whom Carotek has sold products and/or systems containing Kobayashi's Patented Technology since December 27, 2007;

B.    An interim order mandating Carotek to escrow five (5%) percent of the "net sales price" (as defined in the License Agreement) of all products and systems it has at any time sold which use Kobayashi's Patented Technology and for which the appropriate royalty payment was not made, including pre-judgment interest calculated from the due dates of the respective royalty payments to the present at the applicable prime interest rate(s);

C.    An order requiring Carotek to account for and pay to Kobayashi Ventures damages for patent infringement since December 27, 2007, including interest on damages;

D.    Treble damages as applicable pursuant to 35 U.S.C. § 284;

E.    An order granting to Kobayashi Ventures costs and reasonable attorneys' fees to be assessed against Carotek, particularly in view of ongoing, willful infringement;

F.    An order granting to Kobayashi Ventures damages in an amount to be determined at the close of discovery and currently estimated to be up to at least $720,000, pre-judgment interest as allowable by applicable law, post-judgment interest, and costs, and such other and further relief which the Court deems just and proper; and

G.    Such other and further relief which the Court deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Kobayashi Ventures, LLC elects a trial by jury of all issues and claims in this action.

Dated: February 8, 2008

GALLAGHER, HARNETT & LAGALANTE LLP
Attorneys for Defendant/Counter-plaintiff
Kobayashi Ventures, LLC

By:    _____
Brian K. Gallagher (BG 6377)
(A Member of the Firm)
380 Lexington Avenue, Suite 2120
New York, New York 10168
(212) 983-9700

-and-

STEIN, SPERLING, BENNETT, DE JONG,
DRISCOLL & GREENFEIG, P.C.
25 West Middle Lane
Rockville, Maryland 20850
(301) 340-2020

TO:    Raymond Castello
Fish & Richardson, PC
Citigroup Center – 52nd Floor
153 East 53rd Street
New York, NY 10022-4661

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
CAROTEK, INC.,                                      :
                                                    :          07 Civ. 11163 (NRB) (RLE)
                        Plaintiff/Counter-defendant :
                                                    :          **AFFIDAVIT**
                                                    :          **OF SERVICE**
       -against-                                    :
                                                    :
KOBAYASHI VENTURES, LLC,                             :
                                                    :
                        Defendant/Counter-plaintiff. :
-----------------------------------------------------------------x
STATE OF NEW YORK          )
                           ss.:
COUNTY OF NEW YORK         )

       DEVIN R. ROBINSON, being duly sworn, deposes and says:

       1.      I am not a party to this action. I am over the age of eighteen and I
reside in Kings County, New York. My business address is 380 Lexington Avenue, Suite
2120, New York, NY 10168.

       2.      On February 8, 2008, I served upon Plaintiff/Counter-defendant the
annexed Answer and Counterclaim, dated February 8, 2008, with Exhibits 1 through 7
annexed thereto, by sending a true copy thereof by regular mail, securely sealed in a postage
prepaid envelope, addressed to Raymond Castello, Esq., Fish & Richardson, PC, Citigroup
Center – 52nd Floor, 153 East 53rd Street, New York, NY 10022-4661, this being the address
designated for such purpose by Plaintiff/Counter-defendant's counsel in the prior papers
herein.

                                                        _____
                                                        DEVIN R. ROBINSON

Sworn to before me this
8th day of February, 2008

_____
       Notary Public

               BRIAN J. BURNS
       Notary Public, State of New York
                No. 5041069
       Qualified in Westchester County
          Term Expires March 27, _____
                              2011

## PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033.

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _10 th_ day of _December_, 2007.

Jacklin Associates, Inc.

By: _John N Inwin_

On this _10_ day of _Dec_, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

_Nancy Vanning_

NOTARY PUBLIC

My Commission Expires: _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents ("Patent Materials").

PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means    prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind  received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term. Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.      Payments

2.1     Initial Payment.  Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2     Ongoing Payments.

        (a)     During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment").  The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b).  Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement.  When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied.  In the event that funds from Net Royalty Collections payable to Seller under the terms hereof are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations.  In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

        (b)     During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

        As an example:

| Year | 1 | 2 | 3 |
|------|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

        2.3     Statements and Payments.  All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

2.4    Records.    Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.    Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

(i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing   rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

(ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not  have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.    PARAGRAPH INTENTIONALLY DELETED

5.    Representations and Warranties of Seller

5.1    Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2    Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS". Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to: (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.    Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1    Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2    Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.    License

7.1    License Grant. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2    No Other Rights. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.    Miscellaneous

8.1    Limitation of Liability. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2    Limitation on Consequential Damages. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3    Compliance With Laws.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4    Confidentiality.  For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure.  Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5    Governing Law; Venue/Jurisdiction.  This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6    Notices.  All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services: FedEx, U.S.P.S., DHL or UPS.

| If to Purchaser | If to Seller |
|---|---|
| Jacklin Associates, Inc. | International Paper Company |
| Attention: President | Attention: Chief Counsel, Intellectual Property |
| 259 North Radnor Chester Road | 6285 Tri-Ridge Blvd. |
| Suite 210 | Loveland, OH 45140 |
| Wayne, Pennsylvania 19087 | |

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal.  Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7    Severability.  If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8     Waiver.  Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9     Successors and Assigns.  Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit.  Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect.  All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    Independent Contractors.  Seller and Purchaser are independent contractors.  Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy.  Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    Payment of Maintenance Fees.  Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser.  In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller.  Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment.  Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status.  If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14 Revocation of Sale of Assigned Patents and Assigned Agreements.  If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect.  In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller.  Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    Miscellaneous.  This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions.  Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.  The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.  No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                                    PURCHASER:

International Paper Company                 Jacklin Associates, Inc.

By:_____               By:_____

Name:_____               Name:_____

Title:_____               Title:_____


Effective Date:  August _____, 2007

EXHIBIT A

ASSIGNED AGREEMENTS

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

ASSIGNED PATENTS

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

<u>DELIVERABLES</u>

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

## EXHIBIT D
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)    the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)    all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)    all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)    all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)     damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| | | | | |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at *Loveland, OH* on ___ *10-19-2007* .

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____

Name: *NORMAN MARSOLAN*

Title: *DIRECTOR, R&D*

*(Signature MUST be notarized)*

STATE OF *OHIO*          )
                                          ) ss.
COUNTY OF *CLERMONT* )

On *10-19-2007* before me, *JANE A. TOMLINSON* , Notary Public in and for said State, personally appeared *NORMAN MARSOLAN*, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)



**Jane A. Tomlinson**
**Notary Public, State of Ohio**
**My Commission Expires**
**June 19, 2012**

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 8th day December, 1998 between **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 (hereinafter referred to as "CHAMPION", or the "Party") and **CAROTEK. INC.** a corporation organized and existing under the laws of North Carolina, having an office at 700 Sam Newell Road, P.O Box 1395, Matthews, North Carolina 28106 (hereinafter referred to as "LICENSEE" or the "Party").

### WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "CV$^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell CV$^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "CV$^2$ System" shall mean the process monitoring system claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of CV$^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for CV$^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of CV$^2$ System in each country, within six (6) months prior to the date

of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV$^2$ System less twenty-five percent (25%) of such most favorable price, which Cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

    1.6    "Subsidiary" shall mean:

        1.6.1  Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

        1.6.2    Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

    1.7    "CV$^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV$^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV$^2$ System.

    1.8    "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

    1.9    "Commercial Sale" shall mean the CV$^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV$^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

    1.10  "Net Sales Price" shall mean the sum of the Cost of Services and the gross  price of Commercial Sales of CV$^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If CV$^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for CV$^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV$^2$ System.

<div align="center">ARTICLE II-LICENSE GRANT</div>

2.1     Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2     LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE  provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3     Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1     During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2     During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the  System of said $CV^2$ System Installation (i.e. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.     Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1. and 3.2. and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.

3.4     During the term of this Agreement and beginning January 1, 1999 , LICENSEE shall pay to LICENSOR minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per calendar year. Minimum guaranteed annual fees shall be paid to LICENSOR within thirty (30) days after the end of the calendar year for which such fees are due and payable. With respect to any calendar year, LICENSEE shall be entitled to a credit for any royalties under paragraphs 3.1 and 3.2 actually paid to LICENSOR under this Article III during such calendar year against minimum guaranteed annual fees for such year.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1     LICENSEE shall render to CHAMPION all royalties fees due and payable to CHAMPION on account of sales of $CV^2$ System during the preceding Reporting Period.  All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2      All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, Value Added Taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority.

4.3      Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

## ARTICLE V - RECORDS

5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder. LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1      It is understood by the parties hereto that the license fees due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize $CV^2$ System. LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems. In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1      As used herein, "Confidential Information" shall include any and all information disclosed to LICENSEE by or through CHAMPION, including any information obtained by LICENSEE visually through an inspection of any sample, device, document or like tangible thing submitted to LICENSEE by or through CHAMPION or by observation at facilities of CHAMPION or CHAMPION Subsidiaries excluding, however, such information which:

7.1.1  Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by LICENSEE, or its employees; or

7.1.2  Had been Independently developed by the LICENSEE or was otherwise in LICENSEE's lawful possession prior to disclosure, as shown by written records; or

7.1.3  Is hereafter lawfully disclosed to the LICENSEE by a third party which did not acquire the information under an obligation of confidentiality from or through CHAMPION.

7.1.4  Is disclosed by LICENSEE pursuant to judicial action or governmental regulation or requirement; provided that LICENSEE shall notify CHAMPION of any order or request to disclose Information in sufficient time to allow CHAMPION a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to LICENSEE shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to LICENSEE shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2     During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, LICENSEE  shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that LICENSEE employs to maintain the confidentiality of its own Information of like character and shall not disclose the same to any third party, without the prior written consent of the CHAMPION by an authorized officer. Notwithstanding the foregoing, LICENSEE may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of LICENSEE assisting LICENSEE in the exercise of its rights and the performance of its obligations hereunder, provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of LICENSEE under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed LICENSEE's standard employment agreement which LICENSEE warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3     LICENSEE shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of CHAMPION by an authorized officer.

7.4     LICENSEE agrees that all documentary, electronic or like tangible Confidential Information, including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through CHAMPION and documentary, electronic or like tangible Confidential Information which is generated by or for LICENSEE which embodies or is based upon Confidential Information are and shall remain the exclusion property of CHAMPION, and LICENSEE shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control. Promptly on termination or

Caroteck.CV$^2$ License                     5

expiration of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to CHAMPION.

## ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specification and guarantees, and shall be warranted by LICENSEE. The said performance specification, guarantees and warranties shall be at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE, THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

> 11.1.1 A WARRANTY OF MERCHANTABILITY;

> 11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

> 11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

> 11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

> 11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty

terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of LICENSEE, and  CHAMPION shall not be responsible for any such activities.  LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims  and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

Caroteck.$CV^2$ License                            8

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect in the event that:

16.3.1    All the material claims of Patent Rights have been held invalid in a final unappealable judgment of a court of competent jurisdiction; or

16.3.2    A patent or proprietary right infringement dispute arises with respect to Patent rights between CHAMPION or its Subsidiary and a third party, based upon the facts of which an intellectual property attorney of ordinary skill in the art could conclude should be resolved in said third party's favor; or

16.3.3    Other material events or reasons making it impossible or unreasonable for LICENSEE to continue its performance under this Agreement.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

Caroteck.$CV^2$ License                          9

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction.  Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:

          For Business Matters:
          Champion International Corporation
          1 CHAMPION Plaza
          Stamford, CT 06921

              ATTN:     Richard Piela
                          Director, Capital Project
                          Support and MRO

          For Legal Matters:
          Champion International Corporation
          1 Champion Plaza
          Stamford, CT 06921

              ATTN:     Richard C. Stewart, II
                          Chief Patent Counsel

If to LICENSEE:

              Carotek Inc.
              700 Sam Newell Road
              P.O. Box 1395
              Matthews, North Carolina 28106

              ATTN: Addison Bell

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

### ARTICLE XXII - ASSIGNABILITY

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this

Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _Gerard P. Clout_

Name: _GERARD P. CLOSSET_

Title: _VICE PRESIDENT_

CAROTEK INC.

By: _J. Addison Bell_

Name: _J. ADDISON BELL_

Title: _CEO_

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) US Patent No.5,821,990
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

# CAROTEK, INC.

June 7, 2005

JUN 14 2005

Mr. Richard C. Stewart, II
Chief Counsel
International Property Department
International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, OH 45140-8318

Re:     License Agreement Dated September 8, 1998 Between Champion International and
        Carotek, Inc.

Dear Mr. Stewart:

It is our understanding that Papertech, Inc., whom we believe is a licensee of Champion's $CV_2$ System Patents, has not paid any royalties on the patents for a considerable time period.

We are aware that Papertech has sold numerous systems in the United States and abroad and since they are not paying royalties it places Carotek at a competitive disadvantage.

We attach a letter from our intellectual property attorneys stating their advice to Carotek. We would appreciate your review.

Very truly yours,

J. Addison Bell
CEO

JAB:hf

Enc.

cc:  Deryl Bell, President – Carotek, Inc.
     Joe C. Young, Attorney

700 Sam Newell Road / P. O. Box 1395 / Matthews, North Carolina 28106
Office: (704) 847-4406     FAX: (704) 847-4485

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN*
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
ANN G. JAKABCIN*
JEFFREY M. SCHWABER*
DARCY A. SHOOP*
DONALD N. SPERLING*
PAUL T. STEIN*

MD., DC., VA., FL.*
MD., DC., VA., NY.*
MD., DC., PA., NJ.*
MD., DC., VA.*
MD., DC., NY.*
MD., VA., NC.*
MD., DC.*
MD. ONLY*

RONALD M. BOLT*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III*
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN*
MONICA G. HARMS*
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY*
MARY CRAINE LOMBARDO*
DARLA J. MCCLURE*
DEANNA L. PETERS*
DIEGO J. ROJAS*
DAVID A. ROSEN*
KAREN N. SHAPIRO*

OF COUNSEL:
KEVIN P. FAY*
ALAN S. KERXTON*
SUE ANN MAHAFFEY*
BETH McINTOSH IRVING*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER

October 29, 2007

*VIA FEDERAL EXPRESS & FIRST CLASS MAIL*
J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

RE:    *Royalty Payments due to Kobayashi Ventures*

Dear Mr. Bell:

This law firm has been engaged to represent Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain License Agreement between your company and Champion dated December 8, 1998 (the "Agreement"). Kobayashi is in the process of assessing and pursuing its claims arising, inter alia, out of that Agreement and out of the patent rights associated with the proprietary process monitoring system referenced therein.

Please provide me within ten (10) days of the date of this letter with a copy of your most recent license agreement with Champion International Corporation, along with an accounting of any and all payments made by your company either pursuant to the Agreement or otherwise as a result of your use of the proprietary process monitoring system and related technology as referenced therein. To the extent you have not already done so, please provide promptly the minimum guaranteed annual fees set forth in Paragraph 3.4 of the license agreement for each of the years since the execution of that agreement. These funds should be made payable to Kobayashi Ventures, LLC, and remitted to my attention within the same ten (10) day period delineated above. Upon receipt of the minimum royalty payments, we will apply those sums to your company's account, which will more fully be assessed upon receipt of the documents requested herein.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
October 29, 2007
Page 2

   Thank you for your anticipated cooperation and for your immediate attention to this matter.  I look forward to hearing from you.

                                        Very truly yours,

                                        Jeffrey M. Schwaber

JMS:cgv
cc:    John Larkin (via Federal Express and first class mail)
L:\CLIENTS\K\KobayashiVentures.LLC\343 Oct 29 Demand letter to Carotek.doc

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

——

TELEPHONE (301) 340-2020

——

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN*
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
ANN G. JAKABCIN*
JEFFREY M. SCHWABER*
DARCY A. SHOOP*
DONALD N. SPERLING*
PAUL T. STEIN*

——

MD., DC., VA., FL.*
MD., DC., VA., NY.*
MD., DC., PA., NJ.■
MD., DC., VA.♦
MD., DC., NY.☼
MD., VA., NC.*
MD., DC.*
MD. ONLY*

RONALD M. BOLT*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III☼
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PEREZ HALPERN♦
MONICA G. HARMS*
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY♦
MARY CRAINE LOMBARDO■
DARLA J. MCCLURE*
DEANNA L. PETERS♦
DIEGO J. ROJAS*
DAVID A. ROSEN♦
KAREN N. SHAPIRO♦

OF COUNSEL:
KEVIN P. FAY*
ALAN S. KERXTON*
SUE ANN MAHAFFEY*
BETH McINTOSH IRVING*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER
2071656-1

November 9, 2007

***VIA FEDERAL EXPRESS***
Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC 28209

RE:    *Royalty Payments due from Carotek, Inc. to Kobayashi Ventures*

Dear Mr. Young:

This law firm represents Kobayashi Ventures, LLC with regard to its claim against your client Carotek, Inc. I am receipt of an October 31, 2007 letter from J. Addison Bell on behalf of Carotek, Inc. in response to my letter dated October 29, 2007. I have enclosed Mr. Bell's letter as well as my October 29, 2007 letter for your convenient reference. Mr. Bell indicated he was leaving the country for a few weeks, but also indicated that he had referred the matter to you as his counsel. In light of the fact that you now have this matter and presumably have had a chance to review the referenced Agreement, I would appreciate hearing from you promptly regarding the issues raised in my letter. Of particular importance is the need to bring current the arrearage on the minimum royalty payments set forth in the Agreement.

To the extent for some reason you need to wait for Mr. Bell's return to the country, please let me know what is that reason as well as when specifically he is expected to return.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

Joe C. Young
November 9, 2007
Page 2

      Thank you for your immediate attention to this matter.

