## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC         :

        Plaintiff               :

                                :

      v.                         :      Case No. 1:08-cv-04450-LAP

                                :

PAPERTECH INC.                  :      JURY TRIAL DEMANDED

                                :

        Defendant.           :      **FIRST AMENDED COMPLAINT**

                                :

## INTRODUCTION

This is an action brought by Kobayashi Ventures, LLC ("Kobayashi Ventures") for

unpaid royalties due on certain patented technology licensed by Kobayashi Ventures to

Defendant Papertech, Inc. ("Papertech"). Kobayashi Ventures exclusively owns, among other

things, three U.S. patents and a variety of foreign patents that relate to the invention(s) of

synchronizing cameras to the speed of a moving web.

## PARTIES

1.      Kobayashi Ventures is a limited liability company organized and existing under

the laws of the State of Delaware with an office located in the Commonwealth of Virginia. The

business of Kobayashi Ventures is to manage, market, consult, develop, manufacture, create,

own, distribute, purchase, sell and/or license patents and other intellectual property.

2.      Papertech is a corporation organized and existing under the laws of Canada with

its principal place of business in North Vancouver, B.C., Canada, and sales and service offices

and operations in the United States of America. Papertech provides systems and equipment used

in the production of paper and other products.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

JURISDICTION AND VENUE

3.    Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. § 281. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000).

4.    This Court has personal jurisdiction over Papertech based upon a forum selection clause in the parties' contract.

5.    Venue is proper under 28 U.S.C. §1391 and 28 U.S.C. 1400(b).

FACTUAL ALLEGATIONS

6.    On or about December 10, 2007, by written assignment executed and delivered by Jacklin Associates, Inc. to Kobayashi Ventures, Kobayashi Ventures became, and now is, the owner, *inter alia*, of all right, title, and interest in and to such letters patent (previously and hereinafter referenced as "Kobayashi's Patented Technology"), having the exclusive right to make, use, sell, offer for sale, and import into the U.S. the following inventions:

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finnish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Attached hereto as Exhibit 1 and incorporated herein by reference is the Patent Assignment. Such Patent Assignment was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0844.

2

7.    On or about October 19, 2007, by written assignment executed and delivered by International Paper Company ("International Paper") to Jacklin Associates, Inc., Jacklin Associates, Inc. became the owner, *inter alia*, of all right, title, and interest in and to such letters patent (identified in ¶ 6 above), then having the exclusive right to make, use, and sell Kobayashi's Patented Technology. Attached hereto as <u>Exhibit 2</u> and incorporated herein by reference is the Patent Purchase Agreement, Exhibit D of which is the Assignment of Patent Rights. Such Assignment of Patent Rights was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0823.

8.    International Paper became the owner of all right, title, and interest in and to such letters patent (identified in ¶ 6 above) by virtue of assignment from each of the inventors to its predecessor company Champion International Corporation ("Champion"), which became International Paper through a merger. The inventors' assignment was executed March 2, 1995 and recorded in the Patent and Trademark Office on March 6, 1995 at Reel/Frame 007382/0557, and the merger document was executed December 31, 2000 and recorded in the Patent and Trademark Office on November 26, 2007 at Reel/Frame 020143/0440.

9.    On or about November 12, 1998, Papertech entered into a License Agreement with Champion (the "License Agreement"), acquiring patent rights to what is now known as Kobayashi's Patented Technology. Attached hereto as <u>Exhibit 3</u> and incorporated herein by reference is the License Agreement.

10.    The License Agreement provides, in pertinent part, as follows:

"Article III—Royalties"

LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

"Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for the $CV^2$ System.

"Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise used and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

Therefore:

<u>Royalty Due Per $CV^2$ System Sold to bona fide purchaser</u> = 0.05 x 1.10 x [Gross Price of Commercial Sale – Directly Incurred LICENSEE costs (packaging + transport + transport insurance + taxes + duties + third party commissions)]

11.    On July 31, 2000, Papertech made a five percent (5%) royalty payment under the above referenced License Agreement of $21,084.54, on $468,545.48 of sales, of which $274,362 were to the acquiring owner International Paper. Attached hereto as <u>Exhibit 4</u> and incorporated herein by reference is documentation of such payment.