                Very truly yours,

                Jeffrey M. Schwaber

JMS:cgv
Enclosures
L:\CLIENTS\K\Kobayashi Ventures.LLC\Recovery of Royalties.001\Carotek\54-1 young ltr.doc

*F*

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

### ATTORNEYS AT LAW
### 25 WEST MIDDLE LANE
### ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN•
MILLARD S. BENNETT•
ALEXIA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN•
DAVID C. DRISCOLL, JR.•
STUART S. GREENFEIG•
ANN G. JAKABCIN•
JEFFREY M. SCHWABER•
DARCY A. SHOOP•
DONALD N. SPERLING•
PAUL T. STEIN•

MD., DC., VA., FL.•
MD., DC., VA., NY.•
MD., DC., PA., NJ.•
MD., DC., VA.•
MD., DC., NY.•
MD., VA., NC.•
MD., DC.•
MD. ONLY•

RONALD M. BOLT•
E. ANDREW COLE•
JAMES W. DAWSON, JR.•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III•
JEFFREY FENSTER•
ROBERT J. GARAGIOLA•
MELINA PÉREZ HALPERN•
MONICA G. HARMS•
JONATHAN F. LIEBERMAN•
IVONNE C. LINDLEY•
MARY CRAINE LOMBARDO•
DARLA J. McCLURE•
DEANNA L. PETERS•
DIEGO J. ROJAS•
DAVID A. ROSEN•
KAREN N. SHAPIRO•

OF COUNSEL:
KEVIN P. FAY•
ALAN S. KERXTON•
SUE ANN MAHAFFEY•
BETH McINTOSH IRVING•
DAVID R. PODOLSKY•
WILLIAM J. SCOTT•

November 26, 2007

OUR FILE NUMBER
2070656-1

**_VIA FEDERAL EXPRESS & FIRST CLASS MAIL_**

J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC  28209

RE:    _Default Notice to Carotek, Inc. from Kobayashi Ventures, LLC_

Gentlemen:

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain license agreement between Carotek, Inc. and Champion dated December 8, 1998 (the "Agreement"). I am taking the liberty of writing to both of you since it is unclear from Mr. Bell's correspondence whether Mr. Young is indeed representing Carotek in this matter and since Mr. Young has not responded to my November 9, 2007 letter. Please let me know with whom I should communicate going forward.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 2

I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717, 456

U.S. Patent No. 5,821,990

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 3


As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
cc:    Kobayashi Ventures, LLC
L:\CLIENTS\K\KobayashiVentures.LLC\Recovery of Royalties.001\Carotek\54-1 bell.young ltr.doc

# Snell & Wilmer
### —— L.L.P. ——
#### LAW OFFICES

600 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626-7689
714.427.7000
714.427.7799 (Fax)
www.swlaw.com

DENVER

LAS VEGAS

ORANGE COUNTY

PHOENIX

SALT LAKE CITY

TUCSON

J. Rick Taché
714.427.7039
rtache@swlaw.com

February 26, 2008

<u>Via Facsimile</u>

Jeffrey M. Schwaber, Esq.
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850

Re:   <u>Kobayashi Ventures, LLC v. PT Papertech, Inc.</u>

Dear Mr. Schwaber:

The purpose of this letter is to memorialize the agreement reached yesterday regarding the conditions under which our client, PT Papertech Inc., has authorized us to accept service, on its behalf, of the Complaint and any future discovery in the lawsuit currently pending in the U.S. District Court, Eastern District of Virginia, captioned: Kobayashi Ventures, LLC. v. Papertech Inc. Case No. 2:07cv612-HEH.

It has been agreed that Papertech will have: (i) 90 days to respond to the Complaint in accordance with the Federal Rules of Civil Procedure; (ii) a 30-day extension of time, beyond the required period of time, to respond to any discovery requests propounded by plaintiff; and (iii) 30 days advance notice for any corporate representative's deposition. In addition, we have agreed that any deposition will take place at a location convenient for the person being deposed.

Based upon agreement having been reached as to these conditions, we confirmed that our law firm accepted service on behalf of Papertech Inc. on February 6, 2008. Thank you again for your cooperation with regard to this matter.

Very truly yours,

SNELL & WILMER L.L.P.

J. Rick Taché

J. Rick Taché

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN◆
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
ANN G. JAKABCIN◆
JEFFREY M. SCHWABER▫
DARCY A. SHOOP◆
DONALD N. SPERLING◆
PAUL T. STEIN*

MD., DC., VA., FL.◆
MD., DC., VA., NY.*
MD., DC., PA., NJ.▫
MD., DC., VA.◆
MD., DC., NY.◁
MD., VA., NC.◆
MD., DC.*
MD. ONLY*

RONALD M. BOLT*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III◁
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN◆
MONICA G. HARMS*
JONATHAN F. LIEBERMAN◆
IVONNE C. LINDLEY◆
MARY CRAINE LOMBARDO▫
DARLA J. MCCLURE*
DIEGO J. ROJAS*
KAREN N. SHAPIRO◆

OF COUNSEL:
KEVIN P. FAY*
BETH McINTOSH IRVING*
ALAN S. KERXTON*
DEANNA L. PETERS◆
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER
2071656-7

# FACSIMILE COVER SHEET

TO:        J. Rick Taché

FAX #:     714-427-7799

FROM:      Jeff Schwaber

RE:        Kobayashi Ventures, LLC/PT Papertech, Inc.

DATE:      December 6, 2007

PAGES:     2 (excluding this cover sheet)

Please see attached my letter of today's date.

**CONFIDENTIALITY NOTICE:** This facsimile contains confidential information which may also be legally privileged and which is intended only for the use of the Addressee(s) named above. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile, or the taking of any action in reliance on the contents of this telecopied information, may be strictly prohibited. If you have received this facsimile in error, please immediately notify Stein Sperling by telephone to arrange for the return of the transmitted documents.

# STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

### ATTORNEYS AT LAW
### 25 WEST MIDDLE LANE
### ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN*
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
ANN G. JAKABCIN*
JEFFREY M. SCHWABER*
DARCY A. SHOOP*
DONALD N. SPERLING*
PAUL T. STEIN*

MD., DC., VA., FL.*
MD., DC., VA., NY.*
MD., DC., PA., NJ.*
MD., DC., VA.*
MD., DC., NY.*
MD., VA., NC.*
MD., DC.*
MD. ONLY*

RONALD M. BOLT*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III*
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN*
MONICA G. HARMS*
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY*
MARY CRAINE LOMBARDO*
DARLA J. MCCLURE*
DIEGO J. ROJAS*
KAREN N. SHAPIRO*

OF COUNSEL:
KEVIN P. FAY*
BETH McINTOSH IRVING*
ALAN S. KERXTON*
DEANNA L. PETERS*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER
2071656-7

December 6, 2007

### VIA FACSIMILE & MAIL
J. Rick Taché
Snell & Wilmer L.L.P.
600 Anton Boulevard
Suite 400
Costa Mesa, CA  92626

RE:    _Kobayashi Ventures, LLC/PT Papertech, Inc._

Dear Mr. Taché:

I am writing in response to your November 29, 2007 letter regarding your client PT Papertech, Inc. ("Papertech"). I was pleased to read your assertion that Papertech "respects the intellectual property rights of others and takes seriously the allegations" contained within my prior correspondence.

I wish to clarify what appears to be some confusion on your end about the nature of this claim. As your clients are well aware, this claim derives specifically from products that were licensed pursuant to a License Agreement which your client claims to have terminated. The Technology at issue here is and was specifically defined in the License Agreement your client signed with Champion International Corp. which has now been assigned to my client. Your client is well equipped to know which products are using the Technology, because your client licensed its use. The specific patents are delineated in Schedule A to the License Agreement.

**STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.**

J. Rick Taché
December 6, 2007
Page 2

I am concerned about the passage of time since my first letter to your client regarding this matter. Your clients initially denied signing the License Agreement, and then insisted it has been terminated. The licensed Technology continues to be used. As a result, I request that you respond to the demands set forth in my November 27, 2007 letter no later than **Monday, December 10, 2007.**

Very truly yours,

Jeffrey M. Schwaber

Jeffrey M. Schwaber

JMS:cgv
cc:    Kobayashi Ventures, LLC
L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\54-1 tache.ltr.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KOBAYASHI VENTURES LLC )
)
    Plaintiff, )
v. )    Case No. 2:07CV612-RGD-TEM
)
PAPERTECH INC. )
)
    Defendant. )

**DECLARATION OF MICHAEL HEAVEN IN SUPPORT OF PT PAPERTECH INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406**

I, Michael Heaven, declare:

1.    I am currently the General Manager of Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech"). I have been employed by Papertech for over 4 years. In my position as General Manager, I have personal knowledge of Papertech's operations, including, but not limited to information about Papertech's contacts with Virginia, sales of Papertech's WebVision® System, and service contacts related to these products. I have personal knowledge of the facts set forth below and if called as a witness to testify I could and would competently testify to them.

2.    I make this declaration in support of Papertech's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(B)(2), or in the Alternative, Motion to Transfer Venue Pursuant to 28 U.S.C. § 1406.

3.    Papertech manufactures a paper process analysis and optimization system known as the WebVision® System.

4.    Papertech is a corporation organized and existing under the laws of the province

of British Columbia, Canada, with its principal place of business in Vancouver, British Columbia.

5.      At its Vancouver facility, Papertech manufactures a paper process analysis and optimization system known as the WebVision® System.

6.      Papertech does not take any affirmative steps to seek out contacts with Virginia. For example, Papertech is not licensed to do business in Virginia and does not pay taxes in Virginia. Papertech does not maintain agents, bank accounts, employees, or offices in Virginia. Papertech does not target marketing or advertising to Virginia and does not market its products through a distributor or sales agent in Virginia. Papertech also does not maintain either sales or service offices and operations in Virginia. Indeed, Papertech has no offices, assets, employees, contractors, or representatives of any kind in Virginia.

7.      Papertech maintains a website at www.papertech.ca. While Papertech's website can process product information requests, purchases cannot be made through the website. In addition, Papertech's website does not focus on potential customers in any specific geographic location.

8.      Papertech also maintains a toll free phone line.

9.      The pulp and paper industry has trade shows all over the world, including in the United States. For example, I am aware of thirty two pulp and paper industry trade shows that occurred throughout the world between October and December 2007. In the last two years, Papertech has attended three trade shows in North America – two in Montreal and one in Florida. Furthermore, Papertech has never attended a trade show in Virginia.

10.     I conducted a search of Papertech's records related to sales of the WebVision® System. I found that a total of four of these systems have been sold and/or delivered to two companies with facilities in Virginia – Georgia Pacific Corporation ("Georgia Pacific")[1] and

---

[1]     In 2005, Georgia Pacific was acquired by Koch Industries, Inc., a Kansas corporation. Heaven Decl., ¶ 12. For simplicity sake, the two entities are referred to collectively as "Georgia Pacific" in this Declaration.

Greif Brothers – all of which occurred between July 2000 and July 2007. I am aware that in 2005, Georgia Pacific was acquired by Koch Industries, Inc., a Kansas corporation. For simplicity sake, the two entities are referred to collectively as "Georgia Pacific" in this declaration.

11.    I am aware that Grief Brothers is a Virginia corporation with facilities in Virginia. Grief Brothers purchased two WebVision® Systems from Papertech on March 10, 2005 and July 6, 2007.

12.    I am also aware that Georgia Pacific was a Georgia corporation with corporate technology offices in Green Bay, Wisconsin and corporate purchasing offices in Atlanta, Georgia. Georgia Pacific purchased products from Papertech pursuant to a master purchase agreement between the two companies which was signed December 20, 2004 and renewed January 23, 2006. These purchases, which were made in accordance with the master purchase agreement negotiated with Georgia Pacific's corporate offices in Atlanta and Green Bay, included the purchase of two WebVision® Systems on July 13, 2000 and August 24, 2006 that were ultimately shipped to and installed Georgia Pacific facilities in Virginia.

13.    The total of the WebVision® System sales that have been sold and/or installed in Virginia is less than one-half of 1% of Papertech's sales between November 12, 1998 and the present.

14.    Moreover, although Papertech warrants the WebVision® Systems, Papertech does not maintain on-going service contracts or maintenance agreements with either Greif Brothers or Georgia Pacific, or any other Virginia residents. In fact, if either Greif Brothers or Georgia Pacific experiences technical difficulties with their systems, need to order replacement parts, or require other customer assistance, they can contact Papertech's Vancouver office for assistance.

15.    Papertech began recording information about customer service calls January 10, 2002. I searched that information to determine the extent of customer service calls made to Papertech by Greif Brothers and Georgia Pacific's Virginia facilities during that time frame and

3

found that the two companies have placed only sixteen (16) such calls to Papertech since January 10, 2002. I also found that over 2,084 calls have been made to Papertech throughout the world during that same time frame.

I, declare under penalty of perjury that the foregoing is true and correct.

Executed this ___27___ day of February, 2008, at Vancouver, British Columbia, Canada.

PT PAPERTECH INC.

_____ /s/

Michael Heaven

4

FILED

FEB 28 2008

CLERK U.S. DISTRICT COURT
NORFOLK, VA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4

In Case Number __2:07CV612__, Case Name __Kobayashi Ventures LLC v. Papertech, Inc.__

Party Represented by Applicant: __Papertech, Inc.__

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

### PERSONAL STATEMENT

FULL NAME (no initials, please) ___Janet Lynn Hickson___
Bar Identification Number __198849__    State __California__
Firm Name __Snell & Wilmer LLP__
Firm Phone # __714 427 7000__    Direct Dial # __714 427 7006__    FAX # __714 427-7799__
E-Mail Address __jhickson@swlaw.com__
Office Mailing Address __600 Anton Blvd., Suite 1400, Costa Mesa, California 92626__

Name(s) of federal court(s) in which I have been admitted __USDC California (Central) 1998__

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am ____ am not __X__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

(Applicant's Signature)
Janet L. Hickson

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

(Signature)    2/25/08
DABNEY J. CARR, IV    (Date)
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid _____ or Exemption Granted _____

The motion for admission is GRANTED _____ or DENIED _____

_____    _____
(Judge's Signature)    (Date)

Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 2
Receipt Number: 200003643
Cashier ID: tlevinso
Transaction Date: 02/28/2008
Payer Name: TROUTMAN SANDERS
--------------------------------------
PRO HOC VICE
 For: HICKSON AND TACHE
 Case/Party: D-VAE-2-08-CR-PROHAC-001
 Amount:        $100.00
--------------------------------------
CHECK
 Check/Money Order Num: 439268
 Amt Tendered: $100.00
--------------------------------------
Total Due:      $100.00
Total Tendered: $100.00
Change Amt:      $0.00

TROUTMAN SANDERS

JANET HICKSON

JOSEPH TACHE
2:07cv612

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4

In Case Number  2:07CV612 , Case Name Kobayashi Ventures LLC v. Papertech Inc.
Party Represented by Applicant: Papertech, Inc.

**FILED**

FEB 28 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

PERSONAL STATEMENT

FULL NAME (no initials, please)  Joseph Roger Rick Tache
Bar Identification Number  195100    State California
Firm Name Snell & Wilmer LLP
Firm Phone # 714 427 7000    Direct Dial # 714 427-7039    FAX # 714 427-7799
E-Mail Address  rtache@swlaw.com
Office Mailing Address 600 Anton Blvd., Suite 1400, Costa Mesa, California 92626

Name(s) of federal court(s) in which I have been admitted U.S District Court Arizona (2005); E.D. Michigan (1989)
W.D. North Carolina (1993); C.D. California (1998); Federal Circuit
I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice*
admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a
member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court
and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of
Evidence is current.

I am ____ am not _X_ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

(Applicant's Signature)
J. Rick Tache

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant
personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have
examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and
petition the court to admit the applicant *pro hac vice*.

(Signature)                                    2/25/08
DABNEY J. CARR III                             (Date)
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid _____ *or* Exemption Granted _____

The motion for admission is GRANTED _____ *or* DENIED _____

(Judge's Signature)                            (Date)

```
Court Name: EASTERN DISTRICT OF VIRGINIA
Division: 2
Receipt Number: 200003643
Cashier ID: tlevinso
Transaction Date: 02/28/2008
Payer Name: TROUTMAN SANDERS
----------------------------------------
PRO HOC VICE
 For: HICKSON AND TACHE
 Case/Party: D-VAE-2-08-CR-PROHAC-001
 Amount:        $100.00
----------------------------------------
CHECK
 Check/Money Order Num: 439268
 Amt Tendered: $100.00
----------------------------------------
Total Due:       $100.00
Total Tendered: $100.00
Change Amt:       $0.00

TROUTMAN SANDERS

JANET HICKSON

JOSEPH TACHE
2:07cv612
```

FILED

FEB 2 8 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4

In Case Number __2:07CV612__ , Case Name __Kobayashi Ventures LLC v. Papertech, Inc.__

Party Represented by Applicant: __Papertech, Inc.__

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

### PERSONAL STATEMENT

FULL NAME (no initials, please) ___Janet Lynn Hickson___

Bar Identification Number __198849__     State __California__

Firm Name __Snell & Wilmer LLP__

Firm Phone # __714 427 7000__        Direct Dial # __714 427 7006__        FAX # __714 427-7799__

E-Mail Address __jhickson@swlaw.com__

Office Mailing Address __600 Anton Blvd., Suite 1400, Costa Mesa, California 92626__

Name(s) of federal court(s) in which I have been admitted __USDC California (Central) 1998__

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice* admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence is current.

I am ____ am not __X__ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

(Applicant's Signature)
Janet L. Hickson

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and petition the court to admit the applicant *pro hac vice*.

(Signature)        2/25/08
(Date)

DABNEY J. CARR, IV
(Typed or Printed Name)

Court Use Only:

Clerk's Fee Paid _____ *or* Exemption Granted _____

The motion for admission is GRANTED _____ *or* DENIED _____

(Judge's Signature)

Robert G. Doumar
Senior United States District Judge

_____
(Date)

FILED

FEB 2 8 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

APPLICATION TO QUALIFY AS A FOREIGN ATTORNEY UNDER LOCAL CIVIL RULE 83.1(D) AND LOCAL
CRIMINAL RULE 57.4

In Case Number 2:07CV612 , Case Name Kobayashi Ventures LLC v. Papertech, Inc.

Party Represented by Applicant: Papertech, Inc.

**FILED**

FEB 28 2008

CLERK, U.S. DISTRICT COURT
NORFOLK

To: The Honorable Judges of the United States District Court for the Eastern District of Virginia

**PERSONAL STATEMENT**

FULL NAME (no initials, please)  Joseph  Roger  Rick Tache

Bar Identification Number  195100      State  California

Firm Name  Snell & Wilmer LLP

Firm Phone # 714 427 7000      Direct Dial # 714  427-7039      FAX # 714 427-7799

E-Mail Address  rtache@swlaw.com

Office Mailing Address  600 Anton Blvd., Suite 1400, Costa Mesa, California 92626

Name(s) of federal court(s) in which I have been admitted  U.S District Court Arizona (2005); E.D. Michigan (1989)
W.D. North Carolina (1993); C.D. California (1998); Federal Circuit

I certify that the rules of the federal court(s) in which I have been admitted and have my office extend a similar *pro hac vice*
admission privilege to members of the bar of the Eastern District of Virginia.

I have not been reprimanded in any court nor has there been any action in any court pertaining to my conduct or fitness as a
member of the bar.

I hereby certify that, within ninety (90) days before the submission of this application, I have read the Local Rules of this Court
and that my knowledge of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of
Evidence is current.

I am ____ am not _X_ a full-time employee of the United States of America, and if so, request exemption from the admission fee.

_____
(Applicant's Signature)
J. Rick Tache

I, the undersigned, do certify that I am a member of the bar of this Court, not related to the applicant; that I know the applicant
personally, that the said applicant possesses all of the qualifications required for admission to the bar of this Court; that I have
examined the applicant's personal statement. I affirm that his/her personal and professional character and standing are good, and
petition the court to admit the applicant *pro hac vice*.

**FILED**

FEB 28 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

_____      2/25/08
(Signature)                          (Date)
DABNEY J. CARR III
(Typed or Printed Name)

| Court Use Only: | |
|---|---|

Clerk's Fee Paid _____ or Exemption Granted _____

The motion for admission is GRANTED __✓__ or DENIED _____

_____
(Judge's Signature)

/s/
Robert G. Doumar
**Senior United States District Judge**

Feb. 28, 2008
(Date)

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| EASTERN | District of | VIRGINIA |
|---|---|---|

Norfolk Division

KOBAYASHI VENTURES, LLC
12587 FAIR LAKES CIRCLE, SUITE 308
FAIRFAX, VA 22033

Plaintiff

## SUMMONS IN A CIVIL CASE

V.