12.    On August 23, 2000, Richard Stewart, Chief Counsel—Intellectual Property Department of International Paper (formerly of Champion) sent a letter to Papertech by its General Manager, Kari Hilden offering a "fully paid up license under the lump sum payment terms of the Honeywell-Measurex license" for the sum of $1.13 million. Attached hereto as <u>Exhibit 5</u> and incorporated herein by reference is this letter. Papertech did not accept this offer, and therefore did not acquire a fully paid up license. As a result, Papertech remained obligated, <u>inter alia</u>, to pay royalties pursuant to the License Agreement.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

13.     Papertech continues to this day to make, causes to be made, uses, sells, and offers for sale products embodying Kobayashi's Patented Technology.

14.     A number of times, beginning July 16, 2004 and thereafter on or about November 1, 2007, International Paper and Kobayashi Ventures, respectively, notified Papertech in writing of its failure to make royalty payments pursuant to the License Agreement.

15.     In a letter dated June 27, 2008 attached hereto as Exhibit 6, Kobayashi Ventures notified Papertech of its default under the License Agreement and gave Papertech an opportunity to cure by fulfilling its obligations under the License Agreement.

16.     Papertech responded to Kobayashi on November 6, 2007, stating in pertinent part that it had "no knowledge of a license agreement or any other agreement with Champion International Corporation including in particular, any agreement dated November 12, 1998." A copy of Papertech's response is attached hereto and incorporated herein as Exhibit 7. Papertech has since acknowledged the existence of the License Agreement, but purports to have terminated it, despite having expressly failed to do so in accordance with the terms of the License Agreement.

17.     At all times relevant hereto, Papertech has been obligated, among other things, to submit a semiannual report detailing all sales of systems incorporating Kobayashi's Patented Technology. Section 4.3 of the License Agreement states in part, "Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period." Upon information and belief, Papertech consistently has failed to file these mandatory reports.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

18.    Since September of 2000, Papertech by its own admission has installed over 250 WebVision systems in twenty four (24) countries worldwide.  It has utilized a network of over twenty-five (25) distributors, third-party representatives and licensees to do so.

<u>COUNT I</u>
Breach of License Agreement

19.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 1 through 19 above.

20.    Under the License Agreement, Papertech had contractual obligations to, among other things, make royalty payments pursuant to Articles III and IV and to maintain and make available pertinent records relating to license fee payments, royalties and the like pursuant to Article V.

21.    Papertech has materially breached the License Agreement by failing to perform as required by the License Agreement.

22.    Papertech's material breaches of the License Agreement proximately have caused damages to Kobayashi Ventures in an amount in excess of Seventy-Five Thousand Dollars to be determined at trial.

23.    Kobayashi Ventures and its predecessor Licensors duly have performed any and all duties required of Licensor under the License Agreement prerequisite to maintaining this lawsuit.

WHEREFORE, Counter-plaintiff, Kobayashi Ventures, L.L.C. respectfully requests that this Honorable Court grant to it damages in an amount to be determined at the close of discovery and currently projected to be in excess of Two Million Dollars ($2,000,000), pre-judgment

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

interest as allowable by applicable law, post-judgment interest, costs, and such other and further

relief as the Court deems just and proper.

By: _Jeffrey M. Schwaber by BG_

Jeffrey M. Schwaber
New York Bar No. 4529699
Stein, Sperling, Bennett, De Jong,
Driscoll & Greenfeig, P.C.
Attorneys for Plaintiff, Kobayashi Ventures, LLC
25 West Middle Lane
Rockville, MD 20850
Telephone: (301) 838-3210
Facsimile: (301) 354-8110
Email: jschwaber@steinsperling.com

## DEMAND FOR JURY TRIAL

Kobayashi Ventures, LLC elects a trial by jury of all issues and claims in this action.

_Jeffrey M. Schwaber by BG_

Jeffrey M. Schwaber

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 27th day of June, 2008, a copy of the foregoing was sent via electronic mail and first class mail, postage prepaid, to the following person(s):

J. Rick Taché
Janet Lynn Hickson
Snell & Wilmer, LLP
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

Oren J. Warshavsky
Jason S. Oliver
Elizabeth Weldon
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, New York  10174

Jeffrey M. Schwaber

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\drafts\418 Amended complaint - FINAL.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

# EXHIBIT 1

PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033,

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _10th_ day of _December_, 2007.