PAPERTECH INC.
108 - 245 FELL AVENUE
NORTH VANCOUVER, B.C., CANADA

CASE NUMBER:     2:07cv612

Defendant

**□ORIGINAL**

```
FILED

MAR - 5 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

TO: (Name and address of Defendant)

PAPERTECH INC.
108 - 245 FELL AVENUE
NORTH VANCOUVER, B.C., CANADA

SERVE:   KARI K. HILDEN

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

IVONNE C. LINDLEY
JEFFREY M. SCHWABER
STEIN SPERLING BENNETT DE JONG DRISCOLL & GREENFEIG, P.C.
25 WEST MIDDLE LANE
ROCKVILLE, MD 20850

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

Fernando Galindo

CLERK

1/29/08

DATE

(By) DEPUTY CLERK     Lisa Woodcock

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☒ Other (specify): per agreement, counsel for defendant Papertech, INc., agreed to accept service of the Summons and Complaint on behalf of Papertech, Inc., on February 5, 2008.

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ____2/29/08____     _____
              Date              *Signature of Server*   Jeffrey M. Schwaber

                                25 West Middle Lane
                                Rockville, Maryland 20850
                                *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

MAR 1 0 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KOBAYASHI VENTURES, LLC,            :
                                    :
          Plaintiff                 :
                                    :
     v.                             :          Case No. 2:07-cv-00612-RGD-TEM
                                    :
PAPERTECH INC.,                     :
                                    :
          Defendant.                :

**CONSENT ORDER**

The parties in this matter have consented to an extension of Plaintiff's deadline to respond to Defendant's Motion to Dismiss filed on February 28, 2008.

Plaintiff's current deadline to file its responsive pleading is March 10, 2008, and the parties have consented to extending the deadline to March 13, 2008.

/s/
Robert G. Doumar
Senior United States District Judge

United States District Court for the Eastern District of Virginia
The Honorable Robert G. Doumar

SEEN, AGREED, AND CONSENTED TO:


By:     _____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

By: _____

Dabney J. Carr, IV
Virginia Bar No. 28679
Attorney for Defendant Papertech, Inc.
Troutman Sanders LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
Telephone:  (804) 697-1200
Facsimile: (804) 697-1339
Email: dabney.carr@troutmansanders.com

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\10 consent order re 3 day extension.doc

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,      :
                                   :
          Plaintiff            :
                                   :
        v.                  :       Case No. 2:07-cv-00612-RGD-TEM
                                   :
PAPERTECH INC.,               :
                                   :
          Defendant.       :

**KOBAYASHI VENTURES' BRIEF IN OPPOSITION**
**TO PAPERTECH'S MOTION TO DISMISS/TRANSFER**

Plaintiff, Kobayashi Ventures, LLC ("KV"), by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., submits this brief in opposition to "PT Papertech Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to FRCP 12(b)(2) or in the Alternative to Transfer Venue ("Motion to Dismiss")," and states as follows:

I.     <u>INTRODUCTION</u>

      a.   <u>Prior License Agreement</u>

Defendant Papertech ("Defendant Papertech" or "Defendant"), entered into a License Agreement (the "License Agreement") for the subject patented technology on November 12, 1998. On or about September 27, 2000, Defendant unilaterally terminated its License Agreement.[1] When pressed in 2004 for payments, Defendant reiterated its earlier termination of the License Agreement. Defendant has no license. Defendant has no surviving rights under any license. Therefore Defendant has no right to claim governing law or forum under any license agreement.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

   b.  <u>Virginia Contacts</u>

Defendant actively has conducted business in the Commonwealth of Virginia for well

over eight years.  Defendant maintains an active sales force in the United States and actively

markets, both through a direct sales force and through a manufacturer's representative,

specifically SPG,  with "11 experienced pulp and paper industry sales and service personnel"

selling Papertech capital equipment, in Virginia.[2] Defendant's website is replete with admissions

of Virginia contacts.  The site proudly displays four customer testimonials, the largest by far

being from a person identified as "Dennis Jacobs, Project Engineer, Georgia-Pacific Corporation,

Big Island Virginia."[3]  As recently as July 6, 2007, Defendant sold and installed a system at

Greif Brothers, a Virginia corporation, located in Amherst, Virginia.  That system currently is

under warranty by Defendant.   Defendant is contractually obligated to repair the system onsite

in the Commonwealth of Virginia.  The infringing device sold, installed, warranted, and serviced

by Defendant at Greif Brothers is in part composed of multiple computers in a networked

configuration.  Defendant has in the past and will continue in the future to connect remotely by

computer to the infringing computer network.  This fact alone establishes personal jurisdiction

under § 8.01-328.1 B.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[1] The exact date of the termination notice is to be determined.
[2] <u>See</u> <u>Exhibit 1</u> Papertech Website Page – Virginia Sales and Service Representative and <u>Exhibit 2</u> - - Southern Paper Group (SPG) Website Page - Papertech's Virginia Capital Equipment Sales and Service Representative.
[3] <u>See</u> <u>Exhibit 3</u> - Papertech Website Page – Georgia-Pacific Corporation Big Island, VA testimonial.

c.  <u>Right to Sue for Infringement Prior to December 10, 2007</u>

Defendant challenges KV's right to sue for patent infringement prior to December 10, 2007.  On September 28, 2007 KV and Jacklin Associates, Inc. ("JAI"), entered into an Agreement attached hereto as <u>Exhibit 4</u> whereby KV engaged JAI to,

> purchase certain patents and license agreements, as well as any other licenses associated with such patents and/or related thereto (hereinafter referred to as the "Patent Materials") <u>on</u> <u>its</u> <u>behalf</u> from International Paper Company (hereinafter referred to as the "Business Opportunity");

and further,

> As consideration for Jacklin's successful purchase of the Patent Materials and subsequent transfer of all of its right, title and interest in the Patent Materials to KV, KV hereby agrees to pay Jacklin [.]

Emphasis added.  The subject "Patent Materials" directly were passed, totally intact from International Paper Company to KV via JAI.  JAI did not retain any fraction of the "Patent Materials."  Therefore the express right to sue for past infringement passed directly to KV.  Both the managing director of KV and the President and CEO of JAI attest to this fact in the Affidavits attached hereto as <u>Exhibit 5</u> and <u>Exhibit 6</u>.

II.  <u>PERTINENT FACTS</u>

1.  It is undisputed that since about September 27, 2000, Defendant has been making, using, offering to sell, and selling Kobayashi's Patented Technology, *i.e.* 5,717,456 (456), 5,821,990 (990), and 6,211,905 (905) (known as WebVision, WebVision Plus, WebInspector, and Perfect Vision), in the Commonwealth of Virginia.

2.  KV's principal place of business is located in the Commonwealth of Virginia, where it is duly registered as well.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

3

## PERSONAL JURISDICTION

3.    In numerous express references throughout its Brief, including at pages 7, 8, 9, and 15, and Declaration of M. Heaven at pages 2-3, Defendant concedes the requisite minimum contacts with the Commonwealth of Virginia.

4.    Defendant conducts business in the Commonwealth of Virginia, has availed itself of the rights and benefits of Commonwealth law, and has engaged in substantial and continuing contacts with and within the Commonwealth.[4]

> a.  Defendant has sold at least four WebVision Systems to two companies in the Commonwealth of Virginia, including Georgia-Pacific Corporation ("Georgia-Pacific") and Greif Brothers.  Defendant's Motion at p. 8, and Affidavit of M. Heaven at p. 2-3.  The combined gross sales price of these four systems is estimated to be between $200,000 and $400,000 USD.  Defendant is most likely also collecting considerable ongoing revenue for parts, services, hardware upgrades, software upgrades and additional features.
>
> b.  Greif Brothers is a Commonwealth of Virginia corporation with facilities in the Commonwealth.  Defendant's Motion at p. 8, and Affidavit of M. Heaven at p. 3.
>
> c.  Defendant has shipped to Georgia Pacific facilities in the Commonwealth of Virginia.  Defendant's Motion at p. 8, and Affidavit of M. Heaven at p. 3.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[4] Complaint at paragraph no. 4.

d.  Defendant has installed Webvision Systems in the Commonwealth of Virginia. Affidavit of M. Heaven at p. 3.

e.  Defendant warrants its Web Vision Systems sold to customers in the Commonwealth of Virginia.  Affidavit of M. Heaven at p. 3.

f.  Defendant offers service in support of its warranties in the Commonwealth of Virginia. Affidavit of M. Heaven at p. 3.

g.  Defendant's web site touts an endorsement from the Georgia-Pacific Corporation, Big Island (Virginia) Operation.[5]

h.  Defendant had actual knowledge of the subject patents at the time of all of its purposeful availment of the benefit of doing business in the Commonwealth of Virginia.

5.    Disclosed within Kobayashi's Patented Technology is technology that makes it possible to monitor a continuous process for deviations that have a negative impact on the efficiency and yield of the process.

6.    Systems of cameras and multiple computers run proprietary software that is digitally interfaced to the continuous process.

7.    Once a system that utilized the technology is installed and running, it immediately begins to generate income for the end user in the form of reduced downtime, higher quality and higher production speeds.

8.    Any system utilizing Kobayashi's Patented Technology without a proper license is infringing on a continuous basis.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[5] See Exhibit 3.

9.     The systems Defendant admits having installed in Virginia were, are and continue to infringe on a continuous, daily basis.

<div align="center">

KV'S RIGHT TO SUE FOR INFRINGING ACTIVITY
<u>BEFORE DECEMBER 10, 2007</u>

</div>

10.     On or about December 10, 2007, by written assignment executed and delivered by JAI to KV, KV became, and now is, the owner, *inter alia*, of all right, title, and interest in and to such letters patent Kobayashi's Patented Technology, having the exclusive right to make, use, sell, offer for sale, and import into the U.S. the following inventions:  . . . . [6]

> "5,821,990  System for monitoring a continuous manufacturing process
> 5,899,959  Measurement of visual characteristics of paper
> 6,613,195  Method for conditioning paper and paperboard webs
> 6,207,020  Method for conditioning paper and paperboard webs
> 5,717,456  System for monitoring a continuous manufacturing process
> 6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuation-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents ("Patent Materials")."[7]

11.     On or about October 19, 2007, by written assignment executed and delivered by International Paper Company ("International Paper") to JAI, JAI became the owner, *inter alia*, of all right, title, and interest in and to such letters patent, then having the exclusive right to make, use, and sell Kobayashi's Patented Technology. [8]

In addition to the patents identified by number above, Jacklin had received "all right title and interest that exist today and may exist in the future in and to any and all of the following: …(e) all causes of action (whether known or unknown or whether currently pending, filed, or

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[6] Complaint at ¶6.
[7] See Assignment <u>Exhibit 7</u>.

otherwise) and other enforcement rights under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (d) including without limitation all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief (iii) **any other remedies of any kind for past, current and future infringement;** and (iv) all rights to collect royalties and other payment under or on account of any of the Patents…" (emphasis added)[9]

12.    The systems which Defendant admits selling, delivering, installing, warranting, and offering service for in the Commonwealth of Virginia were, are and continue to infringe on a continuous, daily basis. Such infringement was active and occurring as of the date of filing of this suit.

<u>DEFENDANT'S UNDISPUTED TERMINATION OF THE LICENSE AGREEMENT</u>

13.    On September 27, 2000, Defendant by its General Manager, Kari Hilden, allegedly sent a letter to Richard Piela of Champion, "Subject:  Termination of the License Agreement between Champion International Corp. ("Champion") and Papertech"  which claimed termination effective thirty (30) days after receipt by International Paper "as per the agreement Article 16."[10]

14.    On August 23, 2004, Defendant by its General Manager E. Michael Heaven sent a letter to Richard Stewart, Chief Counsel—Intellectual Property Department International Paper. Defendant's letter was in response to a July 16, 2004 letter from International Paper demanding royalty payments under the License Agreement.  In this letter, Defendant claimed, "That agreement was terminated several years ago . . . [11]

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[8] Complaint at ¶7.
[9] See Assignment, <u>Exhibit 8</u>.
[10] Complaint at ¶12 and <u>Exhibit 6</u> thereto.
[11] Complaint at ¶13 and <u>Exhibit 7</u> thereto.

15.     For several years before filing its Motion, Defendant was affirming its termination and never waivered or qualified in any manner its termination of the License Agreement.[12]

III.     APPLICABLE LAW AND ARGUMENT

A.     Standard for Motion to Dismiss under Fed. R. Civ. P. 12(b)(2)

Before conducting any discovery on the jurisdictional issue, plaintiff is required "only to make a *prima facie* showing" of jurisdiction to defeat a 12(b)(2) motion to dismiss.  Trintec Indus., Inc. v. Pedre Promotional Prods., Inc., 395 F.3d 1275 (C.A.Fed. 2005) (citing Silent Drive, 326 F.3d at 1201).  In evaluating this showing, the district court must construe all pleadings and affidavits in the light most favorable to the plaintiff.; Silent Drive; see also Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1383 n. 1 (Fed. Cir.1998).  In determining whether a *prima facie* case has been made, uncontroverted allegations in the complaint are deemed true. Where conflict exists in the facts asserted by the parties, such conflicts are to be resolved in favor of the plaintiff. WNS, Inc. v. Farrow, 884 F.2d 200 (5th Cir. 1989).  To have made a *prima facie* showing, plaintiff need only have produced admissible evidence which, if believed, would be sufficient to establish the existence of personal jurisdiction. Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.,  328 F. 3d 1122 (9th Cir. 2003)

B.     Defendant concedes minimum ("minimal") contacts but nonetheless without any supporting legal authority asks the Court to disregard such sufficient contacts.

In numerous express references throughout its Brief,  Defendant concedes minimum contacts with the Commonwealth of Virginia, thereby satisfying the hornbook, Constitutional requirement for personal jurisdiction.   Nonetheless, without citing a single supporting legal authority, Defendant simply posits that the Court nonetheless may not exercise personal

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[12] See Complaint at ¶¶ 12 and 13 and Exhibit 6 and Exhibit 7 thereto.

jurisdiction, because, "Kobayashi does not have the right to sue for allegedly infringing activity occurring prior to December 10, 2007[.]"[13]

The pertinent express, documented facts include that on December 10, 2007, KV was assigned not only the subject patents, but also expressly, "all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents[.]"  The Seller was JAI, who was assignee, among other things, of all causes of action and other enforcement rights for "remedies of any kind for past, current, and future infringement[.]" [14]

The case of <u>Minco, Inc. v. Combustion Engineering, Inc.</u>, 95 F.3d 1109 (Fed. Cir. 1996) is instructive on this issue.  The <u>Minco, Inc.</u> case involves a series of assignments of interest, including two assignments which explicitly contained the magic words regarding the right to sue for past infringement, and one which did not.  <u>Id.</u>  In <u>Minco</u>, the Federal Circuit found that the assignment provision effectively conveyed the right to sue for past infringement damages.  Based on the totality of the circumstances, the ordinary meaning of "all right, title and interest," which was the key language at issue, was found to include the right to sue for past damages.  <u>Id.</u>

In this case, as stated, there is further specific language establishing KV right to sue for, among other things, past damages.  Nonetheless, even absent such further specific language, under an analysis such as that followed by the Federal Circuit in the <u>Minco</u> case, KV has that right without any further action being necessary.  KV had and continues to have standing to sue, as the nature of the infringement is continuous and ongoing.  Furthermore, the time frame and amount of damages for which Defendant is liable to KV is not the proper subject of a motion to dismiss claiming lack of personal jurisdiction.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[13] Defendant Papertech's Brief at pp. 1 and 16.
[14] See Assignments, <u>Exhibit 7</u> and <u>Exhibit 8</u>.

9

C.    <u>Defendant not only concedes minimum ("minimal") contacts, but in fact has had more than minimum contacts to support the Court exercising personal jurisdiction over it</u>.

As a patent infringement case, this Court is guided by Federal Circuit decisions on matters concerning, personal jurisdiction.  <u>See</u> <u>Beverly Hills Fan Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994) (although issues of personal jurisdiction generally are procedural in nature, they are sufficiently related to substantive patent law, and thus the law of the Federal Circuit controls), <u>cert. dismissed</u>, 512 U.S. 1273 (1994).  A non-resident defendant is subject to personal jurisdiction in a federal district court if, (1) the defendant is within the reach of the forum state's long arm statute, and (2) due process is satisfied.  <u>See</u> <u>Beverly Hills Fan</u>, 21 F.3d at 1569 (courts must look to the relevant state's long-arm statute even when the cause of action is purely federal).

The Federal Circuit has adopted a relatively broad view of personal jurisdiction.  In the case of <u>Beverly Hills Fan</u>, 21 F.3d at 1566, the Court adopted a "stream of commerce" theory for personal jurisdiction, holding that a party who places a product into the stream of commerce knowing that the product likely may reach a particular venue is subject to personal jurisdiction in that venue.  Under the Federal Circuit's view of personal jurisdiction, jurisdiction reaches alien defendants who inject products into the stream of commerce regardless of what a contract says about the geographical location where title changes hands.[15]

---

[15] In <u>Beverly Hills Fan</u> a Chinese company manufactured an alleged patent infringing fan in Taiwan, and an importer located in New Jersey brought the fans into the United States and sold them throughout the country. The company was sued in Virginia, and the Federal Circuit held that exercise of personal jurisdiction was proper there because it was foreseeable that a termination point of the distribution channel was in Virginia and that fans would be sold there. " ... [P]laintiff has stated all of the necessary ingredients for an exercise of jurisdiction consonant with due process: defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

The personal jurisdiction inquiry involves a two-step analysis.  <u>Peanut Corp. of Am. v. Hollywood Brands, Inc.</u>, 696 F.2d 311 (4th Cir.1982); <u>Omega Homes, Inc. v. Citicorp Acceptance Co.</u>, 656 F. Supp. 393 (W.D. Va. 1987).  First the Court must determine that the non-resident defendants' conduct falls within the reach of Virginia's long arm statute.  <u>Id.</u> Second, the Court must determine whether its exercise of personal jurisdiction over the defendant would violate the Due Process Clause of Amendment XIV to the United States Constitution.  <u>Id.</u>

As to the second step of the analysis, the Virginia Supreme Court construes the Virginia long arm statute as extending personal jurisdiction to the very outer contours of the Due Process Clause.  <u>Kolbe, Inc. v. Chromodern Chair Co.</u>, 211 Va. 736, 180 S.E.2d 664, 667 (Va.1971); and <u>Peanut Corp. of Am.</u>, 696 F.2d at 311.  The provisions of Virginia's long arm statue applicable to this case are § 8.01-328.1's "[t]ransacting any business" and "[c]ontracting to supply services" clauses.  As to the first clause, Virginia is a "single act" jurisdiction which broadly interprets conduct as sufficient for personal jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>Viers v. Mounts</u>, 466 F. Supp. 187 (W.D. Va. 1979); and <u>Olin Mathieson Chem. Corp. v. Molins Org'ns, Ltd.</u>, 261 F. Supp. 436 (E.D. Va. 1966) (in a patent infringement suit, a foreign company's sending its main officer to Virginia from time to time to meet and confer with officers from that company's New York subsidiary <u>to supervise machine installation held sufficient contacts</u> (underscore added)). Similarly, the "contracting to supply services" clause usually is read broadly.  <u>See</u>, <u>e.g.</u>, <u>I.T. Sales, Inc. v. Dry</u>, 2778 S.E.2d 789 (1981) (Virginia has personal jurisdiction over defendant from California who entered into employment agreement in Virginia with Virginian though contract called for performance in California).

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

with the forum state were such that they should reasonably have anticipated being brought into court there."  <u>Id.</u> at 1566.

Defendant concedes marketing, selling, installing, servicing, and continuing to service the infringing products in the Commonwealth of Virginia, but has attempted to assert that such sales and service were minor in comparison to its overall profits for the period.  Nonetheless, the law does not require that the sales or contacts be of substantial financial value to the offender to be effective in establishing jurisdiction.  In fact, in the case of <u>Beverly Hills Fan</u>, the Court noted in pertinent part that the statute does not require sales of a certain percentage.  In fact sales of one-half of one percent has been sufficient.  <u>Id.</u> at 963.

Tracing the case law history of the notions of due process involved in establishing jurisdiction, as did the court in <u>Beverly Hills Fan</u>, the basic precept is that a plaintiff must show that the defendant had sufficient minimum contacts with the forum such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945); and <u>Youn v. Track, Inc.</u>, 324 F.3d 409, 417 (6th Cir. 2003).  "Minimum contacts" exist when the defendant's conduct and connection with the forum state are such that the defendant "should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).  The defendant must purposefully avail himself of the privilege of conducting activities within the forum state and thereby invoke the benefits and protections of the state's laws in order to ensure that the defendant will not be haled into a particular forum on the basis of "random," "fortuitous," or "attenuated" activity, or by the unilateral activity of some other party or person.  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985).

The primary case cited by Defendant <u>Silver Ring Splint Co.</u> is inapposite.  That case dealt with a manufacturer of finger splints, which is quite different than the Kobayashi Patented Technology at issue herein.  Once the finger splint is injected into the stream of commerce, the