Jacklin Associates, Inc.

By: _John N Irwin_

On this _10_ day of _Dec_, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

_Nancy Vanning_
NOTARY PUBLIC

My Commission Expires: 

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and
continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all
license agreements and other entitlements to receive royalties to which Seller is a party with respect to the
patents ("Patent Materials").

# EXHIBIT 2

PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means  prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind  received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term.  Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.      Payments

2.1     Initial Payment.  Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2     Ongoing Payments.

        (a)     During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment").  The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b).  Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement.  When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied.  In the event that funds from Net Royalty Collections payable to Seller are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations.  In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

        (b)     During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

        As an example:

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

        2.3     Statements and Payments.  All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

       2.4   <u>Records</u>.     Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.     Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

       (i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing   rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

       (ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.     PARAGRAPH INTENTIONALLY DELETED

5.     Representations and Warranties of Seller

5.1     Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2     Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS". Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to. (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.    Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1    Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2    Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.    License

7.1    <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2    <u>No Other Rights</u>. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.    Miscellaneous

8.1    <u>Limitation of Liability</u>. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2    <u>Limitation on Consequential Damages</u>. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3     Compliance With Laws.   Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4     Confidentiality.   For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure.  Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5     Governing Law; Venue/Jurisdiction.   This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6     Notices.   All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services:  FedEx, U.S.P.S., DHL or UPS.

> If to Purchaser
> Jacklin Associates, Inc.
> Attention: President
> 259 North Radnor Chester Road
> Suite 210
> Wayne, Pennsylvania 19087

> If to Seller
> International Paper Company
> Attention:  Chief Counsel, Intellectual Property
> 6285 Tri-Ridge Blvd.
> Loveland, OH 45140

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal.  Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7     Severability.   If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8     Waiver. Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9     Successors and Assigns. Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit. Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect. All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    Independent Contractors. Seller and Purchaser are independent contractors. Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    Payment of Maintenance Fees. Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser. In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller. Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment. Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status. If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14 Revocation of Sale of Assigned Patents and Assigned Agreements. If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect. In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller. Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                                          PURCHASER:

International Paper Company                       Jacklin Associates, Inc.

By:_____                     By:_____

Name:_____                     Name:_____

Title:_____                   Title:_____


Effective Date:  August _____, 2007

EXHIBIT A

ASSIGNED AGREEMENTS

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

<u>ASSIGNED PATENTS</u>

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

<u>DELIVERABLES</u>

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

EXHIBIT D
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)    the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)    all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)    all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)    all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)    damages,
(ii)    injunctive relief, and
(iii)    any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at *Loveland, OH* on *10-19-2007*

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____

Name: *NORMAN MARSOLAN*

Title: *DIRECTOR, R&D*

(Signature MUST be notarized)

STATE OF *OHIO*        )
                       ) ss.
COUNTY OF *CLERMONT*   )

On *10-19-2007*, before me, *JANE A. TOMLINSON*, Notary Public in and for said State, personally appeared *NORMAN MARSOLAN*, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____        (Seal)



Jane A. Tomlinson
Notary Public, State of Ohio
My Commission Expires
June 19, 2012

TOTAL P.02

# EXHIBIT 3

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this  12th day November, 1998, among **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 and for and on behalf of itself and its successors and assigns (hereinafter referred to collectively and individually as "CHAMPION", or the "Party") and **PAPERTECH, INC.** a Canadian Corporation, having an office at Number 204-2609 Westview Drive, North Vancouver, B.C., Canada V7N 4M2 (hereinafter referred to as "LICENSEE" or the "Party").

## WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system described or claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of $CV^2$ System in each country, within six (6) months prior to the date of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of $CV^2$ System less thirty percent (30%) of such most favorable price, which cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6    "Subsidiary" shall mean:

1.6.1    Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2    Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7    "$CV^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single $CV^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed $CV^2$ System.