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

manufacturer has no need for any further contact with the purchaser.  Defendant's products, in contrast, require extensive technological installation, maintenance, repair, and software upgrades. Moreover, the use of the technology at question here is ongoing, so the infringement is ongoing each day that the paper mill is in use, in stark contrast to the single sale of one (or even several) offending finger splint(s).  As noted by the court in Beverly Hills Fan, "The case is thus fundamentally different from that involving a single tort. In a case involving a continuous tort, it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction. Cf. Bruno Wessel, Inc. v. McCourt, No. C92-079TEH, 1992 U.S.Dist. LEXIS 6230, at * 6-* 11 (N.D.Cal. May 4, 1992)." Beverly Hills Fan, 21 F. 3d at 1563.

> D.    Defendant argues that even if it is wrong as to its initial arguments outlined above, the Court should enforce the License Agreement which Defendant terminated and for all practical purposes does not exist.

Defendant argues that even if it is wrong as to its initial arguments outlined above, the Court should enforce the License Agreement which Defendant terminated and for all legal purposes no longer exists.  As the natural and logical consequence of Defendant's termination of the License Agreement, none of the terms of the License Agreement survive.

In the case of Dow Chemical Co. v. U.S., 32 Fed. Cl. 11 (1994), aff'd in part, rev'd in part on other grounds, 226 F.3d 1334 (Fed. Cir. 2000), the Court states in pertinent part as follows:

> It is hornbook law that a patent license contract can be rescinded for breach of its essential terms. Ridsdale Ellis, Patent Assignments and Licenses § 765 (2d ed. 1943) (citing St. Paul Plow Works v. Starling, 140 U.S. 184, 196, 11 S.Ct. 803, 807, 35 L.Ed. 404 (1891)); see also Ernest Bainbridge Lipscomb III, Lipscomb's Walker on Patents, Licenses § 20:35, p. 127 (3d ed. 1987) (citing Automotive Products Corp. v. Wolverine Bumper & Specialty Co., 15 F.2d 745 (6th Cir.1926); American Street Car Advertising Co. v. Jones, 122 F. 803 (C.C.N.Y.1903)). This is true even where the contract makes no provision for cancellation by the licensor, so long as the breach is in a matter considered essential to the continuance of the contract. Ellis, Patent Assignments and Licenses §§ 779, 784 (2d ed.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

1943); see also Lipscomb, Lipscomb's Walker on Patents, Licenses §§ 20:30 & 20:35, p. 118 & 128 (3d ed. 1987). When termination is sought due to the failure of the licensee to pay royalties the licensee's conduct must be such as to indicate an intention to repudiate the contract. Ellis, Patent Assignments and Licenses § 789 (2d ed. 1943); see also Lipscomb, Lipscomb's Walker on Patents, Licenses § 20:35, p. 128 (3d ed. 1987). That is, nonpayment of royalties, unless long continued, is not ordinarily regarded as sufficient to terminate the license in the absence of a covenant to that effect. Id.

However, where the circumstances show that it is not simply a question of collecting compensation, but that the nonpayment [of royalties] is but an overt act, evidencing with other facts an intention not to duly practice the invention, the real purpose of the license agreement has been repudiated, and the inventor should have it back from the party, who thus either does not consider it of value, or who seeks to pick the brain of the inventor without deeming itself bound to pay for what has been taken from him by reason of the contract.

Ellis, Patent Assignments and Licenses § 789 (2d ed. 1943) (citing Hazeltine Research Corp. v. Freed-Eisemann Radio Corp., 3 F.2d 172 (E.D.N.Y.1924)).

When a license contract is breached by the licensee the licensor has the option of terminating the contract by treating the licensee's action as an offer to rescind and suing on the patent for infringement. Ellis, Patent Assignments and Licenses §§ 779 & 782 (2d ed. 1943). When a license is lawfully canceled the parties are relegated to their status before the granting of the license, and when a license has been declared forfeited by the licensor it cannot be revived or have its validity restored by the subsequent tender of royalties due, or by the licensor's subsequent attempts to obtain payment. Ellis, Patent Assignments and Licenses §§ 770 (2d ed. 1943); see also Lipscomb, Lipscomb's Walker on Patents, Licenses § 20:30, p. 120 (3d ed. 1987). Moreover, the injured party does not change the effect of a repudiation by urging the repudiator to perform. Restatement (Second) of Contracts § 257 (1979).

Id., 32 Fed. Cl. at 17-18.

Further, 69 C.J.S. Patents § 363 states in pertinent part as follows:

As a general rule, on the lawful cancellation or termination of a patent license, the parties are relegated to their status prior to the granting of the license. Invengineering, Inc. v. Foregger Co., 293 F.2d 201 (3d Cir. 1961); Elgin Nat. Watch Co. v. Bulova Watch Co., 281 A.D. 219, 118 N.Y.S.2d 197 (1st Dep't 1953). International Spotlight Corp. v. Casco

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Products Corp., 173 F.2d 475 (2d Cir. 1949). Except as the agreement may otherwise provide, on proper termination of the license, the rights and liabilities of the licensee are likewise brought to an end. Maguire Industries v. Harrington & Richardson Arms Co., 79 F. Supp. 81 (D. Mass. 1948).

The licensee of a patent may forfeit his rights under the license by an abandonment or renunciation of his contract, and on his repudiation the patentee is released from further performance. Morpul, Inc. v. Crescent Hosiery Mills, 265 F. Supp. 279 (E.D. Tenn. 1967); United Mfg. & Service Co. v. Holwin Corp., 187 F.2d 902, 89 U.S.P.Q. (BNA) 204 (7th Cir. 1951). When termination of a patent license contract is sought due to the failure of the licensee to pay royalties, the licensee's conduct must indicate an intention to repudiate the contract; nonpayment of royalties, unless long continued, is not ordinarily regarded as sufficient to terminate a license in the absence of a covenant to that effect. Dow Chemical, supra.

E.    As to the alternative request for transfer, KV's choice of forum should be given deference.

As to the alternative request for transfer, KV's choice of forum should be given

deference. See generally, Neil Bros. Ltd. v. World Wide Lines, Inc., 425 F. Supp. 2d 325

(E.D.N.Y. 2006), which discusses pertinent factors and states in pertinent part as follows:

The Court gives little weight to the alleged forum selection clause appearing in a patent license agreement signed by the parties in 1998...Although this language is sufficient to constitute a mandatory forum selection clause, [citations omitted] World Wide admits that this agreement was terminated in 1998 shortly after it was executed. Therefore, this purported forum selection clause is not binding on the parties with regard to the current dispute.
425 F. Supp. 2d at 328.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

* * *

WHEREFORE, in consideration of the foregoing grounds, <u>Exhibits 1 – 8</u>, hereto, and the

record herein, Plaintiff respectfully requests that the Court deny Defendant's Motion in its

entirety and provide to Plaintiff such other and further relief as the Court deems just and proper.

By:     _____/s/_____
        Jeffrey M. Schwaber
        Virginia Bar No. 35466
        Alexia Kent Bourgerie, *pro hac admission*
        Attorneys for Plaintiff, Kobayashi Ventures, LLC
        Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
        25 West Middle Lane
        Rockville, Maryland  20850
        Telephone:  (301) 838-3210 (Jeffrey Schwaber)
        Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
        Email: jschwaber@steinsperling.com
        Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
        Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
        Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this 13th day of March, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

            Dabney J. Carr, IV
            Troutman Sanders LLP
            1001 Haxall Point
            P.O. Box 1122
            Richmond, Virginia 23218-1122

            J. Rick Tache
            Snell & Wilmer, LLP
            600 Anton Boulevard
            Suite 1400
            Costa Mesa, CA 92626-7689

            Janet Lynn Hickson
            Snell & Wilmer, LLP
            600 Anton Boulevard
            Suite 1400
            Costa Mesa, CA 92626-7689

By:                   /s/
            Jeffrey M. Schwaber
            Virginia Bar No. 35466
            Alexia Kent Bourgerie, *pro hac admission*
            Attorneys for Plaintiff, Kobayashi Ventures, LLC
            Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
            25 West Middle Lane
            Rockville, Maryland  20850
            Telephone:  (301) 838-3210 (Jeffrey Schwaber)
            Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
            Email:  jschwaber@steinsperling.com
            Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
            Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
            Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\146.opp.dismiss.FINAL.doc

# EXHIBIT 1

**Exhibit X1Papertech Website Page – Virginia Sales and Service**

**Representative**

http://www.papertech.ca/WV_reps_Namerica.html



**Capturing Your World with Vision**

| Home | About us | Products | Labs Installations | Product Inquiry | Worldwide Representatives | Customer Support | Contact | Partners |

WebVision® Plus
General Info.

Lights & Cameras

Software

Installations

Portable Systems

Mobile Systems

Customer Results

Representatives

Testimonials

News Releases

Packaging

# WEBVISION plus

*WorldWide Representatives - North America*

<< main representatives

**TX, OK, LA, AR, MS - USA**
Bill Roundtree & Associates, L.L.C. (BRASS)
Email: Bill Roundtree, Tel: +1 318 513 2480

**AL, Northern GA, NC, SC, VA, TN - USA**
Southern Paper Group
Email: John Casey, Tel: +1 800 760 3774, Fax: +1 888 518 7227

**MI, MN, WI - USA**
Up & Running Inc.
Email: James Cooley, Tel: +1 920 491 9301, Fax: +1 920 884 2925

**Mexico**
HSB International Inc.
Email: Brent Starzacher, Tel: +52 55 2624 2307, Fax: +52 55 2624 2308

**Ontario, Quebec, Newfoundland - Canada**
Glenco Products
Email: Chris Hughes , Tel: 416-460-4196, Fax: 905-829-3719

**New Brunswick, Nova Scotia - Canada**
Shadcomm Ltd.
Email: Jody Gallant , Tel: +1 506 622-1101, Fax: +1 506 622-2826

# EXHIBIT 2

**Exhibit X2 -- Southern Paper Group (SPG) Website Page - Papertech's Virginia**

**Capital Equipment Sales and Service Representative**



## Welcome

The premier supplier of quality services, products, and supplies to the Pulp and Paper Industry.

**1-800-760-3774**



## Welcome

**SPG** is the premier supplier of quality products, services, and supplies to the pulp and paper industry.

With headquarters in Greenville, SC, SPG has a network of 11 experienced pulp and paper industry sales and service personnel throughout the United States. Pulp and paper industry backgrounds ranging from experienced Papermakers, Maintenance Superintendents, Maintenance Planners, Mechanical Engineers and Process Specialist are present in the personnel of SPG.

Several recognized pulp and paper industry schools have at least one graduate in the ranks at SPG and each individual has a level of pulp and paper industry experience in excess of 20 years.

**SPG** is very proud to represent B&D Service Center, Conn-Weld, Fluoron, Buschman Corporation, Papertech, Perma-Flex and Whaley. SPG also has the capability to supply Shower Nozzles, Foils and Uhle Box Covers. Specialty Chemicals for the paper mill are a staple product line and we offer our own custom formulated pulp and paper industry products.

**SPG** provides these quality pulp and paper industry services, products, and supplies to the pulp and paper industry in the States of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas and Virginia.

We Welcome the Opportunity to Serve You.

---

### PULP AND PAPER INDUSTRY LINKS

**Mitsubishi Heavy Machinery**
**Perma-Flex**
**Papertech**
**Fluoron**
**Conn-Weld**

**B&D**
**Quantum Sales and Service**
**Auxiliary Process Engineering**

Please enable JavaScript if you wish to send us an E-mail.

**SPG**
**PMB #175, 419 The Parkway, Greer SC 29650**
**1-800-760-3774**

**Contact Carolyn Davis**
**1-800-760-3774**
**E-MAIL**

| Welcome | Capital Equipment | Consumables | Speciality Chemicals | Services |

©2007 SPG. All Rights Reserved.
The premier supplier of quality services, products, and supplies to the Pulp and Paper Industry.

# EXHIBIT 3

**Exhibit X3 -- Papertech Website Page – Georgia-Pacific Corporation Big Island, VA testimonial**

http://www.papertech.ca/WV_references.html

WebVision® Plus General Info.

Lights & Cameras

Software

Installations

Portable Systems

Mobile Systems

Customer Results

Representatives

Testimonials

News Releases

Packaging




***Don't take our word for it, take theirs!***

We are satisfied with our WebVision® system. The system is easy to use, anyone that is computer literate has no problem using it. Our wet end operators use the draw monitoring feature all the time to monitor the edge of the sheet in various locations. It gives them valuable information on where their draw is and if it is changing, so they can see why, before a break occurs.

*Russ Moen*
**Norske Skog, Port Alberni, BC**

We have purchased and installed a Papertech four-camera system on our machines at the Georgia-Pacific Corporation in Big Island, VA. The operators are extremely happy with the high quality video and operator interface. We are able to avoid more breaks by seeing the problem develop and make necessary changes to avoid it. Installation was effortless and Trevor was a tremendous help. The Cameras are rugged enough to withstand the harsh environment behind the paper machines.

With the system, we were able to diagnose problems quicker than before. In one instance, we had a speed match problem between the press and the dryer sections. We were able to zero in on the tachometer on the dryer section knowing the cameras showed the dryers slow down and the tachometer feedback on the dryers remained constant. We are also able to adapt the system to our various needs quickly depending on the problems we are encountering.

I would highly recommend a camera system on any paper machine in the industry. When compared to the competition, Papertech's equipment and service really stands out.

*Dennis Jacobs, Project Engineer*
**Georgia-Pacific Corporation, Big Island Operations**



I am extremely satisfied in my dealings with Papertech. I found their Digital Camera System to be of high quality and easy to use. Also, the payback of our first system (International Paper, Mill T10) was less than six months.

*Mark Mroz, Electrical Engineer*
**International Paper**

I wanted to send you a quick note of congratulations on the successful installation and startup of the WebVision® system here at MPI. I appreciate that the people at Papertech had some creative ideas to insure on-time delivery and an efficient startup. We have seen positive results from day one and are learning the potential of the system every day.

*Mike Doiron,*
*Manager of Paper Manufacturing*
**Madison Paper**

# EXHIBIT  4

## AGREEMENT

This AGREEMENT (this "Agreement"), is made and entered into this 28 day of September, 2007, by and between Kobayashi Ventures LLC ("KV") and Jacklin Associates, Inc. ("Jacklin"). KV and Jacklin sometimes hereinafter may be referred to collectively as the "Parties".

### Recitals

WHEREAS, KV desires to engage Jacklin to purchase certain patents and license agreements, as well as any other licenses associated with such patents and/or related thereto (hereinafter referred to as the "Patent Materials") on its behalf from International Paper Company (hereinafter referred to as the "Business Opportunity"); and

WHEREAS, Jacklin has accepted such engagement on such terms and conditions as hereinafter set forth; and

WHEREAS, in conjunction with the Business Opportunity and during Jacklin's participation with KV, certain confidential information will be disclosed to Jacklin concerning the Business Opportunity; and

WHEREAS, Jacklin acknowledges and agrees that the improper disclosure of any confidential information would cause KV to suffer substantial, immediate and irreparable harm.

NOW, THEREFORE, for and in consideration of the above recitals which shall be deemed to be a substantive part of this Agreement, the mutual obligations herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties hereby covenant and agree as follows:

1.    Patent Purchase.    Jacklin hereby agrees to purchase the Patent Materials, as more fully described and set forth on Exhibit A, which is attached hereto and incorporated by reference herein, from International Paper Company ("Seller") for a purchase price in the amount of Eighty Thousand Dollars ($80,000) ("Purchase Price"). It is acknowledged and agreed that the Purchase Price will be advanced to Jacklin, on or about two (2) days prior to closing on the purchase of the Patent Materials, by KV in the form of a bank wire transfer made payable to Seller. Immediately after the closing, Jacklin agrees to execute an Assignment in the form attached hereto and incorporated by reference herein as Exhibit B.

2.    Consideration.    As consideration for Jacklin's successful purchase of the Patent Materials and subsequent transfer of all of its right, title and interest in the Patent Materials to KV, KV hereby agrees to pay Jacklin the sum of Five Thousand Dollars ($5,000.00).



3.    Indemnification.    KV hereby agrees to indemnify and hold harmless Jacklin from any and all claims, liabilities, expenses, and costs (including but not limited to reasonable attorney's fees) up to a maximum of $10,000.00, resulting from the Business Opportunity contemplated in this Agreement.

4.    Confidentiality and Non-Disclosure.    Jacklin hereby acknowledges and agrees to maintain strict confidentiality with regard to the Business Opportunity and any and all documentation exchanged in the process. During the course of the Parties participation in the Business Opportunity, and at all times

following the termination of this Agreement or the business relationship between the Parties, Jacklin will hold all Confidential Information (as defined below), and each portion thereof, in strict confidence and will not disclose, use, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose the Confidential Information and each portion thereof. Jacklin's disclosure or improper use of any information provided to it during the course of the due diligence regarding the Business Opportunity for the benefit of any party other than KV will cause serious harm and irreparable injury. Jacklin acknowledges and agrees that KV must, in some cases, take reasonable steps to safeguard all information regarding the Business Opportunity, and Jacklin therefore agrees to be bound by the restrictions set forth hereon. As used herein, the term "Confidential Information" shall include all information, in any format, including, without limitation, patent lists, terms of purchase of Patent Materials, business opportunities, client lists, names of licensees, financial information, and resources and other proprietary information of KV, and other information of KV that may have value from not being generally known by other persons who can obtain economic value from the disclosure and/or use thereof, and which is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

5.    Return of Confidential Information.  Jacklin acknowledges and agrees that all information and/or material in Jacklin's possession constituting Confidential Information is the sole and exclusive property of KV and immediately shall be surrendered to KV at any time upon request.

6.    Representations and Warranties,  Jacklin hereby agrees, if requested by KV, to enforce any and all representations and warranties provided by Seller to Jacklin pursuant to the sale of the Patent Materials as set forth in the Purchase Agreement between Jacklin and Seller.

7.    License.  KV hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Patent Materials, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, KV shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee. As used in this subsection, "Licensee" means Seller and other entities, such as joint ventures and subsidiary and affiliated companies, as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, any percentage of control which is legally permitted.

8.    General Provisions

(a)    Assignment.  This Agreement shall not be assignable by any party without the prior written consent of the other party.

(b)    Entire Agreement.  This Agreement supersedes all prior agreements and understandings between the Parties concerning the subject matter herein, and constitutes the entire agreement between the Parties. This Agreement may be amended or modified from time to time only pursuant to a written agreement executed by both parties.

2

(c)    Severability.  The provisions of this Agreement are severable, and if any one or more provisions may be determined to be illegal, invalid or otherwise unenforceable, in whole or in part, and not otherwise subject to modification, the remaining provisions, and any partially unenforceable provision to the extent enforceable, shall, nevertheless, be binding and enforceable.

(d)    Nonwaiver.  The failure of KV to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions or prevent KV from thereafter enforcing each and every other provision of this Agreement.  The rights granted KV herein are cumulative and shall not constitute a waiver of KV's right to assert all other legal remedies available to it under the circumstances.

(e)    Future Assurances.  The Parties agree to execute any and all future documentation necessary to facilitate, enforce and abide by the terms of the Agreement.

(f)    Counsel.  The Parties have had the opportunity, at all times during the course of negotiations leading to the execution of this Agreement, to consult with legal counsel of its own choosing as to the provisions of this Agreement.

(g)    Governing Law and Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Virginia.  Any dispute arising hereunder or between the Parties shall be brought exclusively within the Courts situated in Fairfax County, Virginia.

IN WITNESS WHEREOF, the Parties hereto represent that they have full power and authority to execute this Agreement, and have executed this Agreement as of the day and year first above written.

KOBAYASHI VENTURES, LLC

By: _____
Lisa Daniels

JACKLIN ASSOCIATES, INC.

By: _____
John Irwin

3

Exhibit A

| | |
|---|---|
| 5,821,990 | System for monitoring a continuous manufacturing process |
| 5,899,959 | Measurement of visual characteristics of paper |
| 6,613,195 | Method for conditioning paper and paperboard webs |
| 6,207,020 | Method for conditioning paper and paperboard webs |
| 5,717,456 | System for monitoring a continuous manufacturing process |
| 6,211,905 | System for monitoring a continuous manufacturing process |

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents ("Patent Materials").

EXHIBIT B.

## PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 275 Madison Avenue, 4th Floor, New York, NY 10016.

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _____ day of _____, 2007.

Jacklin Associates, Inc.


By: _____


On this _____ day of _____, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.


(SEAL)


_____
NOTARY PUBLIC


My Commission Expires: _____

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,                 :
                                         :
              Plaintiff                  :
                                         :
       v.                                :        Case No. 2:07-cv-00612-RGD-
TEM                                               
                                         :
PAPERTECH INC.,                          :
                                         :
              Defendant.                 :