1.8    "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9    "Commercial Sale" shall mean the $CV^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the $CV^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10    "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If a $CV^2$ System is sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for such $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

## ARTICLE II-LICENSE GRANT

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (e.g. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1 and 3.2 and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale. Sales by LICENSEE to CHAMPION or a Subsidiary of CHAMPION under Article VIII also do not require a royalty payment hereunder.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    Within sixty (60) days of the termination of any Reporting Period, LICENSEE shall render to CHAMPION all royalty fees due and payable to CHAMPION on account of $CV^2$ Systems sold and accepted by the customer during such Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All

payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, value added taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority which LICENSEE shall be entitled to withhold and remit to such taxing authority.    LICENSEE shall deliver the original or to CHAMPION certified copies of receipts covering payment of any taxes to such taxing authority with the written report of paragraph 4.3 below.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based provided however, that acceptance shall be deemed if CHAMPION does not object to or question any account or statement within six (6) months of its receipt.

## ARTICLE V - RECORDS

5.1  LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder.  LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment. So as to avoid undue interference with LICENSEE's business, CHAMPION's rights of verification shall be exercised reasonably and in a manner that will not unduly interfere with LICENSEE's business and, in any event, not more than twice in any period of twelve (12) months.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the royalties due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize the $CV^2$ System. LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems.  In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all confidential information disclosed to a party (the "receiving party") by or through the other party (the "disclosing party"), including any confidential information obtained by receiving party visually through an inspection of any sample, device, document or like tangible thing submitted to the receiving party by or through the disclosing party or by observation at facilities of the disclosing party or the disclosing party's Subsidiaries excluding, however, such information which:

7.1.1    Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by the receiving party, or its employees; or

7.1.2    Had been independently developed by the receiving party or was otherwise in the receiving party's lawful possession prior to disclosure, as shown by written records or other reasonable evidence; or

7.1.3    Is hereafter lawfully disclosed to the receiving party by a third party which did not acquire the information under an obligation of confidentiality from or through the disclosing party; or

7.1.4    Is disclosed by the receiving party pursuant to judicial action or governmental regulation or requirement; provided that the receiving party shall notify the disclosing party of any order or request to disclose Information in sufficient time to allow the disclosing party a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to the receiving party shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to the receiving party shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2    During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, the receiving party shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that the receiving party employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the disclosing party by an authorized officer. Notwithstanding the foregoing, the receiving party may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of the receiving party assisting the receiving party in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of the receiving party under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed the receiving party's

standard employment agreement which the receiving party warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3    The receiving party shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of the disclosing party by an authorized officer.

7.4    The receiving party agrees that all documentary, electronic or like tangible Confidential Information, in any form including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through the disclosing party and documentary, electronic or like tangible Confidential Information which is generated by or for the receiving party which embodies or is based upon Confidential Information are and shall remain the exclusion property of the disclosing party, and the receiving party shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control. Promptly on termination or expiration  of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to the disclosing party.

### ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specifications, guarantees and warranties at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE TO USE THE $CV^2$ SYSTEM AND PATENT RIGHTS ON THE TERMS OF THIS LICENSE. CHAMPION REPRESENTS AND WARRANTS THAT IT HAS THE LAWFUL RIGHT TO ENFORCE PATENT RIGHTS TO THE EXTENT PROVIDED BY THE LAWS OF THE RELEVANT JURISDICTION TO PREVENT THE USE OF THE $CV^2$ SYSTEM BY PARTIES NOT AUTHORIZED BY CHAMPION TO USE IT. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT CV$^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE CV$^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR (I) ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, OR FOR (II) ANY PATENT INFRINGEMENT OR OTHER DISPUTES BETWEEN CHAMPION OR ITS SUBSIDIARIES AND THIRD PARTIES BASED UPON THE ACTIONS OF CHAMPION OR IT'S SUBSIDIARIES, OR FOR (III) ANY ACTS, NEGLIGENCE OR OMISSIONS OF CHAMPION OR ITS SUBSIDIARIES.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1   It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2   It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of CV$^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of

LICENSEE, and  CHAMPION shall not be responsible for any such activities.  LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of CV$^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

### ARTICLE XIV - PATENT MARKING

14.1   LICENSEE and Subsidiaries of LICENSEE shall mark all CV$^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

### ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1   Prior to marketing any CV$^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

### ARTICLE XVII - TERM AND TERMINATION

16.1   This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2   If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3   LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.4   No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

U/MCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                     11/12/98

9

16.5   In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6   If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7   Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

### ARTICLE XVII - SEVERABILITY

17.1   If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### ARTICLE XVIII - GOVERNING LAW

18.1   This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction. Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

### ARTICLE XIX - HEADINGS

19.1   The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

### ARTICLE XX - AGREEMENT MODIFICATION

20.1   Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

H/MCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                                    11/12/98

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.