**AFFIDAVIT OF KOBAYASHI VENTURES LLC**
**IN SUPPORT OF ASSIGNMENT OF PATENT RIGHTS**

I, Lisa Daniels, on behalf of Kobayashi Ventures LLC, solemnly affirm under the penalties of perjury that the contents of the following paper are true.

1.     I am Manager of Kobayashi Ventures LLC, a Delaware limited liability corporation.

2.     I have served as Manager of Kobayashi Ventures LLC since September 2007.

3.     As Manager of Kobayashi Ventures LLC, I was the person responsible for the transactions described below.

4.     Jacklin Associates Inc. sold, assigned, transferred, and conveyed to Kobayashi Ventures LLC ("Assignee"), or its designees, all right, title, and interest that existed as of December 10, 2007 and may exist in the future in and to any and all of the following (collectively, the "Patent Rights") as detailed in Exhibit A.

5.     Jacklin Associates Inc. purchased all rights as shown in the Exhibit A **"Patent Purchase Agreement"** from International Paper effective October 19, 2007.

6.     In turn, Jacklin Associates Inc. assigned to Kobayashi Ventures LLC all rights under the **"Patent Purchase Agreement"**, including but not limited to, the right to sue for past infringement, acquired from International Paper.

7.    Jacklin Associates Inc. did not retain any rights from the **"Patent Purchase Agreement"**. All rights were transferred to a single entity-- Kobayashi Ventures, LLC.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE.

KOBAYASHI VENTURES LLC

By: _____

Lisa Daniels, Manager

COMMONWEALTH OF VIRGINIA:

COUNTY OF Fairfax    :

I hereby certify that on this _13_ day of ___March___, 2008, before me, a Notary Public of the Commonwealth of Virginia, personally appeared Lisa Daniels, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, who acknowledged that he executed the same for the purpose therein contained.

WITNESS my hand and Notarial Seal.

_____
Notary Public

LINDA M. POZO
Notary Public
Commonwealth of Virginia
7141244
My Commission Expires Apr 30, 2011

My commission expires: 4/30/2011

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\146.KV.affidavit.rev.doc

## EXHIBIT A
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)    the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)    all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)    all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)    all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)    damages,
(ii)    injunctive relief, and
(iii)    any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| | | | | |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

KOBAYASHI VENTURES, LLC,                    :
                                            :
            Plaintiff                       :
                                            :
      v.                                    :        Case No. 2:07-cv-00612-RGD-
TEM                                         :
                                            :
PAPERTECH INC.,                             :
                                            :
            Defendant.                      :
                                            :

## AFFIDAVIT OF JACKLIN ASSOCIATES, INC.
## IN SUPPORT OF ASSIGNMENT OF PATENT RIGHTS

      I, John Irwin, on behalf of Jacklin Associates Inc., solemnly affirm under
the penalties of perjury that the contents of the following paper are true.

      1.      I am President and CEO of Jacklin Associates Inc., a Pennsylvania
corporation.

      2.      I have served as President and CEO of Jacklin Associates Inc. for
25 years.

      3.      As President and CEO of Jacklin Associates Inc. I was the person
responsible for the transactions described below.

      4.      Jacklin Associates Inc. sold, assigned, transferred, and conveyed
to Kobayashi Ventures LLC ("Assignee"), or its designees, all right, title, and
interest that existed as of December 10, 2007 and may exist in the future in and
to any and all of the following (collectively, the "Patent Rights") as detailed in
Exhibit A.

      5.      Jacklin Associates Inc. purchased all rights as shown in the Exhibit
A **"Patent Purchase Agreement"** from International Paper effective October 19,
2007.

      6.      In turn, Jacklin Associates Inc. assigned to Kobayashi Ventures
LLC all rights under the **"Patent Purchase Agreement"**, including but not limited
to, the right to sue for past infringement, acquired from International Paper.

7.    Jacklin Associates Inc. did not retain any rights from the **"Patent Purchase Agreement"**. All rights were transferred to a single entity-- Kobayashi Ventures, LLC.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE.

JACKLIN ASSOCIATES, INC.

By: _John N Irwin_

John Irwin, President and CEO

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF _Delaware_

I hereby certify that on this _13_ day of _March_, 2008, before me, a Notary Public of the Commonwealth of Pennsylvania, personally appeared John Irwin, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, who acknowledged that he executed the same for the purpose therein contained.

WITNESS my hand and Notarial Seal.

_Nancy N. Vanning_

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL.
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 25, 2011

My commission expires:

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\146.jacklin.affidavit.rov.doc

## EXHIBIT A
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)     the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)     all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)     all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)      damages,
(ii)     injunctive relief, and
(iii)    any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

# EXHIBIT 7

PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033.

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this *10th* day of *December*, 2007.

Jacklin Associates, Inc.

By: *John N Irwin*

On this *10* day of *Dec*, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

*Nancy Vanning*
NOTARY PUBLIC

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and
continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all
license agreements and other entitlements to receive royalties to which Seller is a party with respect to the
patents ("Patent Materials").

# EXHIBIT 8

## PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

### RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means    prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term. Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.      Payments

2.1     Initial Payment. Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2     Ongoing Payments.

        (a)     During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment"). The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b). Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement. When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied. In the event that funds from Net Royalty Collections payable to Seller under the terms hereof are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations. In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

        (b)     During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

        As an example:

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

2.3     Statements and Payments. All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

2.4    Records.    Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.    Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

(i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

(ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.    PARAGRAPH INTENTIONALLY DELETED

5.    Representations and Warranties of Seller

5.1    Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2    Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS". Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to. (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.     Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1     Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2     Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.     License

7.1     <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2     <u>No Other Rights</u>. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.     Miscellaneous

8.1     <u>Limitation of Liability</u>. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2     <u>Limitation on Consequential Damages</u>. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3    Compliance With Laws.    Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4    Confidentiality.    For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure. Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5    Governing Law; Venue/Jurisdiction.    This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6    Notices.    All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services: FedEx; U.S.P.S., DHL or UPS.

| If to Purchaser | If to Seller |
| --- | --- |
| Jacklin Associates, Inc. | International Paper Company |
| Attention: President | Attention: Chief Counsel, Intellectual Property |
| 259 North Radnor Chester Road | 6285 Tri-Ridge Blvd. |
| Suite 210 | Loveland, OH 45140 |
| Wayne, Pennsylvania 19087 | |

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal. Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7    Severability.    If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8    Waiver. Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9    Successors and Assigns. Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit. Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect. All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    Independent Contractors. Seller and Purchaser are independent contractors. Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    Payment of Maintenance Fees. Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser. In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller. Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment. Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status. If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14 Revocation of Sale of Assigned Patents and Assigned Agreements. If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect. In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller. Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                                PURCHASER:

International Paper Company             Jacklin Associates, Inc.

By:_____           By:_____

Name:_____           Name:_____

Title:_____          Title:_____


Effective Date: August _____, 2007

EXHIBIT A

ASSIGNED AGREEMENTS

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

ASSIGNED PATENTS

| Patent or Application No. [Patent numbers] | Serial No. For applications | Country [Country] | Filing Date [Filing date(s)] | Title of Patent and First Named Inventor [Title of patent and name of first named inventor] |
|---|---|---|---|---|
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

DELIVERABLES

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

EXHIBIT D
ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)    the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)    all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)    all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)    all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)    damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement; and
(iv)   all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. [Patent numbers] | Serial No. For applications | Country [Country] | Filing Date [Filing date(s)] | Title of Patent and First Named Inventor [Title of patent and name of first named inventor] |
|---|---|---|---|---|
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at _Loveland, OH_ on ___
_10-19-2007_ .

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____

Name: _NORMAN MARSOLAN_

Title: _DIRECTOR, R&D_

*(Signature MUST be notarized)*

STATE OF _OHIO_ )
                               ) ss.
COUNTY OF _CLERMONT_ )

On _10-19-2007_ , before me, _JANE A. TOMLINSON_ , Notary Public in and for said State, personally appeared _NORMAN MARSOLAN_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____    (Seal)



Jane A. Tomlinson
Notary Public, State of Ohio
My Commission Expires
June 19, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC. | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY BRIEF IN SUPPORT OF PT PAPERTECH INC.'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE
OF CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO
TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406**

Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech") files the following reply brief in support of its motion to dismiss, or in the alternative, motion to transfer venue.

**I.**

**INTRODUCTION**

Regardless of whether personal jurisdiction over Papertech is proper, at the very least, this Court should transfer this case to the Southern District of New York. The License Agreement that forms the basis of Plaintiff Kobayashi Ventures LLC's ("Kobayashi") allegations and damage claims against Papertech contains a mandatory forum and venue selection clause requiring the case to be heard there. Furthermore, such a transfer is amply supported because (1) the License Agreement requires that New York law apply to any disputes arising out of that agreement; (2) there is another lawsuit already pending in the Southern District of New York with facts and circumstances common to this case such that judicial economy would be served if the two cases were pending before the same court; and (3) the evidence suggests that many of the witnesses with knowledge and documents that will be relevant to this case reside in New York.

Kobayashi now opposes Papertech's motion to transfer based solely on its argument that Papertech terminated the License Agreement and, therefore, that the forum and venue selection clause in that agreement has no effect.  This argument directly contradicts the allegations and damage claims contained within Kobayashi's Complaint.  The Complaint specifically alleges that Papertech's "attempted" termination of the License Agreement was not effective and specifically seeks damages from Papertech for royalties due under the License Agreement at any time, including between 1998 and September 2000 when the License Agreement was *undisputedly* in effect.  Because Kobayashi does not dispute that it is making these claims, Kobayashi does not therefore dispute that the License Agreement is at issue in this case.  By electing to bring the License Agreement at issue in this lawsuit, Kobayashi also brought into play the forum and venue selection clause, which should be enforced.

Independently, dismissal of this action is also warranted.  Kobayashi failed to meet its burden of proof to establish that asserting personal jurisdiction over Papertech would comport with due process requirements.  Specifically, Kobayashi's Opposition focuses mainly on whether Papertech's sporadic contacts with Virginia authorize jurisdiction under § 8.01-328.1 – a point that Papertech does not dispute – rather than attempting to establish that due process considerations would be satisfied in extending jurisdiction over Papertech, precisely the point that Papertech *does* dispute.  Furthermore, it is unclear whether Kobayashi ascribed its limited arguments or alleged facts in this regard to a theory of general or specific jurisdiction. Regardless of the theory, Kobayashi failed to establish that the due process requirements are satisfied.  Consequently, this Court should dismiss Kobayashi's Complaint in its entirety for lack of personal jurisdiction.

## II.

## THE CASE SHOULD BE TRANSFERRED TO NEW YORK

**A.    Because Kobayashi Seeks Damages Under the License Agreement, the Court Should Transfer This Case to New York.**

The License Agreement, which includes a mandatory forum and venue selection clause, is unequivocally at issue in this case.  Not only does the License Agreement form the foundation of Kobayashi's infringement allegations, it also frames Kobayashi's prayer for relief.  More specifically, paragraphs 11 through 17 of Kobayashi's Complaint detail the terms of the License Agreement, Papertech's "attempted" termination of that agreement, and Papertech's alleged failure to pay royalties under that agreement dating back to the inception of the License Agreement in 1998.   In paragraph 19, Kobayashi then summarizes its allegations in this regard as follows:

> 19.    In summary, Papertech's actions include the following:
>
> - 1998:  Entered into the License Agreement;
>
> - 1998 to License Agreement termination: Failed to pay all royalties due under the License Agreement;
>
> - 2000:  Attempted to unilaterally terminate the License Agreement but failed to give proper notice;
>
>                                  ***
>
> - 2004:  Ignored requests for payment to International Paper due under the License Agreement prior to termination;
>
>                                  ***
>
> - 2001 to present:  Evaded payment of an estimated $750,000 in royalties

(emphasis added).  Based on these allegations, Kobayashi then asks the Court to enter

> . . . an interim order mandating Papertech to escrow five (5) percent of the net sales price of all products and systems it has **at any time sold** which use Kobayashi's Patented Technology[1], including prejudgment interest calculated from the date of sale to present at the applicable prime interest rate(s) . . .

Kobayashi alleges that Papertech failed to pay royalties due under the License Agreement, and Kobayashi now seeks to recover those royalties.

Now that Papertech has brought to the Court's attention the consequences of Kobayashi's putting the License Agreement at issue in this lawsuit, Kobayashi claims for the very first time in its Opposition that Papertech terminated the License Agreement and, therefore, does not have any surviving rights under that agreement.  Opp. at p. 1.  Notably absent from this argument, however, is any argument that Papertech *properly* terminated the License Agreement or that Kobayashi is not seeking any damages arising out of the License Agreement.  Kobayashi's silence in this regard concedes the point.  *See,* for example, *K & K Enters. of Cent. Fla., Inc. v. Tampa Port Auth.*, 2007 U.S. Dist. LEXIS 70863 at 6-7 (D. Fla. 2007) (construing failure to make argument in opposing brief as concession).  Certainly if Kobayashi was not seeking damages under the License Agreement, it would have stated so in the Opposition to avoid having this case transferred to New York.

Even if Kobayashi had conceded that the License Agreement was ***properly*** terminated – something it does not do – Kobayashi is still seeking damages for royalty payments that were due under the License Agreement between 1998 and September 2000, when the License Agreement was undisputedly still in effect.  As such, because of the allegations made and the prayer for relief requested by Kobayashi in its Complaint, the License Agreement is squarely at issue in this lawsuit.  It would therefore be inherently improper to allow Kobayashi to seek

---

[1]    Section 3.2 of the License Agreement requires Licensee [Papertech] to pay "a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations."

damages potentially due under the License Agreement, but not require Kobayashi to be bound by the mandatory forum and venue selection clause in the same agreement.

**B.**    **Transferring the Case to New York Promotes Judicial Economy and the Convenience of the Witnesses.**

Transferring the case to New York would also promote judicial economy and the convenience of the witness. Indeed, the connection between this case and Virginia is tenuous, at best. Kobayashi is nothing more than a shell corporation. It has no employees that likely have any knowledge or information relevant to the issues in this case, and Papertech is not aware of any witnesses with knowledge or documents relevant to this lawsuit that reside in Virginia. In spite of this tenuous connection, and relying on *Neil Bros. Ltd v. World Wide Lines, Inc.*, 425 F.Supp.2d 325 (E.D.N.Y. 2006), Kobayashi summarily argues that its choice of forum should be given deference. Its argument must fail for several reasons.

First, Kobayashi's reliance on *Neil Bros.* is misplaced. In *Neil Bros.*, a British company sued a Tennessee company in New York for patent infringement, and the defendant moved to transfer based on convenience of the witnesses pursuant to 28 U.S.C. § 1404(a). Though not at issue in the motion to transfer, the court briefly touched upon a forum selection clause that appeared in a short-lived patent license agreement between the parties, stating *in dicta* that the agreement did not apply to the pending dispute because it had been terminated. *Id.* at 328. However, *Neil Bros.* involves a key distinction from the case at hand – in *Neil Bros.*, the license agreement with the forum selection clause does not appear to have been at issue in the case; whereas in the instant case, it is.

Second, there is no logical reason to give deference to Kobayashi's choice of forum. Indeed, deference should be given to the interests of judicial economy and the convenience of the witnesses. As discussed in Papertech's moving papers, Carotek, Inc. ("Carotek") and Kobayashi are parties to a declaratory relief action currently pending in the Southern District of New York, which involves issues about the scope of Carotek's license agreement with Champion as well as the validity of the Champion patents in general – some of which will

certainly transcend the case pending before this court.[2]  Judicial economy would be served, therefore, if both cases were pending before the same Court.  Similarly, since New York law governs not only the License Agreement but the Patent Purchase Agreement, the New York courts would presumably be more familiar with the law that must be applied in this case.

In addition, and even though Papertech is not making a motion to transfer pursuant to 28 U.S.C. § 1404(a) at this time,[3] the evidence suggest that many of the witnesses with information and/or documents relevant to this case are in New York.  For example, Papertech believes that the primary inventor of all three of the Champion patents resides in New York and that he may have key documents and information related to the invention and the validity of the Champion patents.  Similarly, International Paper has a considerable number of offices in New York, including offices in Albany and Glenn Falls, New York, a sales office in New York City for the printing and commercial paper division of International Paper, and a paper mill in Ticonderoga, New York.  As the successor-in-interest to Champion, International Paper will have key information and documents about the validity of the patents, the License Agreement, the royalty payments made under those agreements, and Papertech's arguments regarding laches and estoppel.

Thus, between the mandatory forum and venue selection clause, the interests of judicial economy and the convenience of the witnesses, this case should be transferred to New York.

---

[2]     Carotek filed the lawsuit in New York pursuant to a license agreement similar to the one Papertech had with Champion.  Even though Carotek's license agreement had also been terminated, Kobayashi never objected to venue in that case.

[3]     Should the Court deny Papertech's instant motion, Papertech reserves its right to file a motion to transfer pursuant to 28 U.S.C. § 1404(a).

**III.**

## EXERCISING JURISDICTION OVER PAPERTECH WOULD VIOLATE
## CONSTITUTIONAL DUE PROCESS

Dismissal of this case is also warranted because Kobayashi failed to meet its burden of proof, by a preponderance of the evidence, to establish that exercising jurisdiction over Papertech would comport with due process requirements. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989). To meet this burden, Kobayashi would have had to show, with something more than vague and conclusory allegations, that jurisdiction exists not only under Virginia's Long-Arm Statute (§ 8.01-328.1), but that all of the elements of due process are satisfied. Specifically, with respect to due process requirements, Kobayashi had to show that either (1) Papertech's contacts with Virginia in general were systematic and continuous so as to justify exercising general jurisdiction over Papertech; or (2) that the Court could appropriately exercise specific jurisdiction over Papertech because (a) Papertech purposefully directed its activities at residents of Virginia; and (b) Kobayashi's claims arise out of or relate to Papertech's limited activities within Virginia. Kobayashi failed to make any of these showings.