If to CHAMPION:              For Business Matters:
                                        Champion International Corporation
                                        1 CHAMPION Plaza
                                        Stamford, CT 06921

                                        ATTN:        Richard Piela
                                                           Director, Capital Project
                                                           Support and MRO

                             For Legal Matters:
                                        Champion International Corporation
                                        1 Champion Plaza
                                        Stamford, CT 06921

                                        ATTN:        Richard C. Stewart, II
                                                           Chief Patent Counsel

If to LICENSEE:

                             For Business Matters:
                                        Patertech, Inc.
                                        #204-2609 Westview Drive
                                        North Vancouver, B.C.
                                        Canada V7N 4M2


                                        ATTN: Kari K. Hilden
                                                 General Manager

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

## ARTICLE XXII - ASSIGNABILITY

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this

U/MCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                                                   11/12/98

11

agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _____

Name: _____

Title: _____

PAPERTECH, INC.

By: _____

Name: KARL HILDEN

Title: PRESIDENT

**SCHEDULE A**

**PATENT RIGHTS**

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) Divisional of US Patent Application No. 08/829,231

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 12th day November, 1998, among **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 and for and on behalf of itself and its successors and assigns (hereinafter referred to collectively and individually as "CHAMPION", or the "Party") and **PAPERTECH, INC.** a Canadian Corporation, having an office at Number 204-2609 Westview Drive, North Vancouver, B.C., Canada V7N 4M2 (hereinafter referred to as "LICENSEE" or the "Party").

### WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "CV$^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell CV$^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1     "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2     "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3     "CV$^2$ System" shall mean the process monitoring system described or claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4     "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of CV$^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for CV$^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of CV$^2$ System in each country, within six (6) months prior to the date of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV$^2$ System less thirty percent (30%) of such most favorable price, which cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6    "Subsidiary" shall mean:

1.6.1    Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2    Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7    "CV$^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV$^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV$^2$ System.

1.8    "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9    "Commercial Sale" shall mean the CV$^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV$^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10    "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of CV$^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If a CV$^2$ System is sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for such CV$^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV$^2$ System.

## ARTICLE II-LICENSE GRANT

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the  System of said $CV^2$ System Installation (e.g. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1 and 3.2 and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.  Sales by LICENSEE to CHAMPION or a Subsidiary of CHAMPION under Article VIII also do not require a royalty payment hereunder.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    Within sixty (60) days of the termination of any Reporting Period, LICENSEE shall render to CHAMPION all royalty fees due and payable to CHAMPION on account of $CV^2$ Systems sold and accepted by the customer during such Reporting Period.  All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale.  All

U/MCKNIM\FARREL\AGREEMENT\LICENSE\PAPERTECH SECOND.DOC                    11/12/98

3

payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, value added taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority which LICENSEE shall be entitled to withhold and remit to such taxing authority.   LICENSEE shall deliver the original or to CHAMPION certified copies of receipts covering payment of any taxes to such taxing authority with the written report of paragraph 4.3 below.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based provided however, that acceptance shall be deemed if CHAMPION does not object to or question any account or statement within six (6) months of its receipt.

## ARTICLE V - RECORDS

5.1  LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder.  LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment. So as to avoid undue interference with LICENSEE's business, CHAMPION's rights of verification shall be exercised reasonably and in a manner that will not unduly interfere with LICENSEE's business and, in any event, not more than twice in any period of twelve (12) months.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the royalties due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize the CV$^2$ System.  LICENSEE shall promote and commercially exploit CV$^2$ System and satisfy the demand for said CV$^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems.  In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all confidential information disclosed to a party (the "receiving party") by or through the other party (the "disclosing party"), including any confidential information obtained by receiving party visually through an inspection of any sample, device, document or like tangible thing submitted to the receiving party by or through the disclosing party or by observation at facilities of the disclosing party or the disclosing party's Subsidiaries excluding, however, such information which:

7.1.1    Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by the receiving party, or its employees; or

7.1.2    Had been independently developed by the receiving party or was otherwise in the receiving party's lawful possession prior to disclosure, as shown by written records or other reasonable evidence; or