To the contrary, Kobayashi not only failed to discuss each element required to demonstrate that due process is satisfied under either a theory of general or specific jurisdiction, but it also failed altogether to even discern which theory it contended applied here or which facts it ascribed to any theory.[4] Kobayashi only appears to make two arguments

---

[4] For example, Kobayashi's Opposition focuses mainly on whether Papertech's sporadic contacts with Virginia authorize jurisdiction under § 8.01-328.1 – a point that Papertech does not dispute -- rather than focusing on whether due process considerations would be satisfied in extending jurisdiction over Papertech, which is precisely the point that Papertech *does* dispute.

Similarly, Kobayashi cites an endorsement from an employee of the Georgia Pacific Corporation, Big Island Operation as evidence to support jurisdiction. Opp. at p. 5. Such an endorsement, which only establishes that a customer was pleased with the

related to due process considerations – neither of which address all of the elements required to meet its burden of proof and both of which have no merit. First, Kobayashi claims that it has standing to bring this lawsuit. Second, Kobayashi claims that the stream of commerce theory supports due process. Both of these arguments, discussed in detailed below, are factually incorrect and based on a misrepresentation of a case and inadmissible evidence.

**A.    Kobayashi Failed to Show That It Has Standing to Sue for Past Infringement.**

As Papertech's moving papers point out, Kobayashi cannot show that its claims arise out of Papertech's activities in Virginia because Kobayashi does not have the right to sue for any infringement that occurred before Kobayashi allegedly acquired ownership of the Champion patents and because all of Papertech's limited activities within Virginia pre-date Kobayashi's alleged ownership of the Champion patents. Kobayashi now seemingly claims that because it contracted with Jacklin to obtain the Champion patents, and because the agreement between Jacklin and International Paper granted Jacklin the right to sue for past infringement, Kobayashi was necessarily assigned that right as well. The evidence does not support this argument. Furthermore, Kobayashi's belated attempt at an end-run around this issue with the declarations of Lisa Daniels and John Irwin must fail.

**1.    Kobayashi Did Not Acquire the Right to Sue for Past Infringement.**

First, in order to assign the right to sue for past infringement, that right must be expressly set forth in the assignment itself. It cannot be inferred. Therefore, assignments that transfer "all right, title and interest" to a patent do not transfer the right to sue for past infringement *unless* there is an express provision expressly transferring that right.

Despite this, Kobayashi relies on *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) to claim that the right to sue for past infringement was passed from Jacklin to Kobayashi. Kobayashi claims that the *Minco* Court looked at the totality of three

---

product he received, is irrelevant to due process considerations. Kobayashi provides no other evidence in support of its position.

separate agreements to rule that the right to sue for past infringement should be inferred into one of those three agreements based on the other two agreements. Kobayashi misconstrues the findings in *Minco*, because the court did not look at the totality of three separate agreements, but rather, looked only at the express provisions of one contract and found that additional express provisions contained within that contract expanded the scope of the contract to include the right to sue for past infringement.

Specifically, in *Minco,* an investment group called Minco Acquisition Corporation ("MAC") purchased a company called Minco and a patent for making fused silica, which was owned by Ken Jenkins and Verneil Richards (Richards had acquired ownership of the patent from the original inventor, William Rawles). The transaction for the purchase of Minco included an assignment of the patents from Jenkins and Richards to MAC and another assignment of the patent from MAC to Minco. *Id.* at 1113-1114. Minco later sued Combustion Engineering, Inc. for infringement of that patent.

On appeal of a damage award, Combustion claimed that Minco did not have standing to bring the suit because the assignment from Jenkins and Richards to MAC (referred to as the "MAC assignment") did not contain an express assignment of the right to sue for past infringement. The court rejected this claim, ruling that that express language in the MAC assignment expanded the scope of that assignment to include the right to sue for past infringement. In particular, the Court found that the following *express provisions* in the MAC assignment expanded to scope of the assignment to include the right to sue for past infringement: (1) a statement that Richards had received "'all right, title, and interest' from Rawles, including 'all rights of action and damages for past infringement;" (2) a statement expressly confirming Jenkins and Richards were not retaining any right to any recoveries for infringements or to sue in their own name with regard to the patent; and (3) a statement expressly granting MAC all patent rights "as fully and entirely as the same would have been held and enjoyed by Assignors. . . [as if the] agreement had not been made.'" *Id.* at 1117-1118.

This is vastly different from the situation presently before the Court. Here, while the assignment from International Paper accompanying the Patent Purchase agreement gives Jacklin the right to sue for past infringement, neither of the agreements between Jacklin and Kobayashi contain provisions transferring the right to sue for past infringement to Kobayashi. *See*, Exs. 3 and 7 to Opp. For instance, the Assignment from Jacklin to Kobayashi purportedly transferred

> [t]he above listed Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitles to receive royalties to which Seller is a party with respect to the patents.

*See,* Ex. B to Ex. 7 to Opp. This clearly does not transfer the right to sue for past infringement. Furthermore, there are no statements in either of the Jacklin/Kobayashi agreements similar to those considered in the *Minco* case, such as statements that (1) Jacklin received the right to sue for past infringement; or (2) Jacklin was not retaining any right to recover for infringement or to sue in its own name. Exs. 3 and 7 to Opp. Thus, based on these agreements, Kobayashi clearly and unequivocally did not obtain the right to sue for past infringement.

In a belated effort to avoid this fatal problem, Kobayashi now requests that the Court consider the declarations of Lisa Daniels and John Irwin to interpret the Kobayashi/Jacklin agreements to include the right to sue for past infringement. These declarations, however, constitute extrinsic evidence, and the general rule is that parol evidence is inadmissible to vary, contradict, or explain the terms of a complete and unambiguous written contract. *Price v. Taylor*, 466 S.E.2d 87, 89 (Va. 1996). Kobayashi does not, however, contend that anything about the Jacklin/Kobayashi agreements is ambiguous. The simple fact is that these agreements never mention the right to sue for past infringement, and the exclusion of such a

provision from these agreements does not thereby render them ambiguous.[5]   Indeed, if the exclusion of such a provision from an agreement automatically rendered the agreement vague, extrinsic evidence would always be admissible in cases related to such contracts, and there is no authority to support that proposition.

Accordingly, the Court should disregard these declarations just like it would disregard any contract entered into after the date this action was filed that purported to transfer the right to sue for past infringement to Kobayashi.  These declarations contain new provisions and convey new rights to Kobayashi – just as a new contract would – and neither the declarations nor a new contract would confer standing on Kobayashi at the time suit was filed.  *Enzo Apa & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093-1094 (Fed. Cir. 1998) (standing must exist at the time the suit was filed).

### 2.    Kobayashi Confuses Minimum Contacts with the Elements of Patent Infringement.

Furthermore, Kobayashi's assertion that any system utilizing the technology in the Champion patents without a proper license infringes that technology on a continuous basis misses the point.  Kobayashi seems to argue that because a Papertech customer in Virginia uses Papertech's products on a continuous basis, that such ongoing use either provides standing to Kobayashi and/or provides sufficient contacts between Papertech and Virginia to meet due process requirements.  Either argument fails because (1) that position is inconsistent

---

[5]    There may well be good reason for the exclusion of such a provision in either of the Jacklin/Kobayashi agreements.  For example, the September 28, 2007 agreement between Jacklin and Kobayashi, which Kobayashi conveniently excluded from the Complaint, authorized Jacklin to purchase the Champion patents for $80,000.00.  However, according to the Patent Purchase Agreement, Jacklin purchased those patents for a total of $275,000, which is well in excess of the authorized amount, and then assigned the patents to Kobayashi for only $10.00.  The discrepancy and disparity in these amounts supports an argument that Jacklin may have intentionally retained the right to sue for past infringement.

with well established law; and (2) Kobayashi is confusing the elements of patent infringement with the due process requirements in a misguided attempt to establish minimum contacts.

In particular, if the mere fact that an allegedly infringing product was being used by a non-party in a state were sufficient to meet the second prong of the test for specific jurisdiction – i.e., that the cause of action arises out of the alleged infringer's conduct in the forum state – that prong would be rendered meaningless.  That is, any patent owner would always be able to show that its cause of action against an alleged infringer arose out of the alleged infringer's activities within a state where it could show that a product was being used by a customer within the state.  There is no authority to support such an argument.  Indeed, if this were the state of the law, then surely the *Silver Springs* Court, for example, would have reached a different result based on the fact that the allegedly infringing product was being used in Virginia.  508 F.Supp.2d 508 (W.D. Va. 2007).

Furthermore, the fact that an allegedly infringing product is being used within a state cannot establish minimum contacts under either the tests for general or specific jurisdiction.  Whether an allegedly infringing product is used by a non-party end-user on a continuous basis in Virginia potentially goes to the issue of infringement, not whether Papertech's contacts with Virginia are, for example, systematic and continuous.

**B.**    **The Stream of Commerce Theory Does Not Apply to Papertech.**

Kobayashi's claim that Papertech is subject to personal jurisdiction pursuant to a "stream of commerce" theory mischaracterizes Papertech's contacts with Virginia and misses the point because this theory does not apply to Papertech.  Under the "stream of commerce" theory, a forum state may exercise jurisdiction over a non-resident corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state**.**  By definition, a stream of commerce case involves a sale not by the manufacturer, but by another entity in the chain of distribution.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980).  *See also,* for example, *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994) (holding that manufacturer of a ceiling

12

fan was subject to personal jurisdiction because it shipped fans to an intermediary, who in turn ultimately sold them to customers in Virginia); *Federal Ins. Co. v. Lake Shore, Inc.*, 886 F.2d 654, 658-59 (4th Cir. 1989) (holding stream of commerce theory cannot support a finding of minimum contacts where all of company's sales in a state were initiated by the customer and, cumulatively, do not represent "significant activities within the state") (internal citations omitted); and *CBP Resources v. Ingredient Resource Corp.*, 954 F. Supp. 1106, 1109 (D.N.C. 1996) (holding that a supplier had sufficient contacts with North Carolina to subject it to personal jurisdiction there because it sold the products to its distributors, who agreed to be the supplier's exclusive sales representative in 10 states, and the distributors were responsible for shipping the products out of that state).

**1.    Southern Paper Group Does Not Distribute Papertech's Products.**

Unlike the stream of commerce cases discussed above, Papertech does not sell products to a distributor.  Indeed, Southern Paper Group ("SPG"), which is listed as a representative on Papertech's website, does not distribute Papertech products.  Rather, SPG is a non-exclusive representative that develops potential sales leads for Papertech in various geographic locations, including Virginia.  Declaration of Michael Heaven in support of Papertech's Reply Brief ("Heaven Reply Decl.") (filed with this reply) at ¶ 3.  If SPG advises Papertech of a potential sales interest, Papertech then directly follows up with the potential customer regarding its product and the potential sale, which may include making a presentation to the potential customer, answering technical questions and generating a sales proposal.  *Id.*  Any sales made as a result of SPG's leads are directly between Papertech and the customer.  SPG is not a party to any sales agreements between Papertech and the ultimate customer, and the product sold to customers is never delivered into SPG's hands.  *Id.*

Furthermore, SPG's contacts with Virginia related to Papertech have been sporadic. SPG has never utilized eleven (11) sales and service personnel from SPG to market Papertech products to Virginia residents as Kobayashi now claims.  Rather, only one (1) SPG representative was responsible at any given time for contacting customers in Virginia related

to Papertech's products.  However, none of these SPG representatives ever resided in Virginia Heaven Reply Decl. at ¶ 4.  In addition, none of the sales that Papertech has made in Virginia were the result of any lead developed solely by SPG.  Heaven Reply Decl. at ¶ 4. Furthermore, SPG's representative that covered Virginia customers left SPG in 2005 and was only recently replaced.  *Id.*  In fact, in the last four years, SPG has only made ten (10) sales calls to Virginia residents on Papertech's behalf, none of which occurred after December 10, 2007 – when Kobayashi acquired the Champion patents.  *Id.  Cf. Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed. Cir. 1994) (holding that manufacturer of ceiling fan was subject to personal jurisdiction because it shipped fans to intermediary in Virginia for ultimate sale to customers and opposing party found 52 of manufacturers fans at intermediary's stores in Virginia).

### 2.    Papertech's Limited Warranties Do Not Create a Stream of Commerce.

Moreover, the fact that Papertech warrants its products and responds to service calls from the two customers in Virginia also does not somehow create a stream of commerce as Kobayashi now seemingly claims, and their attempt to distinguish *Silver Ring Splint Co.* in this regard fails.  Opp. at pp. 12-13.  Indeed, just because Papertech provides limited warranties for its products does not *ipso facto* mean that Papertech automatically has continuous and systematic contacts with Virginia.  If that were the case, manufacturers would be subject to personal jurisdiction any time their products were sold in a forum state because most manufacturers warrant their products, which is contrary to the whole notion that personal jurisdiction must comport with due process considerations.

*Transcraft Corp. v. Doonan Trailer Corp.*, 1997 U.S. Dist. LEXIS 18687 (D. Ill. 1997), is instructive in that regard.  In that case, Transcraft argued that the defendant's (Doonan) motion to dismiss for lack of personal jurisdiction should be denied, in part, because Doonan warranted products that were sold to residents of the forum state.  The court rejected this claim, stating:

> Transcraft cites no authority for the proposition that defendants who provide warranties to purchasers of their products are subject to personal jurisdiction wherever the stream of commerce sweeps their products. Because most products are sold with warranties attached to them, Transcraft's rule would subject many if not most manufacturers to personal jurisdiction wherever their products are ultimately sold.

*Id.* at 31.

So too here. If Kobayashi's suggestion were followed, Papertech would be subject to personal jurisdiction wherever its products were ultimately sold. The simple fact of warranting a product is not sufficient to establish that due process considerations are met.

### 3.    Papertech's Sporadic Sales and Service Contacts with Virginia Do Not Create a Stream of Commerce.

Kobayashi also suggests that Papertech's sale or delivery of four WebVision Systems – and the dollar amount of those sale – to two companies in Virginia, establishes sufficient contacts with Virginia to justify exercising personal jurisdiction over Papertech. Opp. at p. 4. This suggestion is not supported by the law and attempts to misrepresent the applicable facts.[6] The only thing these four sales show is that Papertech's contacts with Virginia are sporadic and that the sales in Virginia constituted less than *½ of 1%* percent of Papertech's total sales. This Court has established precedent that personal jurisdiction does not comport with the requirements of the due process clause under similar circumstances.

Specifically, in *Chino v. D&T Trucking Co.,* 2006 U.S. Dist. LEXIS 30648 (E.D. Va. 2006), cited in Papertech's moving papers, the defendant trucking company moved to dismiss a case from Virginia based on lack of personal jurisdiction. The plaintiff claimed that since

---

[6]    For example, Kobayashi's claim that Papertech is "most likely also collecting considerable ongoing revenue for parts, services, hardware upgrades, software upgrades and additional features," from Virginia is completely unfounded. The fact is that parts orders sold and/or delivered to residents and/or facilities in Virginia, which only include Greif Brothers and Georgia Pacific, totaled only $12,178.00 during the available time period. This amount is less than .36% (thirty-six hundredths of one percent) of parts orders and software upgrades worldwide over the same time period. Heaven Reply Decl. at ¶ 5.

the defendant did business in Virginia, it consented to jurisdiction in Virginia. In rejecting that argument, the court stated:

> The affidavit of Jim Walker, Director of Safety and Compliance of Defendant, states that out of 15,942 total pickups and deliveries in 2005, Defendant had only eighteen combined pick ups and deliveries in Virginia that year. Thus, 0.11 percent of the total 2005 pickups and deliveries for Defendant occurred in Virginia. Similarly, of the 12,489,962 miles driven by drivers for Defendant doing pickup or delivery work in 2005, only 10,587 miles were driven in Virginia. In other words, 0.08 percent of the miles driven by Defendant drivers in 2005 were in Virginia. Plaintiff cautions the Court that percentages can be misleading and encourages the Court to focus on the absolute amount of contacts. Even so, the absolute amount of Defendant's contacts with Virginia are inadequate for establishing jurisdiction. An average of one and a half pickups or deliveries a month in Virginia does not suggest that Defendant is availing himself of the protections of that state's laws and, in return, consents to jurisdiction in that state's courts as to the business it conducted. Nothing about these numbers suggests continuous and systematic activities in Virginia. It would offend the notions of fair play and substantial justice to find this Court has personal jurisdiction over the Defendant.

*Id.* at 7-8.

The contact that the defendant trucking company had with Virginia in *Chino* -- one and half times per month – is far greater than number of sales and service calls that Papertech has had with Virginia. For example, based on the available customer service information, Papertech has responded to sixteen (16) service calls from facilities in Virginia over a five year period of time, which amounts to far less than one per month. If one and a half pickups or deliveries were insufficient to establish jurisdiction in *Chino*, then certainly responding to one call every 2.6 months in Virginia is insufficient to establish jurisdiction over Papertech.

Moreover, the nature of Papertech's service calls do not change these facts or increase the amount of contact that Papertech has with Virginia residents. While Papertech does have the ability to connect to a customer's system via a modem or network connection, it only does so in response to a service call made by a customer. Heaven Reply Decl. at ¶ 6. It does not routinely access a customer's system absent a separate maintenance agreement, and no

16

Virginia residents have such a maintenance agreement. *Id.* This means that within Virginia, Papertech only dialed into the systems of either Greif Brothers or Georgia Pacific in response to service calls placed by those companies and that Papertech only dialed into these systems less than sixteen (16) times in over a five year period of time. This is simply insufficient to establish personal jurisdiction over Papertech.

In short, the stream of commerce theory does not apply here, and even if it did, Papertech and SPG's sporadic activities within Virginia cannot rise to the level of purposeful availment required to meet due process. Furthermore, since SPG's activities related to Papertech occurred before Kobayashi acquired the Champion patents and since Kobayashi does not have the right to sue for infringement that occurred before that date, Kobayashi's cause of action in this case cannot arise out of SPG's limited activities in Virginia.

**C.**    **Exercising Personal Jurisdiction Over Papertech Is Not Reasonable or Fair.**

Based on the above, Kobayashi clearly has not met its burden of proof. Moreover, even if this Court is inclined to find that Kobayashi did meet its burden of proof, it would still be unreasonable and unfair to assert jurisdiction over Papertech. These arguments are detailed in Papertech's moving papers and will not be repeated in detail here. Suffice it to say that the burden on Papertech in trying this case in Virginia is high, none of the relevant evidence and documents are located in Virginia, and the forum and venue selection clause in the License Agreement, to which Papertech should be entitled to rely on, dictates that the case be heard in New York.

**IV.**

**CONCLUSION**

Dismissing this case for lack of personal jurisdiction is warranted because nothing in the record demonstrates that Kobayashi established the requisite due process elements.

Regardless of what this Court decides regarding the personal jurisdiction issue, however, the

Court is clearly justified in transferring this case to New York.

PT PAPERTECH INC.

By_____/s/_____
                    Of Counsel

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
(804) 697-1200
(804) 697-1339 (Fax)


Of Counsel:
J. Rick Taché (CA Bar #195100)
Janet L. Taché (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## **CERTIFICATE OF SERVICE**

I certify that on the 21st day of March, 2008, I will electronically file the foregoing with

the Clerk of the Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

> Jeffrey M. Schwaber
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> jschwaber@steinsperling.com
>
> Alexia Kent Bourgerie
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerire@steinsperling.com