7.1.3    Is hereafter lawfully disclosed to the receiving party by a third party which did not acquire the information under an obligation of confidentiality from or through the disclosing party; or

7.1.4    Is disclosed by the receiving party pursuant to judicial action or governmental regulation or requirement; provided that the receiving party shall notify the disclosing party of any order or request to disclose Information in sufficient time to allow the disclosing party a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to the receiving party shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to the receiving party shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2    During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, the receiving party shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that the receiving party employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the disclosing party by an authorized officer. Notwithstanding the foregoing, the receiving party may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of the receiving party assisting the receiving party in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,   Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of the receiving party under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed the receiving party's

standard employment agreement which the receiving party warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3    The receiving party shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of the disclosing party by an authorized officer.

7.4    The receiving party agrees that all documentary, electronic or like tangible Confidential Information, in any form including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through the disclosing party and documentary, electronic or like tangible Confidential Information which is generated by or for the receiving party which embodies or is based upon Confidential Information are and shall remain the exclusion property of the disclosing party, and the receiving party shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or expiration  of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to the disclosing party.

<u>ARTICLE VIII - THE INSTALLATION OF CV² SYSTEM AT</u>
<u>FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES</u>

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the CV² System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of CV² System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the CV² System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available CV² System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of CV² System in addition to the said ten (10) units of the CV² System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a CV² System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All CV² System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specifications, guarantees and warranties at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for CV² System as of the date of sale or license of CV² System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a CV$^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the CV$^2$ System, publications pertaining to the CV$^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE TO USE THE CV$^2$ SYSTEM AND PATENT RIGHTS ON THE TERMS OF THIS LICENSE.  CHAMPION REPRESENTS AND WARRANTS THAT IT HAS THE LAWFUL RIGHT TO ENFORCE PATENT RIGHTS TO THE EXTENT PROVIDED BY THE LAWS OF THE RELEVANT JURISDICTION TO PREVENT THE USE OF THE CV$^2$ SYSTEM BY PARTIES NOT AUTHORIZED BY CHAMPION TO USE IT.  EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO CV$^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT CV² SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE CV² SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR (I) ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, OR FOR (II) ANY PATENT INFRINGEMENT OR OTHER DISPUTES BETWEEN CHAMPION OR ITS SUBSIDIARIES AND THIRD PARTIES BASED UPON THE ACTIONS OF CHAMPION OR IT'S SUBSIDIARIES, OR FOR (III) ANY ACTS, NEGLIGENCE OR OMISSIONS OF CHAMPION OR ITS SUBSIDIARIES.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1 It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of CV² System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of

LICENSEE, and CHAMPION shall not be responsible for any such activities. LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE  of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

### ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction. Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

### ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

### ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:            For Business Matters:
                                  Champion International Corporation
                                  1 CHAMPION Plaza
                                  Stamford, CT 06921

                                      ATTN:        Richard Piela
                                                        Director, Capital Project
                                                        Support and MRO

                                  For Legal Matters:
                                  Champion International Corporation
                                  1 Champion Plaza
                                  Stamford, CT 06921

                                      ATTN:        Richard C. Stewart, II
                                                        Chief Patent Counsel

If to LICENSEE:

                                  For Business Matters:
                                  Patertech, Inc.
                                  #204-2609 Westview Drive
                                  North Vancouver, B.C.
                                  Canada V7N 4M2

                                      ATTN: Kari K. Hilden
                                          General Manager

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

## ARTICLE XXII - ASSIGNABILITY

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this

agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

## ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

## ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _____

Name: _____

Title: _____

PAPERTECH, INC.

By. _____

Name: KARL HILDEN

Title: PRESIDENT

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) Divisional of US Patent Application No. 08/829,231

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

# EXHIBIT 4

# INTERNATIONAL  PAPER

**INTERNAL MEMORANDUM**

STAMFORD OFFICE
LEGAL DEPARTMENT

PHONE (203) 358-7681                                                   FAX (203) 358-2941

TO : Christa Ryan                                    DATE : August 16, 2000
FROM : Elaine Wilson,                                CC :
         Sr. Administrative Assistant
SUBJECT : Royalty Payment

Enclosed please find a check in the amount of $21,084.54, representing a royalty payment from Papertech for the $CV^2$ patent license. Please deposit same into our account number 1002-0000-80184.