```
                        /s/
_____
            Dabney J. Carr, IV, VSB #28679
            (dabney.carr@troutmansanders.com)
            TROUTMAN SANDERS LLP
            P. O. Box 1122
            Richmond, Virginia  23218-1122
            (804) 697-1238
            (804) 698-5119 (Fax)
```

8642225

19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| KOBAYASHI VENTURES LLC | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     Case No. 2:07CV612-RGD-TEM |
| | ) |
| PAPERTECH INC. | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF MICHAEL HEAVEN IN SUPPORT OF PT PAPERTECH, INC.'S REPLY BRIEF REGARDING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406

I, Michael Heaven, declare:

1.     I am currently the General Manager of PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech"). I have been employed by Papertech for over 4 years. In my position as General Manager, I have personal knowledge of Papertech's operations, including, but not limited to, information about Papertech's contacts with Virginia, sales of Papertech's WebVision® System, and service contacts related to these products. I have personal knowledge of the facts set forth below and if called as a witness to testify I could and would competently testify to them.

2.     I make this declaration in support of Papertech's Reply Brief regarding its Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(B)(2), or in the Alternative, Motion to Transfer Venue Pursuant to 28 U.S.C. § 1406.

3.     Southern Paper Group ("SPG"), which is listed as a representative on Papertech's website, does not distribute Papertech products. Rather, SPG is a non-exclusive representative that develops potential sales leads for Papertech in various geographic

locations, including Virginia. If SPG advises Papertech of a potential sales interest, Papertech then directly follows up with the potential customer regarding its product and the potential sale, which may include making a presentation to the potential customer, answering technical questions and generating a sales proposal. Any sales made as a result of SPG's leads are directly between Papertech and the customer. SPG is not a party to any sales agreements between Papertech and the ultimate customer, and the product sold to customers is never delivered into SPG's hands.

    4.    I am aware that SPG has never utilized eleven (11) sales and service personnel from SPG to market Papertech products to Virginia residents. Rather, only one (1) SPG representative was responsible at any given time for contacting customers in Virginia related to Papertech's products. I am further aware that none of these SPG representatives ever resided in Virginia. In addition, none of the sales that Papertech has made in Virginia were the result of any lead developed solely by SPG – the sales to Georgia Pacific Big Island were through a corporate master supply agreement, and the sales to Greif Brothers involved direct sales contact between Papertech and the customer throughout the sales process. I am further aware that SPG's representative covering Virginia customers left SPG in November, 2005 and was only recently replaced. Based on call reports received by Papertech since 2004, SPG has only made ten (10) sales calls to Virginia residents on Papertech's behalf and I am unaware of any sales calls to Virginia residents on Papertech's behalf occurring after December 10, 2007.

    5.    I have reviewed our records for revenue related to parts, services, hardware upgrades, software upgrades and additional features that are available for the time period from January 1, 2006 to March 17, 2008. I determined that parts orders sold and/or delivered to residents and/or facilities in Virginia, which only include Greif Brothers and Georgia Pacific, totaled only $12,178.00 during this time period, whereas the total parts orders sold worldwide over the same time period was $3,340,957.43. Accordingly, the parts orders sold and/or delivered to Virginia from January 1, 2006 through March 17, 2008 was less than .36%

2

(thirty-six hundredths of one percent) of parts orders and software upgrades worldwide over the same time period.

6.    While Papertech does have the ability to connect to a customer's system via a modem or network connection, it only does so in response to a service call made by a customer. It does not routinely access a customer's system absent a separate maintenance agreement, and no Virginia residents have such a maintenance agreement.

I, declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of March, 2008, at _____NORTH VANCOUVER, B.C..

PT PAPERTECH, INC.

_____
Michael Heaven

8650414

3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES, LLC, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Case No. 2:07-cv-00612-RGD-TEM |
| | : | |
| PAPERTECH INC., | : | |
| | : | |
| Defendant. | : | |

**KOBAYASHI VENTURES' MOTION TO STRIKE PAPERTECH'S**
**UNTIMELY FILED REPLY BRIEF IN SUPPORT OF IT'S MOTION TO DISMISS**

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., submits this brief in opposition to "Reply Brief in Support of PT Papertech Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to FRCP 12(b)(2) or in the Alternative to Transfer Venue" ("Reply Brief"), and states as follows:

I.    INTRODUCTION

Papertech filed its motion to dismiss based on a lack of jurisdiction, or in alternative, to transfer venue on February 28, 2008.  Plaintiff Kobayashi Ventures, LLC ("KV") responded timely with its opposition on March 13, 2008.  Under the Local Rules for the United States District Court for the Eastern District, any rebuttal brief is due within three days after service of the opposition papers.  Federal Rules of Civil Procedure Rule 6(e) extends the deadline by three days for certain types of service.  Papertech's reply brief, if any, was due **no later than March 19, 2008** and was thus untimely filed on March 21, 2008.  In addition, Papertech has improperly introduced by way of affidavit new matters which were not addressed in its initial motion.  For

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

the reasons and law stated below, Justice requires that this Honorable Court strike Defendant Papertech's Reply Brief in its entirety.

III.    APPLICABLE LAW AND ARGUMENT

A.    Time for filing Reply Briefs is set out by Local Rule 7(F), extended only by three days pursuant to Rule 6(e)

The Local Rules for the U.S. District Court for the Eastern District of Virginia, Rule 7(F), states, in pertinent part, as follows:

> Unless otherwise directed by the Court, the opposing party shall file a responsive brief and such supporting documents as are appropriate, within eleven (11) days after service and the moving party may file a rebuttal brief within three (3) days after the service of the opposing party's reply brief.

This three day response rebuttal brief deadline is extended by FRCP 6(e) and 5(b)(3) by an additional 3 days where, as here, service was effectuated by ECF. The Defendant therefore had six days to file a rebuttal brief, which would have been due on March 19, 2008. Filing on Friday, March 21, 2008 was untimely and in complete disregard of this Court's rules. See Littlejohn v. Moody, 381 F.Supp.2d 507 (E.D.Va., 2005) (holding that while a court may, for good cause shown, enlarge the period of time in which an action is to occur, requests for extensions or enlargements of time must be in writing and, if made after the period of time in which an act was to occur, must be accompanied by a brief (citing Local Rule 7(E) and (H).))

No such request for extension was made here. The Court has the authority to disallow filings untimely made. Littlejohn, 381 F. Supp. 2d at 509. The Reply Brief should therefore be stricken.

B.    Defendant Papertech unjustly seeks to introduce new matters in its reply brief

Even assuming, *arguendo*, that Papertech's Reply Brief was timely, it is improper for the moving party to attempt to introduce new facts or different legal arguments in the reply brief

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

than those presented in the moving papers.  Moreover, even if new matters were raised in the opposition brief, the reply brief may only address those issues if they were reasonably unforeseeable at the time of the opening brief. <u>Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc</u>. 767 F. Supp 1220, 1235 (SDNY, 1991), rev'd on other grounds,   If a court allows and relies on material contained in a reply brief, it must afford the opposing party an opportunity to respond. <u>Beaird v. Seagate Tech, Inc</u>. 145 F. 3d 1159, 1164-5 (10th Cir. 1998).

The Papertech Reply Brief raises for the first time the existence of a witness; "Papertech believes that the primary inventor of all three of the Champion patents resides in New York and that he may have key documents and information related to the invention and the validity of the Champion patents." (Reply Brief at 6.)  Further, Papertech raises for the first time that Southern Paper Group ("SPG") which is listed on Papertech's website as its representative for Virginia, among other states in the eastern central region of the U.S., is not a distributor.  (Reply Brief, at 13, and Declaration of M. Heaven at 1.)  Notably, in it's Motion to Dismiss, Papertech failed to mention that it had a representative in Virginia.

* * *

WHEREFORE,  in consideration of the foregoing grounds, and the record herein, Plaintiff respectfully requests that the Court strike Defendant's Reply Brief in its entirety and provide to Plaintiff such other and further relief as the Court deems just and proper.

By:    _____/s/_____
        Jeffrey M. Schwaber
        Virginia Bar No. 35466
        Alexia Kent Bourgerie, *pro hac admission*
        Attorneys for Plaintiff, Kobayashi Ventures, LLC
        Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
        25 West Middle Lane
        Rockville, Maryland  20850

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of March, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:
Dabney J. Carr, IV

Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia 23218-1122

J. Rick Tache
Snell & Wilmer, LLP
600 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626-7689

Janet Lynn Tache
Snell & Wilmer, LLP
600 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626-7689

By:        _____/s/_____
Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email:  jschwaber@steinsperling.com
Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\222.mtn.strike.reply.brief.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PT PAPERTECH INC.'S OPPOSITION TO KOBAYASHI'S MOTION TO STRIKE
PAPERTECH'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech") files the following Opposition to Kobayashi's Motion to Strike Papertech's Reply Brief In Support Of Its Motion to Dismiss.

**I.**

**LEGAL ARGUMENT**

Kobayashi's Motion to Strike Papertech's Reply Brief is based upon two grounds: (1) that it was untimely filed; and (2) that it introduces new matters. Both of these claims are inaccurate and must fail.

**A.**    **Papertech's Reply Brief Was Timely Pursuant to Federal Rule of Civil Procedure 6(a)(2).**

Kobayashi erroneously argues that Papertech's Reply Brief was due on March 19, 2008 pursuant to FRCP 6(e) and 5(b)(3). While Kobayashi is correct that Papertech "had six days to file a rebuttal brief," Kobayashi incorrectly calculated those six days. Kobayashi failed to consider FRCP 6(a)(2), which provides: "Exclude intermediate Saturdays, Sundays, and legal holidays when the period is less than 11 days." Thus, excluding the Saturday and Sunday following service of Kobayashi's Brief in Opposition, Papertech's Reply Brief was due on March 21, 2008. Accordingly, Papertech properly filed its Reply Brief on March 21, 2008.

Thus, Kobayashi brought this Motion based upon its failure to correctly read and apply the applicable rules. Consequently, this Motion should be denied.

**B.    <u>Papertech Did Not Seek to Introduce New Matters in Its Reply Brief.</u>**

Kobayashi argues that Papertech raises two new matters for the first time in its Reply Brief: (1) the existence of a witness – the primary inventor of the Champion patents; and (2) that Southern Paper Group ("SPG") is not a distributor. Both of these arguments are not only inaccurate they are contrary to established law. As such, they must fail.

**1.    Papertech's Reference to the Inventor Is Not "New" Evidence.**

Papertech's Motion requested that this Court dismiss this case based upon a lack of personal jurisdiction over Papertech or alternatively, transfer this case to New York. Specifically, Papertech discusses its burden as a foreign defendant and the interstate judicial system's interest in obtaining the most efficient resolution of this controversy. Motion at pp. 17-18. In addition, Papertech asserts in its Motion that the bulk of discovery in this case will be directed to non-parties – none of which reside in Virginia. *Id*. at p. 18. Kobayashi's only argument in opposition to Papertech's request to transfer the case to New York is that its choice of forum should be given deference. Opp. at p. 15. Papertech, in its Reply Brief, provides reasons why deference should favor the interests of judicial economy rather than Kobayashi's choice of forum. In so doing, Papertech did not "raise the existence of a witness" and thereby introduce new matter. To the contrary, in its Reply Brief Papertech argues, as it did in its Motion, that many witnesses, documents, and materials are located outside Virginia.

In its Reply Brief, Papertech merely provided an example to illustrate how the transfer of this case to New York would promote judicial economy and the convenience of the witnesses. The existence of the "primary inventor" of the Champion patents is ***not*** a new matter. To the contrary, the name of the primary inventor and the city and state of his primary residence appear *on the face page of each of the Champion patents* being asserted in this case, which were attached and referenced in Kobayashi's Complaint. As such, Papertech did not raise the existence of a witness or introduce a new matter.

**2.    Papertech's Discussion of Southern Paper Group in its Reply Brief Was Solely in Response to Statements in Kobayashi's Opposition.**

Kobayashi's other argument – that Papertech raises for the first time that Southern Paper Group ("SPG") is not a distributor – is also incorrect.  Rather, Papertech makes this argument in its Reply Brief **exclusively** to rebut Kobayashi's assertion that SPG is an active distributor for Papertech "in" Virginia.  Indeed, it was Kobayashi that raised SPG for the first time in its Opposition.  Papertech argues, in its Motion *and* its Reply Brief, that it has no offices, assets, employees, contractors, or representatives of any kind in Virginia.  Motion at pp. 7-9.  It also argues that it does not market its products through a distributor or sales agent in Virginia.  *Id*.  In response, Kobayashi argues: "Papertech maintained an active sales force in the United States and actively markets, both through a direct sales force and through a manufacturer's representative, specifically SPG…."  Opp. at p. 2.  Papertech is entitled to reply to this assertion.  *See*, e.g., *Baugh v. City of Milwaukee*, 823 F.Supp. 1452, 1456-57 (E.D. Wis. 1993) (noting that portions of a reply should not be stricken "where the reply affidavit merely responds to matters placed in issue by the opposition brief."…"It seems absurd to say that reply briefs are allowed but that a party is proscribed from backing up its arguments in reply with the necessary evidentiary material.")  Thus, Papertech properly clarified in its Reply Brief that SPG does not distribute Papertech products, but merely develops potential sales leads for Papertech in *various* geographic locations.

In support of the argument in its Motion to Strike, Kobayashi cites to *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 767 F.Supp. 1220 (S.D.N.Y. 1991).  Kobayashi misinterprets *Litton Industries*.  Specifically, Kobayashi cites to this case to argue: "[E]ven if new matters were raised in the opposition brief, the reply brief may only address those issues if they were reasonably unforeseeable at the time of the opening brief."  Contrary to Kobayashi's representation of the Court's holding, the Court actually held: "Clearly, reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously

unforeseen issues." Thus, Kobayashi's own assertion supports Papertech's right to rebut Kobayashi's erroneous allegations regarding SPG.

A moving party can not be required to anticipate every argument and entity that might be raised in an answering party's opposition. The rule is well-settled that the moving party is entitled to reply to matters generally raised in the answering party's opposition. This Court's decision in *Ilozor v. Hampton Univ.*, 2007 U.S. Dist. LEXIS 33032 at \*39-\*42 (E.D. Va. 2007) is instructive. There, the plaintiff argued that four affidavits submitted by defendant with its reply brief were "new evidence." *Id.* at \* 39. This Court, however, held the declarations were solely submitted because the plaintiff had attacked certain statements as hearsay in its opposition. As this Court clarified, "This declaration is not new evidence, but clearly relates to evidence already presented, in an affort [sic] to rebut the plaintiff's allegations." *Id.* at \* 40. Similarly here, Papertech merely explains its relationship with SPG in order to rebut evidence presented by Kobayashi in its Opposition.

## II.

## <u>CONCLUSION</u>

Kobayashi's Motion offers no justification for the Court to strike Papertech's Reply Brief. In fact, Kobayashi brought this Motion because it failed to correctly read and apply the applicable Federal Rules of Civil Procedure. Kobayashi further incorrectly argues that Papertech introduces "new evidence." Rather, Papertech's Reply Brief was proper because: (1) it discusses issues raised in its initial Motion to Dismiss; and (2) responds to arguments raised in Kobayashi's Opposition. For these reasons, this Court should deny Kobayashi's Motion to Strike Papertech's Reply Brief in Support of its Motion to Dismiss.

PT PAPERTECH INC.


By_____/s/_____
            Of Counsel

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
(804) 697-1200
(804) 697-1339 (Fax)


<u>Of Counsel:</u>
J. Rick Taché (CA Bar #195100)
Janet L. Hickson (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

**CERTIFICATE OF SERVICE**

I certify that on the 25th day of March, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Jeffrey M. Schwaber
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> jschwaber@steinsperling.com
>
> Alexia Kent Bourgerie
> Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerire@steinsperling.com

> /s/
> _____
> Dabney J. Carr, IV, VSB #28679
> (dabney.carr@troutmansanders.com)
> TROUTMAN SANDERS LLP
> P. O. Box 1122
> Richmond, Virginia  23218-1122
> (804) 697-1238
> (804) 698-5119 (Fax)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KOBAYASHI VENTURES, LLC,        :
                                :
            Plaintiff           :
                                :
      v.                        :        Case No. 2:07-cv-00612-RGD-TEM
                                :
PAPERTECH INC.,                 :
                                :
            Defendant.          :

**KOBAYASHI VENTURES' AMENDED MOTION TO STRIKE
PAPERTECH'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

Plaintiff, Kobayashi Ventures, LLC, by and through its attorneys, Jeffrey M. Schwaber,

Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.,

hereby moves to strike Papertech's Reply Brief in Support of its Motion to Dismiss for Lack of

Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(B)(2), or in the Alternative,

Motion to Transfer Venue Pursuant to 28 U.S.C.§1406 ("Reply Brief"), for the reasons more

fully set forth in the accompanying Brief, which is incorporated herein.[1]

WHEREFORE, in consideration of the grounds stated in the accompanying Brief and the

record herein, Plaintiff respectfully requests that this Honorable Court strike Papertech's Reply

Brief in its entirety.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[1] Plaintiff herein re-submits in large part as a supporting brief the text of its previously filed "Motion to Strike Papertech's Untimely Filed Reply Brief in Support of its Motion to Dismiss."

By:            _____/s/_____

Jeffrey M. Schwaber
Virginia Bar No. 35466
Alexia Kent Bourgerie, *pro hac admission*
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland  20850
Telephone:  (301) 838-3210 (Jeffrey Schwaber)
Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
Email: jschwaber@steinsperling.com
Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of March, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Dabney J. Carr, IV
> Troutman Sanders LLP
> 1001 Haxall Point
> P.O. Box 1122
> Richmond, Virginia 23218-1122
>
> J. Rick Tache
> Snell & Wilmer, LLP
> 600 Anton Boulevard
> Suite 1400
> Costa Mesa, CA 92626-7689
>
> Janet Lynn Tache
> Snell & Wilmer, LLP
> 600 Anton Boulevard
> Suite 1400
> Costa Mesa, CA 92626-7689

By:     _____/s/_____
     Jeffrey M. Schwaber
     Virginia Bar No. 35466
     Alexia Kent Bourgerie, *pro hac admission*
     Attorneys for Plaintiff, Kobayashi Ventures, LLC
     Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
     25 West Middle Lane
     Rockville, Maryland  20850
     Telephone:  (301) 838-3210 (Jeffrey Schwaber)
     Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
     Email:  jschwaber@steinsperling.com
     Telephone:  (301) 838-3232 (Alexia Kent Bourgerie)
     Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
     Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\10 amended motion to strike.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

FILED

APR 2 8 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KOBAYASHI VENTURES, LLC,

    Plaintiff,

    v.                                                                    Civil Action No. 2:07cv612

PAPERTECH, INC.,