— Elaine

# papertech

Papertech Inc., #301 - 2659 Westview Drive, North Vancouver, B.C. Canada V7N 4M2
Telephone: (604) 990-1600, FAX (604) 990-1606

THE ROY... ...K OF CANADA
North Shore Region ...usiness Banking Centre
1789 Lonsdale Avenue
North Vancouver, B.C. V7M 2J6

331

3310

U.S. DOLLAR AMOUNT    CHEQUE NO.

PAY    Twenty One Thousand Eighty Four ———————————————————————————54/100
TO THE    Amount in United States Dollar
ORDER OF

Champion International Corp.
One Champion Plaza
Stamford, Connecticut U.S.A. 06921

DATE 7/31/00    US$***AMOUNT 21,084.54 USD

U.S. FUNDS

PER

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK · HOLD AT AN ANGLE TO VIEW

⑈003310⑈ ⑈04000⑈003⑈    400⑈149⑈1⑈

PAPERTECH INC.

Champion International Corp.                    7/31/00                    CHEQUE NO.    331(
                                                                            3310
Royalties2.................................21,084.54

See attached Calculation Sheet.

 **papertech**

Date: July 31, 2000

Champion International Corp. (IP)
One Champion Plaza
Stamford, Connecticut  U.S.A.
06921

**RECEIVED**

AUG 1 4 2000

**PATENT DEPT.**

**Attention:  Rich Stewart**

---

**Subject:    Champion (IP) – Royalty Payment #2**

**IP – Ticonderoga**
  $69,525.00 x 5% = $3,476.25 less 10% Tax withholding =          $ 3,128.62

**Pacifica Papers – Pt. Alberni**
  $93,038.84 x 5% = $4,651.94 less 10% Tax withholding =          $ 4,186.75

**IP – Riegelwood**
  $150,000 x 5% = $7,500.00 less 10% Tax withholding =            $ 6,750.00

**IP – Lockhaven**
  $54,837.00 x 5% = $2,741.85 less 10% Tax withholding =          $ 2,467.66

**Smurfit-Stone – NB**
  $47,811.64 x 5% = $2,390.58 less 10% Tax withholding =          $ 2,151.52

**Westvaco, Wickliffe, KY**
  $53,333.00 x 5% = $2,666.65 less 10% Tax withholding =          $ 2,399.99

                                        **Total Payment**        $21,084.54
                                        Cheque #3310
                                        Dated July 31/00

**Sincerely,**

Darlene Hildén,
Director of Finance & Administration
**Papertech Inc.**

---

Papertech Inc., #301 – 2609 Westview Dr., North Vancouver, B.C., Canada, V7N 4M2, phone: 604/990-1600, fax: 604/990-1606
E-mail: info@papertek.com – Website: http://www.papertek.com

# EXHIBIT 5



# INTERNATIONAL PAPER

RICHARD C. STEWART, II
CHIEF COUNSEL - INTELLECTUAL PROPERTY
PHONE        (845) 577-7312
FACSIMILE    (845) 577-7403

1422 LONG MEADOW ROAD
TUXEDO, NY 10987
E-MAIL STEWART@CHAMPINT.COM

August 23, 2000

VIA DHL
Karl K. Hilden, General Manager
Papertech, Inc.
204 - 2609 Westview Drive
North Vancouver, BC V7N 4M2
CANADA

Re:    Papertech, Inc. License Agreement/CV² Process Monitoring System

Dear Mr. Hilden:

Article 12.1 of the License Agreement between Champion International Corporation ("Champion") and Papertech, Inc. ("Papertech") states that:

> "If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms."

Champion has granted a fully paid up license to Honeywell-Measurex. In consideration, Honeywell-Measurex paid to Champion a lump sum payment of $1.13 million.

It is not clear to me that the lump sum payment terms of the Honeywell-Measurex license are more favorable to the licensee than the running royalty terms of the Papertech license. However, if that is Papertech's position and if Papertech desires a fully paid up license under the lump sum payment terms of the Honeywell-Measurex license, please so indicate as specified in the license and I will raise the issue with my management for consideration.

Very truly yours,

Richard C. Stewart, II /ew

Richard C. Stewart, II
Chief Counsel - Intellectual Property Dept.