    Defendant.


## ORDER

This matter comes before the Court upon Kobayashi's Motion to Strike Papertech's Reply and Kobayashi's Motion to Amend its Motion to Strike. For the reasons set forth herein, the Court hereby **GRANTS** Kobayashi's Motion to Amend and **DENIES** Kobayashi's Motion to Strike.

In its March 24, 2008, Motion to Strike, Kobayashi claims that Papertech's Reply: (1) was untimely filed; and (2) impermissibly raises new evidence not contained in its Motion to Dismiss. In its March 25, 2008, Response, Papertech claims that its Reply: (1) was timely filed; and (2) does not raise new evidence not contained in its Motion to Dismiss or in Kobayashi's Response. In its March 26, 2008, Motion to Amend, Kobayashi concedes that Papertech's Reply was timely filed, but maintains that the Reply impermissibly raises new evidence. The motions have been fully briefed and are ripe for review by this Court.

As a threshold matter, the Court hereby **FINDS** that Papertech's Reply was timely filed pursuant to Fed. R. Civ. P. 6. However, regardless of whether Papertech's Reply was timely filed, the Court hereby **GRANTS** Kobayashi's Motion to Amend its Motion to Strike insofar as the Amended Motion to Strike removes the claim that Papertech's Reply was untimely filed.

In its Amended Motion to Strike, Kobayashi claims that Papertech's Reply impermissibly raises new evidence regarding: (1) the fact that the inventor of the disputed patents resides in New York; and (2) the fact that Southern Paper Group ("SPG") is not a distributor for Papertech. However, Papertech raised both of these pieces of evidence in its Reply to counter Kobayashi's arguments contained in its Response to Papertech's Motion to Dismiss. See Ilozor v. Hampton University, 2007 WL 1310179, *13-*14 (E.D. Va. May 3, 2007). In its Response, Kobayashi claimed that its choice of forum is appropriate and should be given deference and also claimed that SPG is a distributor. Papertech's evidence regarding the location of the inventor of the disputed patents relates directly to whether Kobayashi's choice of forum is appropriate and should be given deference. Similarly, Papertech's evidence regarding SPG's status as a representative (rather than distributor) directly rebuts Kobayashi's claim that SPG is a distributor. Therefore, the Court hereby **FINDS** that Papertech's Reply does not impermissibly raise new evidence and **DENIES** Kobayashi's Motion to Strike.

The Court notes that it admires the business acumen of the attorneys in this case, and congratulates them on their proficiency at generating billable hours.

The Clerk of the Court is **DIRECTED** to deliver a copy of this Order to all counsel of record in this case.

**IT IS SO ORDERED.**

/s/

Robert G. Doumar
Senior United States District Judge

April 2008
Norfolk, Virginia

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**



**FILED**

MAY – 7 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KOBAYASHI VENTURES, LLC,

      Plaintiff,

      v.

PAPERTECH, INC.,

      Defendant.

Civil No. 2:07cv612

## ORDER

This matter comes before the Court upon the motion of Papertech, Inc., ("Papertech" or "Defendant") to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue. For the reasons set forth below, the Court hereby **GRANTS** Papertech's motion to transfer venue and hereby **TRANSFERS** the case to the United States District Court for the Southern District of New York.

## I.   FACTUAL AND PROCEDURAL HISTORY

The three U.S. patents involved in this case purportedly relate to a "system for monitoring a continuous manufacturing process." (Pl.'s Response at ¶ 10). On March 2, 1995, the inventor assigned the patents to Champion International. On November 12, 1998, Champion International licensed the patents to Papertech. On September 27, 2000, Papertech provided 30 days notice to Champion International of its intent to terminate the license agreement. On December 31, 2000, Champion International became International Paper through a merger. On

1

October 19, 2007, International Paper sold the patents to Jacklin Associates. On December 10, 2007, Jacklin Associates assigned the patents to Kobayashi Ventures, LLC ("Kobayashi" or "Plaintiff"). Kobayashi is a Delaware Limited Liability Company with an office in Virginia. Papertech is a Canada Corporation with its principal place of business in Vancouver, British Columbia. Papertech manufactures "a paper process monitoring system known as the WebVision system." (Def.'s Motion at 7).

On December 27, 2007, Kobayashi filed a Complaint against Papertech for patent infringement (Count I) and patent infringement inducement (Count II), claiming that Papertech's WebVision system infringes on Kobayashi's patents. The Complaint seeks an injunction, an escrow of five percent of the net sales price of the systems sold by Papertech "at any time" plus interest, damages, treble damages, and attorneys' fees. On February 28, 2008, Papertech filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue. On March 13, 2008, Kobayashi filed a response. On March 21, 2008, Papertech filed a reply. On March 24, 2008, Kobayashi filed a motion to strike Papertech's reply. On March 25, 2008, Papertech filed a response. On March 26, 2008, Kobayashi filed a motion to amend its motion to strike Papertech's reply. On April 28, 2008, the Court issued an order granting Kobayashi's motion to amend and denying Kobayashi's motion to strike. The motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue is therefore fully briefed and ripe for review by this Court.

## II.    STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(2) permits a party to move the court to dismiss an action if the court

2

lacks personal jurisdiction over the party. When a defendant moves to dismiss a Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the burden ultimately rests on the plaintiff "to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). However, a plaintiff need only make a prima facie showing of jurisdiction when the Court "rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence related to the jurisdictional issue." In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997). In making its ruling, the Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676.

Although the general remedy applied by Courts lacking personal jurisdiction over a party is dismissal of the case, 28 U.S.C. § 1406(a) has been interpreted to permit transfer of the case as an alternative remedy. The statute states, in relevant part:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a). "[S]ection 1406(a) has been interpreted to authorize transfers in cases where venue is proper but personal jurisdiction is lacking or some other impediment exists that would prevent the action from going forward in that district." In re Carefirst of Maryland, Inc., 305 F.3d 253, 255-56 (4th Cir. 2002); see also Saudi v. Northrup Grumman Corp., 427 F.3d 271, 277 (4th Cir. 2005); Porter v. Groat, 840 F.2d 255, 257 (4th Cir. 1988).

3

## III.  ANALYSIS

In its motion to dismiss or, in the alternative, to transfer venue, Papertech claims that its contacts with Virginia are insufficient to establish either general or specific personal jurisdiction in this Court under the Due Process Clause.  Specifically, Papertech claims that the company: (1) is not licensed to conduct business in Virginia; (2) does not pay taxes in Virginia; (3) does not have employees, accounts, or offices in Virginia; and (4) does not directly market its products in Virginia.  In its response, Kobayashi claims that Papertech: (1) has sold four WebVision systems to two companies in Virginia; (2) continues to warrant and maintain those systems in Virginia; (3) operates a website containing an endorsement from a Virginia customer; (4) actively markets its products in Virginia through 11 agents of its sales and service representative Southern Paper Group ("SPG"); and (5) connects remotely to the infringing computer networks of the four systems in Virginia.

In its reply, Papertech claims that: (1) the four WebVision systems sold in Virginia represent less than one percent of Papertech's total sales since 1998; (2) the four systems were sold between July 2000 and July 2007 before Kobayashi acquired the patents; (3) although Papertech warrants the four systems, it does not continue to maintain them; (4) the 16 customer service calls placed by the purchasers of the four systems represent less than one percent of Papertech's 2,100 total service calls since 2002; (5) Papertech has only passively marketed its products in Virginia through 10 sales calls by 1 SPG agent to Virginia residents; (6) all of these calls occurred before Kobayashi acquired the patents and none of these calls resulted in sales; and (7) Papertech has connected remotely to the computer networks of the four systems in Virginia less than 16 times since 2002 and only in response to customer service calls.

4

In Virginia, a court has personal jurisdiction over a defendant if: (1) jurisdiction is authorized by Virginia's Long-Arm Statute, Va. Code § 8.01-328.1, and (2) jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. Hartford Cas. Ins. Co. v. JR Marketing, LLC, 511 F. Supp. 2d 644, 647 (E.D. Va. 2007). However, "because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002) (internal quotations omitted).

To satisfy the Fourteenth Amendment's due process requirements, a defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). The minimum contacts analysis considers whether the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Personal jurisdiction may be "general" or "specific." "[W]hen a defendant's contacts with the forum state are continuous and systematic, irrespective of whether the transaction in question had sufficient contacts with the state, a court may exercise *general* personal jurisdiction over the defendant. In the absence of continuous and systematic contacts, a court may still exercise *specific* personal jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state." Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 450 (4th Cir. 2000) (internal citations omitted).

5

Papertech's limited contacts with Virginia provide an inadequate basis for general personal jurisdiction in this Court. Papertech operates a website accessible in Virginia, made four customer-initiated sales of WebVision systems in Virginia (less than one percent of its sales), provides customer service for those systems (less than one percent of its customer service calls), connects remotely to the computer networks of those systems to provide customer service, and marketed its products in Virginia through ten sales calls by one non-resident agent of SPG. Operation of a website, limited customer-initiated sales, and limited promotional activities are insufficient to constitute "continuous and systematic" contacts. See, e.g., Silver Ring Splint Co. v. Digisplint, Inc., 508 F. Supp. 2d 508, 512 (W.D. Va. 2007).

Papertech's contacts with Virginia are also an inadequate basis for specific personal jurisdiction in this Court. As a threshold matter, the Virginia Long-Arm Statute confers personal jurisdiction over Papertech because Papertech transacted business in Virginia and used a computer network in Virginia. See Va. Code §§ 8.01-328.1(A)(1), (B), and 18.2-152.2 ("A person 'uses' a computer or computer network when he attempts to cause or causes a computer or computer network to perform or to stop performing computer operations.") However, this Court's exercise of personal jurisdiction over Papertech must still comport with the Due Process Clause of the Fourteenth Amendment. See, e.g., Aitken v. Communications Workers of America, 496 F. Supp. 2d 653, 659 (E.D. Va. 2007). Courts apply a three-pronged test to determine whether specific personal jurisdiction passes constitutional muster: "(1) did the defendants 'purposefully avail' themselves of the privileges of conducting activities in the forum, (2) does the claim arise out of these activities, and finally (3) is the exercise of jurisdiction reasonable?" Id. at 659; see also Silent Drive, Inc. v. Strong Industries, Inc., 326

6

F.3d 1194, 1202 (Fed. Cir. 2002).  Step two of this inquiry mirrors the Virginia Long-Arm

Statute's requirement that "only a cause of action arising from acts enumerated in this section

may be asserted against" the defendant.  Va. Code §§ 8.01-328.1(C).

Kobayashi's claim does not arise out of Papertech's activities in Virginia under the

second prong of the specific personal jurisdiction test, and therefore it is unnecessary for the

Court to consider the first and third prongs.  Generally, a plaintiff must have legal title to a patent

at the time of a defendant's infringement to bring a suit against a defendant for damages.

Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991).  An exception to

this general rule applies when an assignment of a patent contains an express assignment of the

right to sue for past infringement.  Id. at 1579 n. 7; see also Crown Die & Tool Co. v. Nye Tool

& Mach. Works, 261 U.S. 24, 40-41 (1923).  For example, in Minco, Inc., v. Combustion

Engineering, Inc., 95 F.3d 1109, 1117-8 (Fed. Cir. 1996), the court found that the assignee of a

patent could bring a suit for past infringement where the assignment expressly stated that the

assignors: (1) possessed "all rights of action and damages for past infringement"; (2) "do not

retain any right to any recoveries for infringement...[or] to sue in their own name with regard to

the [Patent]"; and (3) grant all patent rights "as fully and entirely as the same would have been

held and enjoyed by Assignors ... [as if the] agreement had not been made."

In this case, International Paper assigned the patents to Jacklin Associates on October 19,

2007.  Exhibit D, "Assignment of Patent Rights," to the parties' "Patent Purchase Agreement"

states, in relevant part:

> For good and valuable consideration, the receipt of which is hereby
> acknowledged, International Paper Company, a New York corporation
> ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin

7

("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

. . .

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement right sunder, or account of, any of the Patents and/or any item in any of the categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for:

(i)     damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement, and
(iv)   all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h)

This language indisputably assigned International Paper's right to sue for past infringement to

Jacklin Associates. Jacklin Associates assigned the patents to Kobayashi on December 10, 2007.

The "Patent Assignment" states, in relevant part:

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc., have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

This language, in contrast, clearly is not sufficient under the standard articulated in Minco and

Arachnid to assign Jacklin Associates' right to sue for past infringement to Kobayashi. The

"Patent Assignment" contains no reference to past infringement whatsoever and makes no

reference to the respective rights of Kobayashi and Jacklin Associates to sue for infringement

that took place before the assignment was consummated. Therefore, this Court may only

8

exercise personal jurisdiction over Papertech if Kobayashi's claims arise out of Papertech's activities in Virginia occurring after December 10, 2007.

Kobayashi's claim for patent infringement is based on 28 U.S.C. § 271 which states, in relevant part, "whoever without authority makes, uses, *offers to sell, or sells* any patented invention, within the United States . . . infringes the patent" (emphasis added). Kobayashi's claim for patent infringement arises from Papertech's alleged sale of WebVision systems in Virginia and Papertech's offers to sell WebVision systems in Virginia. However, Kobayashi admits that Papertech's last sale of a WebVision system in Virginia occurred in July 6, 2007, before Kobayashi was assigned the patent. In addition, although SPG marketed WebVision systems in Virginia on Papertech's behalf, SPG has not made sales calls to Virginia residents since December 10, 2007. (Michael Heaven Aff. at ¶ 4). Kobayashi offers no evidence that any other sales of WebVision systems, or offers to sell WebVision systems, occurred subsequent to its acquisition of patent rights on December 10, 2007. However, Kobayashi appears to argue, without citing any support, that its claims against Papertech alternatively arise out of the "ongoing infringement" committed by the users of the WebVision systems in Virginia rather than out of Papertech's own activities. Although the argument would certainly support this Court's exercise of personal jurisdiction over the users of the WebVision systems themselves, it provides no basis for this Court's exercise of personal jurisdiction over Papertech because Papertech itself is not using the systems in Virginia.

Furthermore, although it is unnecessary for the Court to examine the third prong of the specific personal jurisdiction test given that the Court has resolved the issue on the second prong, the Court nevertheless notes that the exercise of jurisdiction by the United States District

9

Court for the Southern District of New York would be far more reasonable than this Court's exercise of jurisdiction because a similar case involving nearly identical issues is currently pending in the Southern District of New York. Champion International also licensed the patents to Carotek, Inc. ("Carotek") pursuant to a license agreement containing a forum selection clause identical to that contained in the Papertech license agreement. On November 26, 2007, Kobayashi notified Carotek that it was in breach of the license agreement. On December 11, 2007, Carotek filed a Complaint in the Southern District of New York seeking a declaratory judgment against Kobayashi that it had not breached the terms of the license agreement. On February 8, 2008, Kobayashi filed an Answer counterclaiming against Carotek for patent infringement (Count I), patent infringement inducement (Count II), and breach of the license agreement (Count III). Given the Court's interest in judicial economy, the competing interests of Virginia and New York in resolving the dispute, and the respective burdens on the parties, it would be unreasonable for this Court to exercise personal jurisdiction over Papertech. Therefore, because Kobayashi's claims do not arise out of Papertech's activities in Virginia and because exercising specific personal jurisdiction over Papertech would be unreasonable, the Court hereby **FINDS** that this Court lacks specific personal jurisdiction over Papertech.

Given that the Court lacks personal jurisdiction over Papertech, the Court must determine whether to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(2) or to transfer the case pursuant to 18 U.S.C. § 1406(a). Papertech concedes that venue would be proper and that the company would be subject to personal jurisdiction in the United States District Court for the Southern District of New York. Furthermore, transfer of the case, rather than dismissal, would conserve the time and resources of both the parties and the courts by eliminating the need for new

10

pleadings to be prepared and by permitting consolidation of this case with the similar case

already pending in the Southern District of New York. Therefore, the Court hereby **FINDS** that

transfer of the case to the United States District Court for the Southern District of New York, a

district in which the case could have originally been brought, is in the interest of justice pursuant

to 18 U.S.C. § 1406(a).

In its motion to dismiss or, in the alternative, to transfer, Papertech also argues that this

Court should transfer the case to the United States District Court for the Southern District of

New York because Kobayashi is seeking royalties under Papertech's original license agreement

with Champion International and because the license agreement contains a forum selection

clause which states, in relevant part:

> 18.1    This Agreement shall be construed and the legal relations between the
> parties shall be determined, in accordance with the laws of the State of
> New York, without recourse to the conflicts of laws of said State which
> would direct the use of laws of another jurisdiction. Any suit brought by
> either party against the other party on the basis of any controversy or
> claim arising out of or relating to this Agreement or a breach thereof shall
> be brought in the United States District Court for the Southern District of
> New York, and, if the United States District Court declines jurisdiction for
> any reason, then in the Supreme Court First Department of the State of
> New York. The Parties hereby consent to the personal jurisdiction of the
> courts and hereby designate the Secretary of State of the State of New
> York for receipt of service of process.

In its response, Kobayashi claims that this forum selection clause does not apply because

Papertech terminated the license agreement by providing 30 days notice to Champion

International of its intent to terminate the license agreement on September 27, 2000. Because

this Court lacks personal jurisdiction over Papertech, it deliberately declines to resolve the

dispute between the parties over whether the license agreement applies and leaves the dispute to

be resolved by the United States District Court for the Southern District of New York.

## IV.    **CONCLUSION**

For the foregoing reasons, the Court hereby **GRANTS** Papertech's motion to transfer venue and hereby **TRANSFERS** the case to the United States District Court for the Southern District of New York.

The Clerk of the Court is **DIRECTED** to deliver a copy of this Order to all counsel of record. The Clerk of the Court is further **DIRECTED** to transfer this case to the United States District Court for the Southern District of New York.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge

May 7, 2008
Norfolk, Virginia

12