RCS/ew
g:\legal\11wilsbellegrlst\hilden.ltr

# EXHIBIT 6

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN*
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
MONICA G. HARMS*
ANN G. JAKABCIN*
DARLA J. MCCLURE*
JEFFREY M. SCHWABER*
KAREN N. SHAPIRO*
DARCY A. SHOOP*
DONALD N. SPERLING*
PAUL T. STEIN*

MD., DC., VA., NY., CA.e
MD., DC., VA., NY., FL.+
MD., DC., VA., NY.*
MD., DC., PA., NJ.□
MD., DC., MA.Φ
MD., DC., NY.∝
MD., DC., VA.♦
MD., VA., NC.*
MD., DC.*
MD., VA.μ
MD. ONLY.*

RONALD M. BOLT*
ADAM J. COHEN*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III∝
WILLIAM G. DUNLAP*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN*
LOUIS M. LEIBOWITZ◊
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY*
MARY CRAINE LOMBARDO□
NEVEEN H. MCLEOD*
NINDIYA G. RAMCHANDANI*
DIEGO J. ROJAS*
ANDREW L. SCHWARTZ μ
SOLOMON M. STERENBERGε
ALISON C. WEINBERG*

OF COUNSEL:
KEVIN P. FAY*
BETH McINTOSH IRVING*
ALAN S. KERXTON*
DEANNA L. PETERS*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER
2071656-7

June 27, 2008

***VIA FEDERAL EXPRESS & FIRST CLASS MAIL***
J. Rick Taché
Janet Lynn Hickson
Snell & Wilmer, LLP
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

Oren J. Warshavsky
Jason S. Oliver
Elizabeth Weldon
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

RE:    *Default Notice to PT Papertech, Inc. ("Papertech") from Kobayashi Ventures, LLC*

Dear Counsel:

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation ("Champion") pursuant to that certain license agreement between Papertech and Champion dated November 12, 1998 (the "License Agreement").

Counsel
June 27, 2008
Page 2

Papertech was advised in writing on July 16, 2004, that they were in breach of the License Agreement, and that royalty payments should be made forthwith. Since that time, Papertech has not made any efforts to reconcile its responsibilities under the License Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Papertech is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the License Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter, absent a timely cure by Papertech.

Please note that pursuant to §16.5 of the License Agreement, upon termination, Papertech must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717, 456

U.S. Patent No. 5,821,990

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

Counsel
June 27, 2008
Page 3

As made clear in §16.4, upon termination, Papertech remains obligated, *inter alia*, for the royalty payments which have accrued prior to the effective date of termination.


  Absent a timely cure of Papertech's defaults, Papertech must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Papertech customer's use of the referenced licensed Technology for any purpose.  Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

  Thank you for your anticipated cooperation and for your immediate attention to this matter.

        Very truly yours,

        Jeffrey M. Schwaber

JMS:lml
cc:  Kobayashi Ventures, LLC
L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\correspondence\418 default notice ltr.doc

# EXHIBIT 7

# Lang Michener LLP

Lawyers - Patent & Trade Mark Agents

Vancouver
Toronto
Ottawa

1500 - 1055 West Georgia Street, P.O. Box 11117
Vancouver, British Columbia, Canada V6E 4N7
Telephone (604) 689-9111
Facsimile (604) 685-7084

File Number:    52646-0003

Web site: www.langmichener.com

Direct Line: (604) 691-7427
E-Mail: kgustafson@lmls.com

November 6 , 2007

Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
Attorneys at Law
25 West Middle Lane
Rockville, Maryland, USA
20850-2204

Attention:    Jeffrey M. Schwaber

Dear Sirs/Mesdames:

**Claim by Kobayashi Ventures, LLC for Royalty Payments**

We refer to your letter dated November 1, 2007 addressed to Kari Hilden, President of
Papertech Inc.  Mr. Hilden has asked us to respond on his behalf to your letter.

We have no knowledge of a license agreement or any other agreement with Champion
International Corporation including in particular, any agreement dated November 12, 1998.
Accordingly, we would be grateful if you would please provide a copy of the license
agreement to which you refer.  Thank you.

Yours truly,

Karl E. Gustafson, Q.C.
for **Lang Michener LLP**

KEG/

cc. Kari Hilden

*A member of*
**TerraLex**
The World's Network of Independent Law Firms

1944439.1